## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

JOSEPH J. GIACALONE, JR. )
 )
  Plaintiff, )
 ) Case No. 08-CV-2670
v. )
 ) Hon. George M. Marovich
RESURRECTION MEDICAL CENTER and )
ILLINOIS COLLECTION SERVICE, INC., ) Mag. Judge Susan E. Cox
 )
  Defendants. )
 )
 )

## RESURRECTION MEDICAL CENTER'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS

### INTRODUCTION

Resurrection Medical Center ("Resurrection") is a not-for-profit health system located on the northwest side of Chicago.  Resurrection, affiliated with the Catholic Church, strives to provide compassionate, family health care to the greater Chicago area.  Plaintiff is a *pro se* attorney who, after failing to pay for medical services provided by Resurrection, brings this claim against Resurrection and Illinois Collection Service, Inc. ("ICS" and collectively with Resurrection, the "Defendants") arising out of their attempts to obtain payment for the services. Plaintiff's prolix nine-count Complaint should be dismissed for the following reasons:[1]

- **Count I (Illinois Consumer Fraud and Deceptive Business Practices Act)**: (i) the claim is preempted by the Fair Credit Reporting Act; (ii) the complained of conduct was not unfair or deceptive; and (iii) Plaintiff could not have been deceived when he knew the truth;

- **Count II (Illinois Uniform Deceptive Trade Practices Act)**:  (i) the claim is preempted by the Fair Credit Reporting Act; (ii) the complained of conduct does not fall within the purview of this act; and (iii) the statute does not permit a private cause of action for damages;

- **Count III (Fair Credit Reporting Act)**:  Plaintiff lacks standing to bring a private cause of action because enforcement is limited to governmental entities;

---

[1] In addition to the listed substantive reasons, the Complaint should be dismissed because it is prolix.  *See Vicom, Inc. v. Harbridge Merchant Services, Inc.* 20 F.3d 771, 776 (7th Cir. 1994) (explaining that prolix complaints violate the fundamental purpose of FED. R. CIV. P. 8 because of the burden such complaints impose upon the court and defendants to decipher the allegations and claims).

- **Count IV (Defamation)**: (i) the claim is preempted by the Fair Credit Reporting Act; (ii) Plaintiff does not plead actual damages with particularity; and, alternatively (iii) a substantial portion of the claims are barred by the one-year statute of limitations;

- **Count V (Tortious Interference with Prospective Economic Advantage)**: (i) the claim is preempted by the Fair Credit Reporting Act; (ii) Plaintiff has not and cannot allege any reasonable expectation of entering into a valid business relationship with a financial institution; (iii) the allegations demonstrate that Resurrection did not engage in any conduct directed toward a party with whom Plaintiff allegedly had a valid expectancy; (iv) the Complaint does not allege that Resurrection acted with malice;

- **Count VI (Intentional Infliction of Emotional Distress)**: Resurrection's alleged conduct is not outrageous enough to state a claim;

- **Count VII (Negligent Infliction of Emotional Distress)**:  (i) Resurrection did not owe a duty to the Plaintiff; and (ii) the alleged conduct fails to state a claim for negligence;

- **Count VIII (Fraud)**:  (i) Plaintiff fails to allege any material misstatements of fact made to him; (ii) Plaintiff did not reasonably rely upon any alleged misstatements of fact because he knew the truth; and (iii) to the extent the allegations relate to reporting credit information, the claim is preempted by the Fair Credit Reporting Act.[2]

### STATEMENT OF THE PERTINENT ALLEGATIONS

The Complaint appears to rest on three separate occasions where Plaintiff received medical care at Resurrection. (*See* Verified Complaint at Law ("Compl.") at ¶ 28.)  Plaintiff was allegedly treated on March 9, 2005, for which he was billed $1,143.00. (*Id.*)  On April 7, 2005, however, Plaintiff filed for bankruptcy protection pursuant to Chapter 7 of the Bankruptcy Code and he allegedly received a discharge on July 26, 2005. (*Id.* at ¶¶ 4 & 11.)  Plaintiff claims that, after he filed bankruptcy, Resurrection attempted to collect payment for the medical services that it rendered to Plaintiff and then placed the account for collection with ICS. (*Id.* at ¶¶ 7, 8, 9, 28 & 33.)  Plaintiff also contends that this account was erroneously reported to the credit bureaus. (*Id.* at ¶ 10.)  Although Plaintiff now asserts (three years later) that Defendants violated the automatic stay, he apparently did not raise those allegations before the bankruptcy court.

Plaintiff alleges that he again received medical treatment at Resurrection on November 25, 2005. (*Id.* at ¶ 28.)  Resurrection billed him $2,138.35 for those services without first contacting his insurance company. (*Id.* at ¶ 17.)  He further alleges that once the insurance was

---

[2]    Count IX is not asserted against Resurrection and, therefore, is not addressed in this motion to dismiss.

reconciled, he only owed $273.71.  (*Id.*)  According to Plaintiff, Resurrection incorrectly told ICS that Plaintiff owed $2,138.35 instead of $273.71 and ICS then allegedly reported it to the credit bureaus.  (*See id.* at ¶¶ 15–21, 28, 46 & 64.)

Finally, on April 13, 2006, Plaintiff was treated at Resurrection.  (*Id.* at ¶¶ 18 & 28.) According to the Complaint, Resurrection billed Plaintiff $99.27 for those services.  (*Id.*) Plaintiff alleges that in July 2006, he paid Resurrection approximately $880.00; however, he insists that he did not actually owe $880.00 because $417.45 of it was discharged in bankruptcy. (*Id.* at 19.)  Furthermore, Plaintiff contends that, although the payment was in full satisfaction of the $99.27 bill, Resurrection allegedly placed that account for collection with ICS, who then supposedly reported that account to the credit bureaus.  (*Id.* at ¶¶ 20 & 21.)

## ARGUMENT

### I.     STANDARDS FOR DISMISSAL

To survive a motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6), a complaint must aver "more than labels and conclusions, and a formulaic recitation of a cause of actions' elements will not do."  *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1959 (2007).  Rather, the complaint must contain factual allegations sufficient to "raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true."  *Id.*  If a complaint does not assert factual allegations rising above the speculative level, the complaint must be dismissed.  *See E.E.O.C. v. Concentra Health Services, Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (a complaint's "allegations must plausibly suggest that the plaintiff has a right to relief, raising that possibility above a 'speculative level'; if they do not, the plaintiff pleads itself out of court.").

### II.    COUNTS I, II, IV, V AND VIII SHOULD BE DISMISSED BECAUSE THEY ARE PREEMPTED BY THE FAIR CREDIT REPORTING ACT.

#### A.     <u>Section 1681t of FCRA Preempts Counts I, II, V and VIII.</u>

Section 1681s-2 of the Fair Credit Reporting Act ("FCRA") governs the duties and responsibilities of persons or entities that report credit information.  *See generally* 15 U.S.C. 1681s-2.  Section 1681t(b)(1)(F) of FCRA ("Section 1681t") expressly preempts state law claims that come within the purview of Section 1681s-2:

> No requirement or prohibition may be imposed under the laws of
> any State—

(1) with respect to any subject matter regulated under—

\*     \*     \*

(F)    **section 1681s-2 of this title**, relating to the responsibilities of persons who furnish information to consumer reporting agencies. . .

15 U.S.C. § 1681(t)(1)(F) (emphasis added).  Thus, pursuant to this provision, when a state law claim is predicated upon conduct that also forms the basis of a claim under Section 1681s-2, the state law claim is preempted.  *See Hukic v. Aurora Loan Services, Inc.*, No. 05-C-4950, 2007 WL 2563363, at \*11 (N.D. Ill. Aug. 31, 2007) (holding that plaintiff's tortious interference with prospective economic advantage claim was preempted by FCRA when the tort claim was predicated upon alleged "intentional and unjustified reports to credit agencies that interfered with [the plaintiff's] prospective third-party relationships with prospective lenders."); *see also Brown v. Bank One Corp.*, No. 01-C-4698, 2002 WL 31654950, at \*3 (N.D. Ill. Nov. 22, 2002) (dismissing a claim brought pursuant to the Illinois Consumer Fraud and Deceptive Business Practices Act, finding that it was preempted by FCRA).[3]

In this case, Count I (Illinois Consumer Fraud and Deceptive Business Practices Act), Count II (Illinois Uniform Deceptive Trade Practices Act), and Count V (tortious interference with prospective economic advantage) are entirely predicated upon allegations that Resurrection made false reports of credit information and are identical to the allegations that form the basis of Count III, in which Plaintiff claims that Resurrection violated Section 1681s-2.  (*See* Compl. at ¶¶ 35, 37, 44–46, 50-52, 74–76.)  Therefore, these claims are preempted by FCRA.  Also, in Count VIII (fraud), Plaintiff contends that Resurrection made a material misrepresentation of fact by reporting false credit information.  (*See* Compl. at ¶ 87.)  As those allegations fall within the purview of Section 1681s-2, they too are preempted by FCRA.

**B.    Section 1681h(e) of FCRA Preempts Counts IV.**

Count IV, which purports to bring a claim for defamation, is preempted by 15 U.S.C. § 1681h(e), which states:

Except as provided in sections 1681n and 1681*o* of this title, no consumer may bring any action or proceeding in the nature of **defamation**, invasion of privacy, or negligence with respect to the reporting of information against any consumer reporting agency, any user of information, or any person who furnishes information

---

[3]    For the convenience of the Court, copies of all unpublished decisions cited in this motion are attached hereto, in order of citation, as **Exhibit 1**.

> to a consumer reporting agency, based on information disclosed
> pursuant to section 1681g, 1681h, or 1681m of this title, or based
> on information disclosed by a user of a consumer report to or for
> a consumer against whom the user has taken adverse action,
> based in whole or in part on the report except as to false
> information furnished with malice or willful intent to injure such
> consumer.

15 U.S.C. § 1681h(e) (emphasis added).   Pursuant to this provision, claims in the nature of defamation will be preempted unless the plaintiff alleges that the "defendant acted maliciously or willfully intended to injure the plaintiff." *Nwoke v. Countrywide Home Loans*, No. 07-2233, 2007 WL 3037118, at *2 (7th Cir. Oct. 17, 2007) (finding that the Fair Credit Reporting Act preempts state-law claim for negligence when that claim related to providing inaccurate information to credit-reporting agencies) (citing *Young v. Equifax Credit Information Services, Inc.*, 294 F.3d 631, 638 (5th Cir. 2002) and *Thorton v. Equifax, Inc.*, 619 F.2d 700, 703 (8th Cir. 1980)).

In this case, Plaintiff fails to allege facts that Resurrection maliciously intended to injure Plaintiff.   Accordingly, Plaintiff's defamation claim is preempted by Section 1681h(e) of FCRA.[4]

## III.   EACH OF PLAINTIFF'S CLAIMS SHOULD BE DISMISSED FOR OTHER REASONS.

### A.   Count I (Illinois Consumer Fraud and Deceptive Business Practices Act) Fails Because the Complained of Conduct Was Not Unfair or Deceptive.

To state a claim under the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILL. COMP. STAT. 505/1 *et seq.* ("ICFA"), Plaintiff must plead facts supporting the following elements: (1) a deceptive or unfair act or practice; (2) intent by the defendant that the plaintiff rely on the deception or unfair practice; (3) the deception or unfair practice occurred in the course of conduct involving trade or commerce; and (4) the plaintiff's injury was proximately caused by the complained of deceptive or unfair conduct.   *See Rockford Mem. Hosp. v. Havrilesko*, 368 Ill. App. 3d 115, 121 (2d Dist. 2006).

---

[4]      Plaintiff also alleges that Resurrection violated the automatic stay in bankruptcy, as set forth in 11 U.S.C. § 362, by sending Plaintiff bills after he filed for personal bankruptcy protection.  (*See, e.g.,* Compl. at ¶¶ 4–9, 33, 34, 37, 38, 45, 61, 62, 74, 79 & 83.)  Suits to enforce alleged violations of the automatic stay, however, must be brought in the United States Bankruptcy Court because it has *exclusive* jurisdiction over such claims.  *See Halas v. Platek*, 239 B.R. 784, 792 (N.D. Ill. 1999) (holding that bankruptcy courts have exclusive jurisdiction to adjudicate issues regarding violations of the automatic stay).  Accordingly, such allegations, even if true, do not state a claim in this court.

Moreover, to establish a claim for deceptive acts under the ICFA, the Plaintiff must demonstrate that he actually relied upon the alleged deceptive acts. *See Gros v. Midland Credit Mgmt.*, 525 F. Supp. 2d 1019, 1025 (N.D. Ill. 2007) (citing *Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill. 2d 100 (2005)) (dismissing an ICFA claim where plaintiff averred that he disputed the debt and, therefore, admitted that he was not actually deceived). Furthermore, when considering whether action is "unfair" under the ICFA, a court will look at three factors: "(1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; and (3) whether it causes substantial injury to consumers." *Galvan v. Northwestern Mem. Hosp.*, ___ N.E.2d ___, 2008 WL 1790436, at *4 (1st Dist. Apr. 14, 2008) (citing *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 417–18 (2002)).

In this case, Plaintiff asserts that Resurrection violated the ICFA by allegedly sending invoices in violation of the automatic stay in bankruptcy and improperly placing accounts for collection with ICS. (*See* Compl. at ¶¶ 33, 34 & 35.) These allegations cannot state a claim because Plaintiff allegedly knows the truth and, thus, could not be deceived. Indeed, Plaintiff admits that he did not rely upon the alleged deceptive acts to his detriment because he repeatedly disputed that he owed on the accounts. (*See* Compl. at ¶¶ 10, 13, 14–17, 20, 22, 23 & 26.) Thus, as in *Gros*, Plaintiff cannot state a claim for a deceptive act that violates the ICFA.

Similarly, Resurrection did not engage in unfair conduct. In the Complaint, Plaintiff simply recites the law and states the legal conclusion that Resurrection's conduct was unfair. Moreover, the Complaint sets forth no allegations that Plaintiff (or consumers as a whole) suffered substantial injury. In fact, the Complaint does not even identify any particular injury that Plaintiff suffered—let alone a substantial injury. Accordingly, the Complaint does not state a claim for an unfair practice in violation of FCRA and, as such, Count I must be dismissed.

**B.    Count II (Illinois Uniform Deceptive Trade Practices Act) Should Be Dismissed Because Resurrection's Conduct is Not Within the Purview of the Act and the Statute Does Not Permit a Cause of Action for Damages.**

The Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. 510/1 *et seq.* ("IUDTPA"), states, in pertinent part:

> (a) A person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation, the person:

> \*        \*        \*

> (8) disparages the goods, services, or business of another by false or misleading representation of fact;

\*     \*     \*

(12) engages in any other conduct which similarly creates a
likelihood of confusion or misunderstanding.

815 ILL. COMP. STAT. 510/2(a).  For a violation of the IUDTPA to occur, either the defendant must make some public communication regarding the victim's goods or services that is false, misleading, or deceptive, or the plaintiff must show a likelihood of consumer confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services. *See Associated Underwriters of America Agency, Inc. v. McCarthy*, 356 Ill. App. 3d 1010, 1069 (1st Dist. 2005) (defendant must make public communication regarding victim's goods or services); *see also Neopost Industrie B.V. v. PFE Int'l, Inc.*, 403 F. Supp. 2d 669, 685 (N.D. Ill. 2005) (plaintiff must show a likelihood of consumer confusion).

Moreover, it is well settled that the statute does not grant standing to bring a cause of action for damages; rather, the statute only permits injunctive relief.  *See* 815 ILL. COMP. STAT. 510/3 ("[a] person likely to be damaged by a deceptive trade practice of another may be granted injunctive relief upon terms that the court considers reasonable."); *Greenberg v. United Airlines, Inc.*, 206 Ill. App. 3d 40, 46 (1st Dist. 1990) ("[t]he Act does not provide a cause of action for damages, but it does permit private suits for injunctive relief.

Here, the Complaint does not set forth ***any*** allegations that Resurrection disparaged Plaintiff's goods or services, or somehow caused consumer confusion with respect to the source of goods or services; rather, it is clear that this case simply revolves around a billing dispute between a medical services provider and its patient.  Accordingly, Plaintiff's allegations do not fall within the purview of the IUDTPA.  Furthermore, the IUDTPA claim should be dismissed because Plaintiff ***only*** seeks monetary damages, which is not permitted under the statute.  (*See* Compl. at ¶¶ 42–48; *see also* Compl. at p. 22 (*ad damnum* clause for Count II seeking actual damages, punitive damages, costs and fees).)

**C.    Count III (Fair Credit Reporting Act) Should Be Dismissed Because Plaintiff Lacks Standing.**

In Count III, Plaintiff purports to bring an action against Resurrection for violations of Section 1681s-2(a) of FCRA, which governs the responsibilities of furnishers of information to consumer reporting agencies.[5]   Under this section, furnishers of information generally have a

---

[5]    For purposes of this motion only, Resurrection takes Plaintiff's allegation as true that it is a furnisher of information for purposes of FCRA.  (*See* Compl. at ¶ 52.)

duty to provide accurate information to credit reporting agencies. *See generally* 15 U.S.C. § 1681s-2(a). The liability and enforcement of the duties set forth in Section 1681s-2(a), however, are expressly limited by Sections 1681s-2(c) and (d). Section 1681s-2(c) provides that Sections 1681n and 1681*o* (which are the only sections of FCRA that permit civil liability) *do not* apply to any violation of Section 1681s-2(a). *See* 15 U.S.C. § 1681s-2(c) ([e]xcept as provided in section 1681(c)(1)(B) of this title, sections 1681n and 1681*o* of this title do not apply to any violation of: (1) subsection (a) of this section, including any regulations issued thereunder."). In addition, pursuant to Section 1681s-2(d), violations of Section 1681s-2(a) "shall be enforced exclusively . . . by the Federal agencies and officials and the State officials identified in section 1681s of this title." 15 U.S.C. § 1681s-2(d).

In this case, Plaintiff contends that Resurrection violated Section 1681s-2(a) by reporting false information. (*See, e.g.,* Compl. at ¶¶ 49–52.) Based on the clear statutory language, however, Plaintiff may not bring a private cause of action against Resurrection under Section 1681s-2(a). Accordingly, Plaintiff's FCRA claim should be dismissed with prejudice.

### D.     Count IV (Defamation) Should Be Dismissed Because Plaintiff Has Not Pled Actual Damages With Particularity and, Alternatively, a Substantial Portion of the Claims Are Barred by the 1-Year Statute of Limitations.

#### 1.     *Plaintiff Has Not Pled Actual Damages With Particularity.*

To state a claim for defamation, Plaintiff must allege facts supporting the following elements: (1) a false assertion of fact about plaintiff; (2) publication by the defendant to a third party; and (3) injury to the plaintiff's reputation. *See Dry Enterprises, Inc. v. Sunjut As*, No. 07-C-1657, 2008 WL 904902, at *5 (N.D. Ill. Mar. 31, 2008); *see also Chambers v. The Habitat Company*, No. 99-C-2095, 2001 WL 1104615, at *8 (N.D. Ill. Sept. 18, 2001) (dismissing defamation claim because the plaintiff "fail[ed] to state the substance of the defamation either with regard to the rumors or the damage to her credit report."). In Illinois, a plaintiff may "proceed on a theory of defamation *per se* (if the harm caused by defendant's statements is so obvious that damages may be presumed) or defamation *per quod* (if extrinsic facts are needed to prove the defamatory nature of the defendant's statement)." *Gros*, 525 F. Supp. 2d at 1025.[6]

---

[6]     Defamation *per se* "is limited to statements regarding (1) commission of a criminal offense; (2) infection with a venereal disease; (3) inability to perform or want of integrity in the discharge of duties of public office; (4) fornication or adultery; and (5) words that prejudice a party in her trade, profession, or business." *Gros*, 525 F. Supp. 2d at 1025. In this case, Plaintiff does not assert any allegations that Resurrection made any purported statements that fall within these very limited categories. Accordingly, Plaintiff can only proceed (if at all) under a theory of defamation *per quod*.

To assert a cause of action for defamation *per quod*, the plaintiff must allege actual damages with particularity. *Id.* at 1026–27 (dismissing defamation claim against a company who allegedly falsely reported credit information when plaintiff only made general allegations of out-of-pocket losses and emotional distress); *see also Taradash v. Adelet/Scott-Fetzer Co.*, 260 Ill. App. 3d 313, 318 (1st Dist. 1993) ('[g]eneral allegations of damages, such as damages to an individual's health or reputation or general economic loss, are insufficient to state a claim of defamation *per quod*.").

In this case, Plaintiff asserts that Resurrection reported erroneous debts to ICS for collection. (*See* Compl. ¶¶ 61–65.)   Based on that alleged conduct, Plaintiff makes the conclusory and unsubstantiated allegation that he suffered damages in the form of "loss of credit, refusal to extend credit to the plaintiff, an impaired good name and reputation, injuries to plaintiff's psyche, emotional distress, severe blows to plaintiff's self-worth and self-confidence, and humiliation and embarrassment every time plaintiff was rejected for credit." (*Id.* at ¶ 70.) As in *Gros*, those generalized allegations are insufficient to allege actual damages with particularity. *Gros*, 525 F. Supp. 2d at 1026.  Accordingly, Plaintiff's defamation claim should be dismissed.

### 2.      Plaintiff's Defamation Claim is Substantially Barred by the 1-Year Statute of Limitations.

The statute of limitations for a defamation claim in Illinois is one year. *See* 735 Ill. Comp. Stat. 5/13-201.  Here, Plaintiff's defamation claim is predicated upon allegations that Resurrection reported false accounts to ICS on the following dates: July 8, 2005 (Compl. ¶ 9); August 8, 2005 (Compl. ¶ 12); July 28, 2006 (Compl. ¶ 21); July 31, 2006 (Compl. ¶¶ 46 & 64); and July 2, 2007 (Compl ¶ 47).  Plaintiff filed the Complaint on March 17, 2008—therefore, all but the alleged July 2, 2007 report are barred by the statute of limitations.  Thus, the defamation claim should be dismissed with respect to all conduct occurring prior to July 2, 2007.

### E.      Count V (Tortious Interference with Prospective Economic Advantage) Should Be Dismissed Because Plaintiff Has Not and Cannot Plead Any Facts Supporting Any Element of the Claim.

To state a claim for tortious interference with prospective economic advantage, Plaintiff must demonstrate: "(1) the plaintiff's reasonable expectation of entering into a valid business relationship; (2) the defendant's knowledge of plaintiff's expectancy; (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectancy from being fulfilled; and (4)

damages to the plaintiff resulting from such interference." *International Star Registry of Illinois v. ABC Radio Network, Inc.*, 451 F. Supp. 2d 982, 992 (N.D. Ill. 2006).  Moreover, it is "well established that the assertedly tortious interference allegedly committed by the defendant must be directed toward the third party or parties with whom the plaintiff had the business expectancy— not simply toward the plaintiff."  *Id.* at 992.  In addition, the Plaintiff must allege that the defendant acted with actual malice, and failure to do so mandates dismissal.  *See, e.g., id.* (dismissing tortious interference claim due to the plaintiff's failure to allege any facts substantiating actual malice).

In *Schaffner v. U.S. Bank, N.A.*, the plaintiff brought a claim for, *inter alia*, tortious interference based on allegations that the defendant improperly reported adverse credit information to the credit bureaus.  *Schaffner v. U.S. Bank, N.A.*, No. 02-C-8062, 2004 WL 783352, at *2 (N.D. Ill. Jan . 20, 2004).  In dismissing the claim, the court explained:

> U.S. Bank argues that plaintiffs have failed to allege the first, second, and third elements of this tort. We agree.  The amended complaint does not expressly allege that plaintiffs had a reasonable expectancy of receiving the additional financing, nor does it allege facts indicating that this was the case.  The allegation that plaintiffs *applied* for financing is not sufficient to allege that they reasonably expected to receive the financing. Moreover, plaintiffs do not allege that U.S. Bank knew of the Schaffners' application for additional financing or that U.S. Bank purposefully interfered with the financing.  Because Count II fails to allege three of the four elements of a tortious interference with prospective economic advantage claim, it will be dismissed.

*Id.* at *2–3 (emphasis in original).

Here, the tortious interference claim should be dismissed because Plaintiff has not pled that he had a reasonable expectation of entering into a valid business relationship with any financial institutions that extend credit.  As such, Plaintiff cannot plead facts supporting the first element.

Similarly, Plaintiff cannot plead that Resurrection had knowledge of any such expectancy.  In particular, Plaintiff avers that the "Defendants had knowledge of the expectancy of future business because it [*sic*] is familiar with business practices whereby financial institutions review credit reports before extending credit to customers."  (Compl. at ¶ 73.)  Stated quite simply, the Complaint admits that the Defendants did not have knowledge of any particular

financial institutions with whom Plaintiff was attempting to obtain credit. Accordingly, Plaintiff cannot plead facts supporting the second element of his claim.

Moreover, the Complaint demonstrates that Resurrection did not direct any alleged tortious conduct at third parties with whom Plaintiff claims to have had an expectancy—*i.e.*, financial institutions that extend credit to customers. (*See* Compl. at ¶ 72.) Instead, the Complaint only asserts that Resurrection placed certain of Plaintiff's unpaid accounts for collection with ICS. (*See* Compl. at ¶¶ 9, 12, 21, 46, 47 & 64.) As such, the Plaintiff cannot establish the third element

Finally, the Complaint fails to allege that Resurrection acted with malice. *See Int'l Star Registry of Illinois*, 451 F. Supp. 2d at 992 ("[t]o establish malice under Illinois law [the plaintiff] must prove that [the defendant] acted with a desire to harm") Rather, Plaintiff predicates his claim on allegations that Resurrection attempted to collect on medical bills in violation of the automatic stay from his bankruptcy (*see, e.g.,* Compl. at ¶¶ 4–9, 33, 34, 37, 38, 45, 61, 62, 74, 79 & 83); that Resurrection failed to reconcile a bill with his health insurance plan (*see, e.g., id.* at ¶ 17); and that Resurrection placed a paid bill for collection (*see, e.g., id.* at ¶ 19.) Those allegations do not constitute an evil motive or intent to injure Plaintiff. Based on the foregoing, Plaintiff's claim for tortious interference should be dismissed.[7]

### F.    Count VI (Intentional Infliction of Emotional Distress) Should Be Dismissed Because Resurrection's Conduct Was Not Extreme and Outrageous.

In Illinois, "a plaintiff may recover damages for intentional infliction of emotional distress only if he establishes that (1) the defendant's conduct was extreme and outrageous, (2) the defendant intended to inflict severe emotional distress or knew that there was at least a high probability that his conduct would inflict severe emotional distress, and (3) the defendant's conduct did cause severe emotional distress." *Van Stan v. Fancy Colours & Co.*, 125 F.3d 563, 567 (7th Cir. 1997). Moreover, "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities do not amount to extreme and outrageous conduct, nor does conduct

---

[7]    As part of the foundation for Count V (as well as other counts), Plaintiff asserts that Resurrection wrongfully placed an account for collection with ICS in the amount of $2,138.35. (*See, e.g.,* Compl. at ¶ 74.) The only alleged basis as to why that placement was improper is that Resurrection failed to contact Plaintiff's insurance company prior to attempting to collect on that debt (apparently because there may have been coverage). (*Id.* at ¶¶ 17 & 74.) Plaintiff offers no explanation as to why Resurrection's failure to contact his insurance company somehow renders the attempt to collect on that debt wrongful; nor does Plaintiff identify why Resurrection is required to contact his insurance company. That conduct is not unlawful under any theory of liability.

characterized by malice or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort."  *Id.*

In this case, Plaintiff complains that Resurrection attempted to collect payment for legitimate medical services by sending Plaintiff letters and calling him on a few occasions.  (*See* Compl. at ¶¶ 8, 9, 17, 18, 22–24 & 33.)  That alleged conduct is ***not*** extreme and outrageous as a matter of law and, as such, the claim should be dismissed with respect to Resurrection.  *See, e.g., Brackett v. Galesburg Clinic Assoc.*, 293 Ill. App. 3d 867, 871 (3rd Dist. 1997) (dismissing claim for tortious interference where the "plaintiff was certainly subjected to hurt feelings and a certain amount of indignity [but] none of defendants' alleged actions constituted conduct that was outrageous or beyond the bounds of decency.").

### G.    Count VII (Negligent Infliction of Emotional Distress) Should Be Dismissed Because Resurrection Did Not Owe a Duty to Plaintiff and the Complained of Acts Were Not A Breach of Any Duty.

To state a claim for negligent infliction of emotional distress, Plaintiff "must set out facts that establish the existence of a duty owed by the defendant to the plaintiff, a breach of that duty, and an injury proximately caused by that breach."  *Brackett*, 293 Ill. App. 3d at 872 (3d Dist. 1997).  To determine whether a duty exists, "a court will look at various policy considerations, such as the likelihood of harm, the gravity of the injury, the burden of guarding against the injury, and the relationship between the parties."  *Gorgan v. Muehling*, 143 Ill. 2d 296, 306 (1991).  The determination of whether a duty exists is an issue of law to be determined by the court.  *Brackett*, 293 Ill. App. 3d at 872.  When the conduct complained of is alleged to be intentional rather than negligent, then no breach of a duty can lie.  *See id.* ("[w]here the purported emotional distress has been caused by *intentional* acts committed by a defendant, the plaintiff does not state a cause of action for *negligent* infliction of emotional distress.") (emphasis in original).

Here, the Complaint does not set forth any allegations of fact supporting the conclusion that Resurrection owed Plaintiff a duty.  (*See generally* Compl. at ¶¶ 83–85.)  For instance, not only does the Complaint fail to aver facts supporting grave injury to the Plaintiff, Plaintiff does not dispute that Resurrection rendered medical services to him or that the bills were for valid services.  In similar regard, the burden of guarding against the injury (*i.e.*, emotional distress) is great because Plaintiff does not dispute the validity of the bills and Resurrection, generally

speaking, has a right to attempt to collect on those valid bills. As such, Resurrection did not owe Plaintiff a duty.

Moreover, the Complaint contains several allegations that Resurrection engaged in intentional conduct—*i.e.*, contacting Plaintiff to attempt to collect on bills for valid medical services. (*See, e.g.,* Compl. at ¶ 83) (alleging that Resurrection contacted Plaintiff by phone and mail and engaged in fraud, which is an intentional tort). Given that Plaintiff alleges *intentional* actions as a foundation for his *negligent* infliction of emotional distress claim, Plaintiff has pled his way out of this claim. *See Brackett*, 293 Ill. App. 3d at 872.

### H.    Count VIII (Fraud) Should Be Dismissed Because Plaintiff Cannot Establish Justifiable Reliance When He Allegedly Knew the Truth.

To state a claim for common law fraud in Illinois, Plaintiff must allege with particularity facts supporting the following elements: "(1) a false statement of material fact; (2) the defendant's knowledge or belief that the statement was false; (3) the defendant's intent that the statement induce the plaintiff to act; (4) the plaintiff's justifiable reliance upon the truth of the statement; and (5) damages resulting from reliance on the statement." *Bauer v. Giannis*, 359 Ill. App. 3d 897, 902 (2d Dist. 2005).

In this case, Plaintiff has pled himself out of a fraud claim. Plaintiff predicates this claim on two alleged separate courses of conduct: (i) making "false representations of material fact regarding Plaintiff's payment history to the credit bureaus and numerous financial institutions" (*see* Compl. at ¶ 87); and (ii) making misrepresentations that Plaintiff owed $881.97, when Plaintiff purportedly only owed $464.52 because the remaining $417.45 was stayed and eventually discharged in bankruptcy (*see id.* at ¶¶ 88–90). With respect to the first category of allegations, Plaintiff cannot plead that Resurrection intended for Plaintiff to rely upon any statement to his detriment because any such statements were simply informational and made to third parties. Furthermore, Plaintiff cannot establish that he relied upon the truth of any such statement because he knew the alleged truth and, in fact, disputed that he owed any money.

Similarly, the purportedly fraudulent statement that Resurrection made to Plaintiff—*i.e.*, that he owed $881.97, when Plaintiff only owed $464.52 because the remaining $417.45 was allegedly stayed and eventually discharged in bankruptcy—shows that Plaintiff could not have justifiably relied upon the truth of that statement. In fact, the Complaint is rife with allegations that the $417.45 was a debt stayed and discharged due to his bankruptcy. (*See, e.g.,* Compl. at ¶ 8) ("[o]n May 15, 2005, Resurrection sent a collection letter to plaintiff for the date of service

of March 9, 2007, demanding $417.45 in violation of the automatic stay.")  Given these allegations, Plaintiff could not under any circumstances have justifiably relied upon Resurrection's alleged representation that this amount was due after the bankruptcy.  As such, Plaintiff's fraud claim should be dismissed.

## IV.    PLAINTIFF'S CLAIMS FOR PUNITIVE DAMAGES MUST BE DISMISSED BECAUSE THE COMPLAINT FAILS TO ALLEGE THAT RESURRECTION ACTED WITH AN EVIL MOTIVE.

In Illinois, punitive damages are not favored.  *Loitz v. Remington Arms Co., Inc.*, 138 Ill. 2d 404, 414 (1990).  As the Illinois Supreme Court has explained:

> Since the purpose of punitive damages is not compensation of the plaintiff but punishment of the defendant and deterrence, these damages can be awarded **only** for conduct for which this remedy is appropriate—which is to say, **conduct involving some element of outrage similar to that usually found in crime**.  The conduct must be outrageous, either because the defendant's acts are done with an evil motive or because they are done with reckless indifference to the rights of others.

*Id.* at 415 (emphasis added).  If a complaint does not set forth allegations rising to this level, then a request for punitive damages should be dismissed.  *See, e.g., Canel & Hale, Ltd. v. Tobin*, 304 Ill. App. 3d 906, 921 (1st Dist. 1999) (dismissing complaint's request for punitive damages where there were no allegations supporting an "evil motive."); *Citicorp Savings of Illinois v. Rucker*, 295 Ill. App. 3d 801, 811 (1st Dist. 1998) (dismissing complaint where plaintiff "has not pled facts necessary to support the imposition of punitive damages."); *Guice v. Sentinel Technologies, Inc.*, 294 Ill. App. 3d 97, 110–11 (1st Dist. 1997) (dismissing request for punitive damages when the complaint simply set forth conclusory allegations that the defendant acted maliciously and with intent to harm the plaintiff).

In this case, Plaintiff alleges that the Defendants violated the automatic stay from his bankruptcy (*see, e.g.,* Compl. at ¶¶ 4–9, 33, 34, 37, 38, 45, 61, 62, 74, 79 & 83); that Resurrection failed to reconcile a bill with his health insurance plan (*see, e.g., id.* at ¶ 17); and that the Defendants placed a bill for collection that was purportedly paid (*see, e.g., id.* at ¶ 19). The Complaint contains no facts that the Defendants acted with an evil motive or engaged in "conduct involving some element of outrage similar to that usually found in crime." *Loitz*, 138 Ill. 2d at 415.  Accordingly, Plaintiff's request for punitive damages should be dismissed.

<u>**CONCLUSION**</u>

As the Complaint demonstrates, Plaintiff received medical care at Resurrection and he failed to pay for all of it.  Now, Plaintiff seeks to make a federal case out of this billing dispute over a couple of thousand dollars.  Plaintiff's Complaint fails to state a claim and it should be dismissed with prejudice.

Dated: June 12, 2008

Respectfully submitted,

RESURRECTION MEDICAL CENTER


_____/s/  Steven D. Hamilton_____
One of Its Attorneys

Edwin E. Brooks
Steven D. Hamilton
MCGUIREWOODS LLP
77 West Wacker Drive, Suite 4100
Chicago, IL 60601
(t) 312-849-8100
(f) 312-849-3690

*Attorneys for Resurrection Medical Center*

<u>**CERTIFICATE OF SERVICE**</u>

I, Steven D. Hamilton, an attorney, hereby certify that on June 12, 2008, I caused a copy of the foregoing *Resurrection Medical Center's Memorandum of Law in Support of Its Motion to Dismiss* to be filed with the Court's electronic filing system.  Parties may access this document through that system.  Additionally, I hereby certify that I caused copy of the same to be served via First Class U.S. Mail, postage prepaid, at 77 West Wacker Drive, Suite 4100, Chicago, IL 60601, upon the following people:

Joseph J. Giacalone, Jr.
Giacalone & Associates, LLC
4304 N. Osceola Ave.
Norridge, IL 60706

/s/  Steven D. Hamilton

\6274287.3

16

# EXHIBIT 1



Slip Copy
Slip Copy, 2007 WL 2563363 (N.D.Ill.)
(Cite as: 2007 WL 2563363 (N.D.Ill.))

C

Hukic v. Aurora Loan Services, Inc.
N.D.Ill.,2007.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois,Eastern
Division.
Avdo HUKIC, Plaintiff,
v.
AURORA LOAN SERVICES, INC. and Ocwen
Federal Bank, FSB, Defendants.
No. 05 C 4950.

Aug. 31, 2007.

Stephen M. Komie, Brian E. King, Sarah Elizabeth
Toney, Komie & Associates, Michael G. Rogers,
Mike Rogers Attorney at Law, PC, Chicago, IL, for
Plaintiff.
Robert Jerald Emanuel, Alexander D. Marks, Leann
Pedersen Pope, Burke, Warren, Mackay & Serri-
tella, P.C., David Luther Hartsell, McGuirewoods
LLP, Ralph T. Wutscher, Roberts Wutscher, LLP,
Chicago, IL, Jason Scott Zarin, Laura Mary De
Jaager, O'Melveny & Myers, LLP, Washington,
DC, for Defendants.

### MEMORANDUM OPINION AND ORDER

VIRGINIA M. KENDALL, United States District
Judge.
*1 Plaintiff Avdo Hukic ("Hukic") filed a fifteen-
count Amended Complaint against Aurora Loan
Services, Inc. ("Aurora") and Ocwen Federal Bank,
FSB ("Ocwen" and together with Aurora,
"Defendants"). Seven counts were dismissed pursu-
ant to Defendants' Motions to Dismiss. The remain-
ing counts against Defendants seek damages for
breach of contract, tortious interference with pro-
spective economic advantage,[FN1] and violations of
the Fair Credit Reporting Act ("FCRA") Section 15
U.S.C. § 1681s-2(b)[FN2]. Defendants have moved
for summary judgment on all of the remaining
counts of Hukic's Amended Complaint. For the
reasons stated below, Defendants' Motions for

Summary Judgment are granted and Hukic's claims
against Aurora and Ocwen are dismissed with pre-
judice.

> FN1. Hukic claims that Defendants tor-
> tiously interfered with his credit expect-
> ancy. Since there is no claim in Illinois for
> "tortious interference with credit expect-
> ancy," the Court examines this claim as
> one of tortious interference with prospect-
> ive economic advantage.

> FN2. Hukic's claims brought under 15
> U.S.C. § 1681s-2(a) were dismissed.

### STATEMENT OF FACTS

*Hukic's Mortgage Loan with Life Savings Bank*

Hukic entered into a mortgage loan ("the loan")
with Life Savings Bank ("LSB") in September
1997. Pltf. 56.1 Resp. Aurora ¶ 1.[FN3] The note and
mortgage concerned property located at 4862 West
Cornelia, Chicago, Illinois. Pltf. 56.1 Ocwen ¶ 5;
*see also* Ocwen's Ans. Am. Cplt. ¶¶ 2, 7. The
amount of the mortgage loan from LSB was
$119,700, with a final maturity date of October 1,
2012. Pltf. 56.1 Resp. Aurora ¶ 2. The interest rate
was 10.65%. *Id.* Under the mortgage loan, Hukic
was required to make monthly payments in the
amount of $1,334.32. Pltf. 56.1 Resp. Ocwen ¶ 7.
Paragraphs two and four of the Mortgage Agree-
ment provided that the borrower, Hukic, shall pay
all taxes and yearly hazard or property insurance
premiums. Hukic Dep. Ex. 2 ¶¶ 2, 4; Pltf. 56.1
Resp. Aurora ¶ 1 2; Pltf. 56.1 Resp. Ocwen ¶ 1 7.
The Mortgage Agreement allows the borrower to
pay the taxes and insurance premiums directly to
the person owed payment provided that:

> FN3. Citations to "Plaintiff's Answer to
> Aurora's Statement of Material Facts" have
> been abbreviated to "Pltf. 56.1 Resp. Au-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

rora," citations to Plaintiff's Answer to Ocwen's Statement of Material Facts" have been abbreviated to "Pltf. 56.1 Resp. Ocwen," citations to "Aurora Loan Service LLC's Reply to Plaintiff's Statement of Additional Material Facts" have been abbreviated to "Aurora 56.1 Rep.", and citations to "Ocwen Loan Servicing LLC's Reply to Plaintiff's Statement of Additional Material Facts" have been abbreviated to "Ocwen 56.1 Rep."

Borrower shall promptly furnish to Lender all notices of amounts to be paid under this paragraph. If Borrower makes these payments directly, Borrow shall promptly furnish to Lender receipts evidencing the payments.
Hukic Dep. Ex. 2 ¶¶ 2, 4; Pltf. 56.1 Resp. Aurora ¶ 12; Pltf. 56.1 Resp. Ocwen ¶¶ 17, 18.

### The April 1998 Mortgage Payment to LSB

Hukic submitted his monthly payments to LSB using money orders. Pltf. 56.1 Ocwen ¶ 8. Hukic's monthly payments were initially $1,334.32. Aurora 56.1 Rep. ¶ 6. On April 8, 1998, Hukic submitted a $1,335 money order to LSB. Pltf. 56.1 Resp. Ocwen ¶ 9. LSB made an "input error" or a "bookkeeping error" and entered the amount as $1,335. Pltf. 56.1 Resp. Aurora ¶ 10; Pltf. 56.1 Resp. Ocwen ¶ 9. [FN4]

> FN4. This Court finds that Hukic all or part of Hukic's Responses to paragraphs 9, 14, 16-23, 26-36, 38-39, 41, and 46 of Ocwen's Statement of Facts and Hukic's Responses to paragraphs 10, 12-13, 17, and 26 of Aurora's Statement of Facts were insufficiently denied.

### Aurora Begins Servicing Hukic's Mortgage

On or about May 8, 1998, Hukic's mortgage loan was transferred from LSB to Aurora for servicing. Pltf. 56.1 Resp. Ocwen ¶ 10; Aurora 56.1 Rep. ¶ 4. LSB forwarded only $1,135 to Aurora to be applied

to Hukic's loan. Pltf. 56.1 Resp. Aurora ¶ 7. Because the amount of money received by Aurora was $200 less than the mortgage payment amount, Hukic's funds were placed in a "suspense account" and were not applied to the payment due for April 1998. Pltf. 56.1 Resp. Aurora ¶ 9. Shortly after the mortgage was transferred and again on August 25, 1998, Aurora told Hukic that his April 1998 payment was deficient and that Hukic should request a refund from the issuer of the money order that he used to make his April 1998 payment. Pltf. 56.1 Resp. Ocwen ¶¶ 11, 12. Hukic did not go back to the money order issuer for a refund of the $200 nor did Hukic or his attorneys contact LSB regarding the April 1998 money order payment. Pltf. 56.1 Resp. Ocwen ¶¶ 13-15. Instead, Hukic faxed a copy of the April 1998 money order to Aurora in May, June, and July 1998. Aurora 56.1 Rep. ¶ 5. Although Hukic continued to make full and timely payments to Aurora, Hukic's loan appeared to be one-month delinquent because each of his subsequent monthly payments was applied to the amount due for the prior month. Pltf. 56.1 Resp. Aurora ¶ 10.

*2 When Aurora began servicing the loan, LSB advised Aurora that Hukic's hazard insurance had expired. Consequently, Aurora forced a coverage insurance binder on the account. Pltf. 56.1 Resp. Aurora ¶ 11; see also Hukic Dep. Ex. 8. Aurora mailed a copy of the binder to Hukic and told him that if current evidence of insurance was not received prior to the expiration of the sixty day binder period, the binder would go to the policy and an escrow account would be established to pay the $1,716 annual premium for policy year April 1998 to April 1999. Id. Evidence of insurance was not received, and Aurora advanced the funds for hazard insurance. Id. Aurora further advised Hukic's counsel that it paid Hukic's premiums for the April 1999 to April 2000 year. Id.

In addition to paying Hukic's property insurance, Aurora paid Hukic's property taxes in the amount of $1,297.28 for the first half of 1999. Pltf. 56.1 Resp.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Ocwen ¶ 20. If Hukic paid his property taxes directly, the Mortgage Agreement obligated him to provide evidence of proof of payment. Pltf. 56.1 Resp. Ocwen ¶ 19. However, Hukic refused numerous requests to provide this information.*Id.* In July and November 1999 Hukic's insurance agent faxed Aurora insurance information, but the record is silent on what information was provided. Aurora 56.1 Rep. ¶ 7 . Hukic was apprised regarding problems with the payment of property taxes and insurance, but took no actions to correct the problems because he claimed that it was not his responsibility. Pltf. 56.1 Resp. Aurora ¶ 12. Aurora established an escrow account pursuant to the terms of the mortgage agreement for the reimbursement of the money it had advanced to pay Hukic's 1999 property taxes and Hukic's monthly payment increased as a result. Pltf. 56.1 Resp. Ocwen ¶¶ 11, 21; *see also* Aurora Ex. 8.[FN5] Despite the increase, Hukic continued to make monthly payments in the amount of $1,335. Pltf. 56.1 Resp. Ocwen ¶ 23.

> FN5. Hukic disputes that the monthly payment should have been increased and Aurora claims that the increase resulted from the deficient April 1998 payment and the fact that Aurora was forced to advance tax and insurance payments on Hukic's behalf.

Aurora has not serviced Hukic's loan since February 2000. Pltf. 56.1 Resp. Aurora ¶ 18. Aurora continued to report the loan as delinquent through the time that the loan servicing was transferred from Aurora to Ocwen on or about March 9, 2000. Pltf. 56.1 Resp. Aurora ¶ 17. Hukic contacted Aurora telephonically on fifteen occasions within the first five months of Aurora's servicing of the loan and a total of thirty-six times during Aurora's tenure servicing of the loan. Pltf. 56.1 Resp. Aurora ¶ 15.

*Ocwen Begins Servicing Hukic's Mortgage*

Hukic's mortgage was transferred from Aurora to Ocwen for servicing on March 3, 2000. Aurora 56.1 Rep. ¶ 9; Ocwen 56.1 Rep. ¶ 5. As of March 13,

2000, Ocwen's records reflect that Hukic owed $7,261.16 in principal and interest, escrow advances and late charges. Pltf. 56.1 Resp. Ocwen ¶ 27; Ocwen Ex. 15. In addition to the amount owed as a result of the April 1998 mortgage payment, Ocwen asserts that Hukic's account was in default when the mortgage was transferred to it for servicing because Hukic failed to make his January 1, 2000 mortgage payment. Pltf. 56.1 Resp. Ocwen ¶ 25; *see also* Ocwen Ex. B. Ocwen's comment log notes three entries on March 20, 2000 associated with a January 1, 2000 payment, but there is no explanation regarding the meaning of the log's codes or entries. *Id.*

*3 Although Hukic was paying his property taxes directly, he failed to provide Ocwen with a copy of his tax bill and proof of payment even though his Mortgage Agreement required him to do so. Pltf. 56.1 Resp. Ocwen ¶ 34. On or about September 8, 2000, Ocwen advanced $1,116.38 to pay Hukic's property taxes and made adjustments to Hukic's escrow account to reflect the funds it had remitted on his behalf. Pltf. 56.1 Resp. Ocwen ¶ 35. Once Ocwen learned of his payments, Ocwen requested that Hukic obtain a refund of the property taxes he paid to Cook County and that Hukic remit the full amount of the refund to Ocwen to reimburse Ocwen for the deficiency in the escrow account. Pltf. 56.1 Resp. Ocwen ¶ 36. Hukic did not request a refund of the property taxes for himself and did not remit funds to Ocwen to cure the deficiency in his escrow account. Pltf. 56.1 Resp. Ocwen ¶ 37.

On February 7, 2001 and October 15, 2001, Ocwen advanced funds in the amount of $1,319.12 and $1,636.49, respectively, to pay Hukic's property taxes and made adjustments to Hukic's escrow account to reflect the funds it had remitted on his behalf. Pltf. 56.1 Resp. Ocwen ¶¶ 38, 39. Hukic continued to pay $1,335 for his monthly mortgage payment representing principal and interest.

*Ocwen's Notifies Hukic that he is in Default*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                              Page 4
Slip Copy, 2007 WL 2563363 (N.D.Ill.)
**(Cite as: 2007 WL 2563363 (N.D.Ill.))**

Ocwen mailed Hukic a notice of default on March 13, 2000, eight days after Ocwen began servicing Hukic's loan. The notice advised Hukic that he was required to remit a payment of $7,261.16 by April 12, 2000 to cure the delinquency on his account and that failure to cure the default could result in the initiation of foreclosure proceedings. Pltf. 56.1 Resp. Ocwen ¶¶ 26, 27, 28. The notice provided a method to dispute the debt. It stated:

"Unless you dispute the validity of the debt, or any portion thereof, within thirty days after receipt of this letter, the debt will be assumed to be valid by Ocwen Federal. If you notify Ocwen Federal in writing within thirty days that the debt or a portion of the debt is disputed, Ocwen Federal will send you verification of the debt. Verification of the debt or a portion thereof may be requested in writing from the below named Loan Resolution Consultant within thirty days."

Pltf. 56.1 Resp. Ocwen ¶ 29.

On March 21, 2000, April 7, 2000, August 30, 2000, September 11, 2000, October 11, 2000, November 9, 2000, December 12, 2000, February 13, 2001, March 14, 2001, April 13, 2001, and May 15, 2001, Ocwen mailed and Hukic received and read similar notices of default. Pltf. 56.1 Resp. Ocwen ¶¶ 30, 31. Hukic did not dispute the validity of the debt or deficiency. Pltf. 56.1 Resp. Ocwen ¶ 33. On December 6, 2000, Ocwen wrote Hukic and advised him that his mortgage had been transferred to Ocwen's Early Intervention Department for review and possible foreclosure. Pltf. 56.1 Resp. Ocwen ¶ 32. The letter stated, "We hope that you will take advantage of this invitation to settle your account and avoid further damage to your credit rating."*Id.*

*4 On January 11, 2001, Hukic's counsel, Stephen Komie ("Komie"), sent a letter to Aurora stating that his firm had been retained to represent Hukic in connection with Aurora's "libelous and slanderous behavior" to ward Hukic. Pltf. 56.1 Resp. Aurora ¶ 19; Komie letter. The letter advised that

Hukic made timely payments to Aurora and was paying his property taxes directly. Komie stated that Hukic had been unable to refinance his home due to Aurora's negative reports. *Id.* Komie sent another letter on July 18, 2001 and on October 12, 2001, Aurora's counsel responded. Pltf. 56.1 Resp. Ocwen ¶ 45; Pltf. 56.1 Aurora ¶ 11 *see also* Hukic Dep. Ex. Aurora wrote that on August 25, 1998, Aurora telephoned Hukic and discussed LSB's "bookkeeping error." *Id.; see also* Pltf. 56.1 Resp. Aurora ¶ 20; Exhibit E. The letter explained:

"Although the money order was in the amount of $1335, it appears that the amount was input as $1135 and the money order was cashed in that amount. These funds were forwarded to and received by [Aurora] on June 26, 1998. Because the funds were not sufficient to apply the monthly payment, the funds were deposited to the suspense account. The suspense account is a holding account for unapplied funds. Mr. Huckic (sic) must contact the issuer of the money order to request a refund of the $200.00 difference between the amount purchased and the amount paid by the money order issuer. This information was relayed to Mr. Hukic during an August 25, 1998 telephone conversation."

Aurora's letter explained why the April 1998 payment caused the remainder of Hukic's monthly payments to be deposited into a suspense account and discussed Aurora's advances from 1998 to 2000 associated with Hukic's property tax and insurance premiums. *Id.* Hukic's attorney sent similar letters Ocwen in 2001 disputing the accuracy of information appearing on his credit report. Pltf. 56.1 Resp. Ocwen ¶ 45. Hukic does not believe that Aurora and Ocwen intentionally reported his credit incorrectly, but rather, he believes that they made a mistake. Pltf. 56.1 Resp. Aurora ¶ 25.

*Foreclosure in Illinois State Court*

On November 7, 2001, First Union National Bank filed a foreclosure action against Hukic. Pltf. 56.1 Resp. Ocwen ¶ 42; Aurora 56.1 Rep. ¶ 10.[FN6]On

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 5
Slip Copy, 2007 WL 2563363 (N.D.Ill.)
(Cite as: 2007 WL 2563363 (N.D.Ill.))

June 16, 2003, the foreclosure proceedings were dismissed without prejudice pursuant to 735 ILCS 5/2-619 and Hukic's mortgage was reinstated. Pltf. 56.1 Resp. Ocwen ¶ 43. The order reflects that Hukic tendered proof of payment of Cook County Real Estate taxes for 2002 and the first installment of 2003. Aurora 56.1 Rep. ¶ 14; Hukic Ex. D, Order dated June 16, 2003. The judgment was recorded with the Cook County Recorder of Deeds. Aurora 56.1 Rep. ¶ 1 5. After 90 days, the dismissal was with prejudice. *Id.*

> FN6. On December 6, 2002, Pacific Premier Bank, F.S.B., f/k/a Life Savings Bank F.S.B., assigned Hukic's mortgage and note to First Union National Bank, as trustee. Aurora 56.1 Rep. ¶ 11.

In July and August 2003, Hukic prepared an Application for Property Tax Refund. Pltf. 56.1 Resp. Ocwen ¶¶ 37, 44. In that document, an Ocwen representative certified that Ocwen paid the property taxes in error. *Id.* At no point prior to foreclosure did Hukic remit funds to cure the $200 shortfall in the April 1998 payment. Pltf. 56.1 Resp. Ocwen ¶ 16.

### *Hukic Notifies Trans Union that he disputed the status of his account*

**\*5** On April 1, 2004, nearly one year after foreclosure proceedings concluded, Hukic notified Trans Union, a credit reporting agency, that he disputed the status of his Ocwen account and asked Trans Union to investigate. Pltf. 56.1 Resp. Ocwen ¶ 46; Hukic Dep. Ex. 10. On or before April 1, 2004, Hukic's employer, Stephen Glarner, also drafted a letter to Trans Union on Hukic's behalf asking Trans Union to investigate the accuracy of the information relating to Hukic's Ocwen account. Pltf. 56.1 Resp. Ocwen ¶ 47. Glarner's letter is not a part of the record. According to Hukic, Glarner's letter was Hukic's first request for investigation that Hukic made to any credit reporting agency. Pltf. 56.1 Resp. Ocwen ¶ 48.

On May 1, 2004, Trans Union informed Hukic that the negative credit information reported by Ocwen had been deleted from his credit report. Pltf. 56.1 Resp. Ocwen ¶ 51; Hukic Dep. Ex. 33. According to the report, Trans Union file number 1263187812, the only "adverse account" was associated with an Aurora Loan. The maximum delinquency on the Aurora account was "60 days past due" in April 2000 and Hukic paid 30 days late sometime in the 17 months prior to the last update on the account. *Id.*

On May 14, 2004, Trans Union sent a letter to Hukic stating that Trans Union had "recently" r eceived Hukic's dispute, Trans Union file number 127127008953. Aurora 56.1 Rep. ¶ 16; Hukic Dep. Ex. 11. However, Trans Union refused to accept the dispute because it was sent by a third party. Hukic Dep. Ex. 11. Trans Union gave Hukic a form to fill out and return in the event that he wished to dispute the matter directly. Pltf. 56.1 Resp. Ocwen ¶ 49. Hukic, with Glarner's assistance, filled out the form and returned it to Trans Union within a few days. Pltf. 56.1 Resp. Ocwen ¶ 50; Hukic Dep. Ex. 11; Hukic Dep., pp. 110-111. In the form, Hukic disputed both Ocwen's and Aurora's credit reports. Hukic Dep. Ex. 11. The typed portion of the form stated that "Upon receipt of your request, an investigation will be initiated and completed within 30 days. Upon completion, you will receive written notice of the results of the investigation."*Id.* If Trans Union responded to this request, it was not included in the record.

Hukic produced an August 8, 2006 Equifax Credit Report and under Aurora's Account History section, there is an entry indicating that in December 1999 Hukic's account was "30-59 days past due." Hukic Ex. M. Additionally, there are two entries indicating that Hukic's account was "60-89 days past due" in January and February of 2000. *Id.* Hukic claims that the report demonstrates that Aurora continued to report Hukic as "paying late" up to and including August, 2006. Ocwen 56.1 Rep. ¶ 13. Aurora denies that the report is adverse because the report

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

states that the Aurora loan has been "paid," that its current status is "pays as agreed," and that there is no past due amount.*Id.; see also* Hukic Ex. M. Ocwen's negative reports were deleted from Hukic's credit report on or before May 1, 2004. Pltf. 56.1 Resp. Ocwen ¶ 51.

**6** Hukic's annual income in 2000 was $24,000 and Hukic's employer, friends, and family contributed toward his monthly expenses. Pltf. 56.1 Resp. Aurora ¶ 26. From 2000 to 2004, Hukic's monthly financial obligations included his monthly mortgage payment of $1,335, a $500 car loan payment, monthly bills for his home telephone, property taxes, electricity, groceries, car insurance, medicine, and clothes, and payments to several credit cards from agencies such as Visa, Banco Popular, American Express, LaSalle Bank, Home Depot, Sam's Club, and Menards. *Id.* He never paid his credit card balances in full, but made minimum payments. *Id.* Although Hukic had a Sallie Mae loan for his son, he does not remember his monthly payment. *Id.* Hukic was a co-signor for several other loans for his friends that came to the country without a credit history.*Id.* Hukic's monthly expenses were approximately $2,384.00. *Id.* Hukic's income did not cover his monthly expenses in 2000, but he was able to make up for the difference because his boss paid some of his expenses and his family contributed to his monthly bills in lieu of paying rent.[FN7]Without receiving contributions from friends, family, and Hukic's employer, Hukic would not have been able to pay all of his bills. *Id.* Hukic's family continued to contribute to his monthly bills through 2005. *Id.*

> FN7. During Hukic's deposition, Ocwen's counsel totaled Hukic's monthly expenses to be $2,384.00, but Hukic disputes that figure, without support, in his answers to Aurora's Statement of Facts.

*Hukic's applications for loans and credit*

On September 4, 2001 and October 18, 2001, Hukic applied for a loan from State Farm Bank and his ap-

plication was denied. Pl. Am. Cplt. Ex. O. State Farm based its decision to deny Hukic's loan application "in whole or in part" upon information contained within a Trans Union report. *Id.* On September 7, 2001, Wells Fargo denied Hukic's application for a credit application on the basis of information it received from Trans Union. *Id.* On the same day, Hukic's credit application to purchase an ABT Television was denied based upon information it received in an Equifax credit report. *Id.* Specifically, ABT denied the application due to "serious delinquency," the amount Hukic owed on delinquent accounts, ABT's opinion that Hukic's balances were too high on revolving accounts, and because Hukic's last delinquent report was too recent or was unknown. *Id.* On June 24, 2002, Monogram Credit Card Bank of Georgia denied Hukic's application for a credit line increase on his Home Depot credit card and its decision was based in whole or in part upon a report from Equifax Inc. *Id.*On July 16, 2003, Hukic's application for a Discover Credit card and eight days later Banco Popular denied Hukic's credit application to Northwest Auto Sales. Both agencies based their denials upon information contained in a Trans Union report. *Id.* Finally, on December 3, 2003 First Financial Mortgage Consultants, Inc. denied Hukic's application for an extension or renewal of credit based upon a Trans Union credit report that disclosed "delinquent credit obligations." *Id.*

### DISCUSSION

I. *Hukic's FCRA claims against Aurora and Ocwen*

**7** Hukic alleges that Aurora and Ocwen violated § 1681s-2(b) of the FCRA.[FN8]The FCRA places various requirements on consumer credit reporting agencies, furnishers of credit information to consumer credit reporting agencies, and users of consumer credit reports. Aurora and Ocwen are furnishers of credit information. 15 U.S.C. § 1681a(f). The duties created by § 1681s-2(b) arise only after the furnisher receives notice from a consumer re-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

porting agency that a consumer is disputing credit information.*Dornhecker v. Ameritech Corp.,* 99 F.Supp.2d 918, 925 (N.D.Ill.2000). Once a furnisher has received notice, it must:

> FN8. This Court previously ruled that there is no private right of action under 15 U.S.C. § 1681s-2(a).

(A) conduct an investigation with respect to the disputed information;

(B) review all relevant information provided by the consumer reporting agency pursuant to section 1681i(a)(2) of this title;

(C) report the results of the investigation to the consumer reporting agency; and

(D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis.

15 U.S.C. § 1681s-2(b)(1)(A-D).

A. *Aurora's and Ocwen's Statute of Limitations Defenses*

Defendants contend that Hukic's FCRA claims are time barred. Hukic's § 1681s-2(b) claim was filed on July 1, 2005. The FCRA includes a limitation on private actions brought to enforce its provisions. The statute provides:

An action to enforce any liability created under this subchapter may be brought in any appropriate United States district court, without regard to the amount in controversy, or in any other court of competent jurisdiction, not later than the earlier of-

(1) 2 years after the date of discovery by the plaintiff of the violation that is the basis for such liability; or

(2) 5 years after the date on which the violation that

is the basis for such liability occurs.

15 U.S.C. § 1681p.

Hukic disputed the status of his Ocwen account to Trans Union on April 1, 2004 and disputed his Aurora account shortly after May 14, 2004. Pltf. 56.1 Resp. Ocwen ¶¶ 46, 50; Hukic Dep. Ex. 10, 11; Hukic Dep. pp. 110-111. Defendants' obligations under § 1681s-2(b) were triggered only after Trans Union gave notice to Defendants that Hukic disputed the accounts on his credit report.

Defendants could not have violated the provisions of subsection (b) until the 30-day time-period under § 1681i(a) expired. Assuming Trans Union notified Ocwen and Aurora regarding Hukic's disputes on the same day they were received, Ocwen and Aurora had until May 1, 2004 and June 14, 2004, respectively, to comply with the provision of § 1681s-2(b). Therefore, Hukic's claims were timely filed on July 1, 2005.

B. *Ocwen's Liability under § 1681s-2(b )*

On April 1, 2004, Hukic sent a letter to Trans Union disputing the status of his Ocwen account and asked Trans Union to investigate Ocwen's report. Pltf. 56.1 Resp. Ocwen ¶ 46; Hukic Dep. Ex. 10. Following Hukic's dispute, Trans Union had a duty under § 1681i(a) to convey information to Ocwen regarding Hukic's dispute. 15 U.S.C. § 1681s-2(b); 15 U.S.C. § 1681i(a)(1); *see also Nelson v. Chase Manhattan Mortgage Co.,* 282 F.3d 1057, 1060 (9th Cir.2002). Once Trans Union conveyed Hukic's dispute to Ocwen, Ocwen had a duty to conduct an investigation regarding the disputed information, review all relevant information by Trans Union, and report the result of the investigation to Trans Union within the time period allotted under the statute. 15 U.S.C. § 1681s-2(b); 15 U.S.C. § 1681i(a)(2). Ocwen complied with the provisions of subsection (b) because it removed the negative information it reported on or before May 1, 2004. Pltf. 56.1 Resp. Ocwen ¶ 51. Hukic's August 8, 2006 Equifax report

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2563363 (N.D.Ill.)
(Cite as: 2007 WL 2563363 (N.D.Ill.))

is further evidence that Ocwen complied with § 1681s-2(b)(D) because the report contained no adverse findings associated with Ocwen's account.

**8** Although Hukic argues that Ocwen had a duty to inform Aurora that Hukic's credit report was disputed, his argument is premised upon the fact that servicing of the loan was transferred from LSB to Aurora to Ocwen and that Ocwen became Aurora's "sub-agent" and Aurora was LSB's agent. In order to prevail under this "sub-agent" theory, the record would need to reflect that Aurora employed Ocwen to assist Aurora in transacting the affairs of Aurora's principal, LSB. *See Ayh Holdings, Inc. v. Avreco, Inc.,* 357 Ill.App.3d 17, 292 Ill.Dec. 675, 826 N.E.2d 1111, 1125-26 (Ill.App.Ct.2005) *(see also* Black's Law Dictionary 1277 (5th ed. 1979) (A sub-agent is a person employed by an agent to assist him in transacting the affairs of his principal). In fact, Aurora has not serviced the loan since February 2000. Pltf. 56.1 Resp. Aurora ¶ 18. It follows that Aurora did not employ Ocwen to assist it in "transacting the affairs of its principal."Although Hukic argues that it was "highly likely" that Aurora reported Hukic late and that because Ocwen had the authority to access Hukic's credit report, Ocwen had constructive knowledge that Aurora reported Hukic late, his argument is factually unsupported in the record. More important, a furnisher of information has no duty under the statute to report to other furnishers of information; nor is there a statutory duty to investigate another furnisher's reporting information. *See* 15 U . S.C. § 1681s-2. Accordingly, Hukic advances no persuasive authority to support the imposition of a duty upon Ocwen as a furnisher of information to pass information from Trans Union to Aurora and be held liable for Aurora's failure to correct the inaccurate information. Accordingly, there is no genuine issues of material fact associated with Hukic's claims under § 1681s-2(b) against Ocwen. Ocwen is entitled to summary judgment and Count XIV is dismissed with prejudice.

*C. Aurora's liability under 15 U.S.C. § 1681s-2(b)*

Hukic's April 1, 2004 letter disputed the accuracy of Ocwen's account and not Aurora's. Pltf. 56.1 Resp. Ocwen ¶ 46; Hukic Dep. Ex. 10. Hukic disputed the status of Aurora's account a few days after May 14, 2004. Hukic Dep. Ex. 11. The typed portion of the Trans Union form stated that "Upon receipt of your request, an investigation will be initiated and completed within 30 days. Upon completion, you will receive written notice of the results of the investigation."Hukic Dep. Ex. 11. However, if Trans Union responded, its response was not included in the record. Further, there is no evidence that Trans Union notified Aurora. Hukic produced an August 8, 2006 Equifax credit report as evidence that Aurora continued to furnish negative reports to credit agencies. Under Aurora's Account History, the report shows two entries of "60-89 days past due" in January and February of 2000 and "30-59 days past due" in December 1999, but the report concludes that the current status of the loan is "pays as agreed" and that there is no amount past due. Hukic Ex. M. Even if this Court were to assume that the Equifax Report was adverse to Hukic, there is nothing to indicate that Aurora continued to furnish this report after Trans Union provided proper notice to Aurora under the statute.[FN9]Aurora 56.1 Rep. ¶ 17; *see also* Hukic Ex. M. Aurora's duty under § 1681s-2(b) was not triggered until sometime after May 14, 2004 and without some evidence that Trans Union notified Aurora of Hukic's dispute, Hukic's § 1681s-2(b) claim against Aurora is factually insufficient and summary judgment is appropriate.

FN9. Trans Union's duties fall under 15 U.S.C. § 1681i(a)(2) which provides:

Prompt notice of dispute to furnisher of information.

(A) In general. Before the expiration of the 5-business-day period beginning on the date on which a consumer reporting agency receives notice of a dispute from any consumer in accordance with paragraph (1), the agency shall provide noti-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2563363 (N.D.Ill.)
**(Cite as: 2007 WL 2563363 (N.D.Ill.))**

Page 9

fication of the dispute to any person who provided any item of information in dispute, at the address and in the manner established with the person. The notice shall include all relevant information regarding the dispute that the agency has received from the consumer.

(B) Provision of other information from consumer. The consumer reporting agency shall promptly provide to the person who provided the information in dispute all relevant information regarding the dispute that is received by the agency from the consumer after the period referred to in subparagraph (A) and before the end of the period referred to in paragraph (1)(A).

*9 Hukic argues that Aurora and Ocwen failed to correct LSB's "bookkeeping" error which input Hukic's April 1998 payment as $1,135 instead of $1,335 and that Defendants' subsequent reports to credit agencies regarding Hukic's April 1998 payment were inaccurate. Whether Aurora or Ocwen should have provided negative information in the first instance to credit reporting agencies associated with Hukic's April 1998 payment or deficiencies associated with the escrow account is immaterial to Defendants' liability under § 1681s-2(b).[FN10] Similarly, even though Hukic repeatedly advised Aurora and Ocwen of the bookkeeping error and Defendants concede that the error was LSB's, Hukic's complaints directly to his creditors do not trigger liability under § 1681s-2(b). *See Dumas v. Dovenmuehle Mortgage, Inc.,* 2005 U.S. Dist. LEXIS 13369, *17 (N .D. Ill.2005) (plaintiff must show that the furnisher received notice from a credit reporting agency, not the consumer, that the credit information is disputed); *See also Nelson,* 282 F.3d at 1060 (describing the filter set up by Congress to prevent furnishers of information from being sued by every dissatisfied consumer). Accordingly, Hukic's claims against Aurora under the FCRA do not withstand summary judgment and Count XIII is

dismissed with prejudice.

FN10. Hukic initially brought suit under 1681s-2(a) which concerns Aurora and Ocwen's duties as furnishers of information to provide accurate information to consumer reporting agencies. This Court struck Hukic's claims brought under FCRA 1681s-2(a) because there is no private right of action under that section. *See*15 U.S.C. § 1681s-2(c) (specifically prohibiting the use of the statutes permitting private rights of action in the FCRA, § 1681n and § 1681o, for enforcement of subsection (a)); *Rollins v. People's Gas Light and Coke Co.,* 379 F.Supp.2d 964, 966-67 (N.D.Ill.2005) (distinguishing claims under subsection (a) from those under subsection (b)).

Because Hukic has not proffered evidence supportive of his claim under FCRA § 1681s-2(b), there is no occasion to consider damages. *See also Ruffin-Thompkins v. Experian Info. Solutions,* 422 F.3d 603, 610 (7th Cir.2005) ( "because [plaintiff's] claim under the FCRA cannot survive, it follows, *a fortiori,* that the court must deny her claim for punitive or statutory damages."). Hukic is only entitled to punitive damages if Aurora and Ocwen "willfully" failed to comply with "any requirements of this subchapter." 15 U .S.C. § 1681n(a). Any negative information associated with Ocwen was removed within 30 days of Hukic's request and there is no evidence that Ocwen willfully failed to comply with § 1681s-2(b) after Hukic notified Trans Union. Similarly, the record is silent on Trans Union and Aurora's response to Hukic's request made on or after May 14, 2004. Therefore, there is no evidence supportive of "willful" conduct on Aurora's behalf. Accordingly, Count XV seeking punitive damages under the FCRA is dismissed with prejudice.

II. *Hukic's state law claims against Aurora and Ocwen for Tortious Interference with Prospective*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2563363 (N.D.Ill.)
**(Cite as: 2007 WL 2563363 (N.D.Ill.))**

Page 10

*Economic Advantage and Breach of Contract*

A. *The dismissal of the State Court foreclosure action*

Hukic contends that Defendants are collaterally estopped from arguing that he failed to comply with the terms of the mortgage agreement because those issues were litigated in the June 2003 foreclosure proceeding in Illinois State Court. (Hukic's Resp. Ocwen, p. 6; Hukic Resp. Aurora, p. 15). Illinois applies the doctrines of collateral estoppel to preclude individuals from re-litigating claims and issues that have been "finally determined between the parties on the merits, by a court of competent jurisdiction[.]"*Feltman v. Blatt, Hasenmiller, Leibsker & Moore, LLC,* 2006 U.S. Dist. LEXIS 57579, *7-8 (N.D.Ill.2006) (citing *Charles E. Harding Co. v. Harding,* 352 Ill. 417, 186 N.E. 152, 155 (Ill.1933). Collateral estoppel applies where (1) the issue previously decided is identical to the issue in the current suit; (2) there was a final judgment on the merits; (3) the party against whom estoppel is asserted was a party to the prior action ...; and (4) the factual issue ... has actually and necessarily been litigated and determined in the prior action. *Id; citing Boelkes v. Harlem Consolidated Sch. Dist. No. 122,* 363 Ill.App.3d 551, 299 Ill.Dec. 753, 842 N.E.2d 790, 795 (Ill.App.Ct.2006). Whether the doctrine of collateral estoppel should bar Defendants from litigating their defense to Hukic's breach of contract claim in federal court involves analysis of the nature of and ruling on the motion to dismiss the state court action.

*10 On May 16, 2003, the Circuit Court Order reflected that "Ocwen F .S.B. as servicer for First Union will accept reinstatement of monthly payments only" and the parties to continue to negotiate as to the tax escrow issue. (Exhibit B, Ocwen's Reply). The order stated that the hearing on defendant's 2-619 Motion to Dismiss was stricken, and the matter was continued for status on June 16, 2003. *Id.* On June 16, 2003, the foreclosure proceedings were dismissed without prejudice pursuant to 735 ILCS 5/2-619 and Hukic's mortgage was re-

instated. Pltf. 56.1 Resp. Ocwen ¶ 43. The order reads:

"This matter coming to be heard upon the Defendants Avdo Hukic's Motion for Involuntary Dismissal: due notice being given; the Court being fully advised in the premises; doth find: A) That the Court has jurisdiction over the parties and the subject matter: B) That the Defendant has tender(sic) proof of payment of Cook Co. Real Estate Taxes for Tax year 2002 and first installment of 2003. IT IS ORDERED: A) That the Defendant' motion to dismiss pursuant to 735 ILCS 5/619 (sic) is granted without prejudice to Reinstate within 90 days. Further, after 90 days, this dismissal is with prejudice."

(Exhibit A, Ocwen Reply).

Hukic's Motion in the foreclosure proceeding was brought pursuant to 735 ILCS 5/2-619. Hukic's argued that First Union National Bank's claim was barred because Aurora acknowledged that LSB made an input error related to the April 1998 mortgage payment. Hukic Ex. E. First Union National Bank ("First Union") filed a foreclosure action against Hukic. Pltf. 56.1 Resp. Ocwen ¶ 42; Aurora 56.1 Rep. ¶ 10. Hukic's mortgage and note were assigned to First Union by LSB. Aurora 56.1 Rep. ¶ 11. Aurora and Ocwen were not parties to the foreclosure proceeding, but Hukic argues that Aurora and Ocwen are First Union's agents. As stated above, Hukic failed to established a "sub-agent" relationship between Aurora and Ocwen and Aurora's "principal," LSB and Hukic's assertion that First Union contracted with Ocwen, its agent, to continue to service the loan, is similarly unsupported in the record. (Hukic Response Ocwen, p. 7; see also Ocwen 56.1 Rep. ¶¶ 7-9). However, Aurora and Ocwen serviced Hukic's loan and Ocwen was referenced in the May 16, 2003 order as agreeing to reinstate the mortgage.

Even if this Court were to assume that Aurora and Ocwen, as servicers of Hukic's mortgage, became First Union's agents when LSB assigned the mortgage, Hukic cannot meet the first, and fourth

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

prongs of the elements of collateral estoppel. Namely, Hukic has not proffered evidence that the issues previously decided in the foreclosure action are identical to the issues in the current suit and that the factual issues have actually and necessarily been litigated and determined in the prior action. For example, the June 16, 2004 Court Order states that Hukic tendered proof of payment of Cook County real estate taxes for the Tax year 2002 and first installment of 2003. However, there is nothing in the record to indicate that Hukic tendered proof of those payments to his lenders prior to the foreclosure action, and in fact, Hukic concedes in this litigation that he failed to tender proof of payment to his lenders. Pltf. 56.1 Resp. Ocwen ¶¶ 19, 34, 41. Morever, the May 16, 2003 order states that the parties agreed to reinstate the mortgage, but the order does not state whether the Court found as a matter of law whether Hukic was in default. The Order suggests that Hukic was in default because it states that the mortgage was "reinstated." *See* 735 ILCS 5/15-1602 (Reinstatement is effected by curing all defaults then existing, other than payment of such portion of the principal which would not have been due had no acceleration occurred, and by paying all costs and expenses required by the mortgage to be paid in the event of such defaults ..."). Finally, there is nothing in the record that explains the basis of the Court's ruling or that it found plaintiff's factual assertions in its motion to be true after an evidentiary hearing. In summary, there is nothing in the record to supoprt the application of the doctrine of collateral estoppel to Hukic's breach of contract claims against Defendants.

B. *Preemption of Hukic's claims against Defendants for Tortious Interference with Prospective Economic Advantage and Breach of Contract*

**\*11** Aurora argues that § 1681(h)(e) of the FCRA preempts Hukic's state law claims for tortious interference with prospective economic advantage and breach of contract. Although not addressed by the parties, the more specific preemption clause in § 1681t(b)(1)(F), which provides in pertinent part,

"[n]o requirement or prohibition may be imposed under the laws of any State (1) with respect to a subject matter regulated under ...section 1681s-2 of this title, relating to the responsibilities of persons who furnish information to consumer reporting agencies ..."15 U.S.C. § 1 681t(b)(1) (F). Congress added the more sweeping § 1681(b)(1)(F) language in a series of 1996 amendments. Those amendments made no mention of the earlier § 1681(h)(e) language.

Section 1681t(b) (1)(F) preempts any subject matter regulated under section 1681s-2. 15 U.S.C. § 1681t(b)(1)(F). Although some courts have held that § 16812t(b)(1)(F) completely preempts all state law causes of action, and thus eliminates the possibility of any supplemental state claims against furnishers of information, (*See Hasvold v. First USA Bank,* 194 F.Supp.2d 1228 (D.Wyo.2002); *see also Jaramillo v. Experian Info Solutions, Inc.,* 155 F.Supp.2d 356, 363 (E.D.Pa.2001)), other courts have held that the provision has a more limited scope. *See Stafford v. Cross Country Bank,* 262 F.Supp.2d 776, 785-787 (W.D.Ky.2003); *see also Vazquez-Garcia v. Trans Union de Puerto Rico,* 222 F.Supp.2d 150, 161 (D.P.R.2002); *Aklagi v. Nationscredit Financial Services, Corp.,* 196 F.Supp.2d 1186, 1194 (D.Kan.2002). Under the latter approach, the only state law claims preempted are those relating to the obligations of furnishers of information once they know, or have reason to know, about possible inaccuracies. *Id.* That is, these courts interpret § 1681t(b)(1)(F) as preempting only those claims that relate to the actual language of § 1681s-2. *Id* If the allegations against defendants are not regulated by § 1681s-2, then they are not preempted by § 1681t(b)(1)(F).*See Brown v. Bank One Corp.,* 2002 U.S. Dist. LEXIS 22692, *4 (N.D.Ill.2002) (Defendants alleged misconduct in issuing false loans in plaintiffs' names does not raise a challenge to the information supplied to consumer reporting agencies, and thus, is not regulated by the FCRA); *see also Dornhecker,* 99 F.Supp.2d at 931 (plaintiffs' claim for breach of duty arising from defendant's opening of accounts based on

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

stolen information was not regulated by the FCRA). Accordingly, whether Hukic's state law claims against Defendants for tortious interference and breach of contract are preempted by § 1681t(b)(1)(F) depends upon whether the Defendants' alleged misconduct is regulated by § 1681s-2.

Section 1681s-2(a) sets forth the duties of furnisher of information to provide accurate information when they know or have reasonable cause to believe that the information is inaccurate and correct information that they know is inaccurate. 15 U.S.C. § 1681s-2(a).Section 1681s-2(a) also regulates a furnisher's duty to provide notice of delinquency of accounts to credit reporting agencies. *Id.* Section 1681s-2(b) concerns the duties of furnishers of information once a consumer notifies a credit reporting agency that he is disputing information on his credit report. 15 U.S.C. § 1681s-2(b). Hukic's alleges that Defendants knowingly reported false information regarding the status of Hukic's account to credit reporting agencies-conduct regulated by § 1681s-2(a).*See* Pl. Am. Cplt. Counts VI and VI. Similarly, Defendants' conduct following Hukic's notice to Trans Union that he disputed the accuracy of the status of his account is regulated by § 1681s-2(B).*See  id.*Hukic's Amended Complaint does not allege conduct on behalf of Defendants unrelated to their duties as furnishers of information such as issuing loans or opening accounts. Pl. Am. Cplt. Counts VI and VI; *See Brown,* 2002 U.S. Dist. LEXIS 22692 at *4; *see also Dornhecker,* 99 F.Supp.2d at 931. Accordingly, Hukic's allegations associated with his tortious interference claims and the evidence Hukic proffered in support of those claims relate to Defendants' intentional and unjustified reports to credit agencies that interfered with Hukic's prospective third-party relationships with prospective lenders. Defendants' conduct falls under the scope of Sections 1681s-2(a) and (b), and therefore, Hukic's claims against Defendants for tortious interference of prospective economic advantage are preempted by § 1681t(b)(1)(F). As a result, Counts V and VI are dismissed with prejudice.

*12 Unlike Hukic's tortious interference claims, not all of the allegations related to Hukic's breach of contract claims concern Defendants' conduct as furnishers of information. Namely, Hukic's allegations that relate to their purported duties to timely negotiate all payments tendered by the borrower and to credit the note and mortgage for the full amount of the tendered payments have nothing to do with their duties as furnishers of information to credit agencies. *See* Pl. Am. Cplt, Count II, ¶ 166. On the contrary, Hukic's allegations concerning Defendants' duties to "investigate the inaccurate records and reports," and Defendants' conduct that relates to the reports they furnished to credit agencies are preempted by § 1681t(b)(1)(F).

*C. Hukic's Breach of Contract Claims against Defendants*

While some of Defendants' conduct under the breach of contract action is not preempted by § 1681t(b)(1)(F), the surviving allegations do not withstand summary judgment because Hukic has failed to put forth evidence that he performed his obligations under the contract. In order to state an Illinois common law claim for breach of contract, a plaintiff must state: (i) the existence of a valid contract; (ii) plaintiff's performance; (iii) defendant's breach; and (iv) damages to the plaintiff as a result of the breach. *Catania v. Local 4250/5050 of Communications Workers of America,* 359 Ill.App.3d 718, 296 Ill.Dec. 161, 834 N.E.2d 966, 971 (Ill.App.Ct.2005). Defendants argue that Plaintiff cannot state a claim for breach because Plaintiff failed to perform his duties under the contract when he failed to maintain required insurance on his home and failed to make adequate monthly payments. Hukic's breach of contract claim stems in part from Defendants' failure to timely apply, record, and credit his mortgage and note when it received his monthly payments. Even if this Court were to assume that LSB breached a contractual duty to input his April 1998 payment as $1,335 and that it was the lender's responsibility to cure the $200 shortfall, Hukic concedes that he failed to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2563363 (N.D.Ill.)
**(Cite as: 2007 WL 2563363 (N.D.Ill.))**

provide proof to LSB, Aurora, and Ocwen that he was paying his property insurance and taxes directly. As a result, Aurora and LSB advanced thousands of dollars in funds on Hukic's behalf and increased his monthly payments to remit to the escrow account. Even though Hukic was told about the problems with the insurance and taxes, he refused to tender proof of payment and continued to pay only $1,335. Hukic's Mortgage Agreement required Hukic as the borrower to notify his Lender should he pay his property taxes directly and Hukic conceded that he failed to provide such proof to LSB, Aurora, and Ocwen prior to foreclosure. Based upon Hukic's failure to comply with the provisions of the Mortgage Agreement, Hukic has failed to put forth evidence that he performed all of his obligations under the contract at issue and Hukic is barred from bringing claims against Aurora and Ocwen for breach of contract. Counts I and II are dismissed with prejudice.

**\*13** Additionally, Hukic had many opportunities to correct purported deficiencies in his account, but failed to do so. Hukic could have contacted his money lender or LSB to dispute the April 1998 late payment. Hukic could have complied with the Mortgage Agreement and supplied his lenders with proof that property was insured and the taxes paid. Hukic could have also responded to any one of the eleven notices of default from Ocwen and could have disputed Aurora and Ocwen's reports to credit reporting agencies years before his first letter of April 2004. Instead, Hukic waited until after foreclosure proceedings to tender proof of his Cook County tax payments and one year after foreclosure proceedings to dispute adverse reports with Trans Union. In short, Hukic had a duty to make a reasonable effort to avoid damages, and many if not all of his damages would have been avoided by reasonable diligence. *Maere v. Churchill,* 116 Ill.App.3d 939, 72 Ill.Dec. 441, 452 N.E.2d 694, 699-700 (Ill.App.Ct.1983) (*quoting Nelson v. Buick Motor Co.,* 183 Ill.App. 323, 325 (Ill.1913) ("There can be no recovery for damages which might have been avoided by reasonable effort on the part of the per-

son injured.") Therefore, Hukic's claims against Defendants for breach of contract do not withstand summary judgment and Counts I and II are dismissed with prejudice.

Because Hukic's state law claims are dismissed in their entirety, this Court has no occasion to consider damages and Count XII seeking punitive damages for Hukic's common law claims is dismissed with prejudice.

### III. *Conclusion and Order*

For the foregoing reasons, Aurora and Ocwen's Motions for Summary Judgment are granted and Hukic's claims against Aurora and Ocwen are dismissed as a matter of law with prejudice.

So ordered.

N.D.Ill.,2007.
Hukic v. Aurora Loan Services, Inc.
Slip Copy, 2007 WL 2563363 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# SLIP SHEET

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31654950 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2002 WL 31654950 (N.D.Ill.))

Page 1

**C**
Brown v. Bank One Corp.
N.D.Ill.,2002.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern Division.
Clark BROWN and Becca Brown, Plaintiffs,
v.
BANK ONE CORPORATION and Bank One, N.A., Defendants.
**No. 01 C 4698.**

Nov. 22, 2002.

Consumers brought action against bank, alleging violations of the Fair Credit Reporting Act (FCRA) and the Illinois Consumer Fraud and Deceptive Business Practices Act. On, inter alia, consumers' motion to amend complaint, the District Court, Nan R. Nolan, United States Magistrate Judge, held that: (1) proposed amendment to complaint to assert claim under section of FCRA, which provided consumers with private right of action against furnisher of credit information for failing to properly comply with its investigative duties after it received notice of dispute from credit reporting agency, would not be futile or inappropriate, and (2) proposed amendment to assert claim that bank knowingly issued number of false loans in consumers' name in violation of Illinois Consumer Fraud and Deceptive Business Practices Act would not futile, in that claim would not be preempted by FCRA.

Plaintiffs' motion granted.

West Headnotes

**[1] Federal Civil Procedure 170A ⟪═══841**

170A Federal Civil Procedure
   170AVII Pleadings and Motions
     170AVII(E) Amendments
      170Ak839 Complaint
       170Ak841 k. New Cause of Action in General. Most Cited Cases

**Federal Civil Procedure 170A ⟪═══851**

170A Federal Civil Procedure
   170AVII Pleadings and Motions
     170AVII(E) Amendments
      170Ak851 k. Form and Sufficiency of Amendment. Most Cited Cases
Consumers' proposed amendment to complaint against bank to assert claim under section of Fair Credit Reporting Act (FCRA), which provided consumers with private right of action against furnisher of credit information for failing to properly comply with its investigative duties after it received notice of dispute from credit reporting agency, would not be futile or inappropriate, although consumers did not have direct evidence that bank was notified of dispute by agency; under federal liberal pleading requirements, it was sufficient for consumers to allege that "on information and belief" bank was notified of dispute. Consumer Credit Protection Act, § 623(b), as amended, 15 U.S.C.A. § 1681s-2(b); Fed.Rules Civ.Proc.Rule 8, 28 U.S.C.A.

**[2] Federal Civil Procedure 170A ⟪═══851**

170A Federal Civil Procedure
   170AVII Pleadings and Motions
     170AVII(E) Amendments
      170Ak851 k. Form and Sufficiency of Amendment. Most Cited Cases
Proposed amendment to consumers' complaint against bank to assert claim that bank knowingly issued number of false loans in consumers' name in violation of Illinois Consumer Fraud and Deceptive Business Practices Act would not be futile, in that claim would not be preempted by Fair Credit Reporting Act (FCRA); bank's alleged misconduct in issuing false loans in consumers' names did not raise challenge to information supplied to consumer reporting agencies and, thus, was not regulated by FCRA. Consumer Credit Protection Act, § 802 et seq., as amended, 15 U.S.C.A. § 1692 et seq.; S.H.A. 815 ILCS 505/1 et seq.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                   Page 2
Not Reported in F.Supp.2d, 2002 WL 31654950 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 31654950 (N.D.Ill.))**

*MEMORANDUM OPINION AND ORDER*

NOLAN, Magistrate J.

*1 Plaintiffs Clark and Becca Brown filed suit against defendants Bank One Corporation and Bank One, N.A. ("Bank One") alleging violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681*et seq.,* and the Illinois Consumer Fraud and Deceptive Business Practices Act ("Consumer Fraud Act"), 815 ILCS 505/1*et seq.* The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). This matter is now before the Court on Bank One's Motion to Dismiss Plaintiffs' Amended Complaint for Failure to State a Claim pursuant to Fed.R.Civ.P. 12(b)(6), and plaintiffs' Motion for Leave to File Second Amended Complaint. For the reasons set forth below, plaintiffs' motion for leave to amend is granted, and Bank One's motion to dismiss is denied as moot.

### FACTUAL BACKGROUND

In August 1997, Becca Brown was contacted by a representative of Bank One who informed her that someone had tried to obtain a fraudulent loan under her husband's name. The Bank One representative told Ms. Brown that the loan had been denied but, shortly thereafter, another representative told plaintiffs that Bank One-Texas, N.A. had actually made two loans in Mr. Brown's name. Cmplt. ¶¶ 8-9. On several occasions in 1998, plaintiffs were denied credit by various credit reporting agencies. Thus, in June 1999, plaintiffs contacted Bank One to ensure that the false information from the fraudulent loans had been removed from their credit records. Bank One representatives assured plaintiffs that the information would be removed as soon as possible. However, by August 2000, the false information was still appearing on plaintiffs' credit reports and plaintiffs were still being denied credit from various companies. *Id.* ¶¶ 11-16.

On June 20, 2001, plaintiffs filed a complaint alleging that Bank One Corporation violated the

FCRA and the Consumer Fraud Act by wrongfully furnishing inaccurate information to credit reporting agencies, which prevented them from obtaining credit. Plaintiffs amended the complaint on June 3, 2002 to add Bank One, N.A. as a defendant. Bank One now seeks to dismiss the amended complaint for failure to state a claim. Plaintiffs, in turn, seek leave to amend the complaint.

### DISCUSSION

The purpose of a motion to dismiss is to test the sufficiency of the complaint, not to decide its merits. *Gibson* v. *Chicag o, 9* 10 F.2d 1510, 1520 (7th Cir.1990). A motion to dismiss will be granted only "if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which entitles him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In reviewing a motion to dismiss for failure to state a claim, the court takes as true all factual allegations in the plaintiffs' complaint and draws all reasonable inferences in their favor. *Franzoni v. Hartmarx Corp.,* 300 F.3d 767, 770 (7th Cir.2002).

### A. The FCRA

[1] The FCRA requires consumer reporting agencies to follow "reasonable procedures to assure maximum possible accuracy" o f the data within a consumer's credit report. 15 U.S.C. § 1681c(b). The FCRA also imposes duties upon persons who furnish information to consumer reporting agencies. *See* 15 U.S.C. § 1681s-2. Plaintiffs allege that Bank One is such a furnisher of information and, thus, had an obligation to refrain from reporting inaccurate information about plaintiffs' credit. Although the complaint purports to state a claim under 15 U.S.C. § 1681s-2(a), plaintiffs concede that "[i]ndividual consumers have a private right of action against a furnisher of information pursuant to § 1681s-2(b) of the FCRA" and not § 1681s-2(a). *See Wexler v. Banc of America Auto Finance Corp.,* No. 00 C 0865, 2001 WL 428155, at *2 (N.D.Ill.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 3
Not Reported in F.Supp.2d, 2002 WL 31654950 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 31654950 (N.D.Ill.))**

Apr.26, 2001) (citing *Dornhecker v. Ameritech Corp.,* 99 F.Supp.2d 918, 926 (N.D.Ill.2000)); Pl. Mem., p. 3 n. 2.

**\*2** The duties created by § 1681s-2(b)"arise only after the furnisher of information receives notice from a consumer reporting agency that a consumer is disputing the credit information."*Wexler,* 2001 WL 428155, at \*2;*Dornhecker,* 99 F.Supp.2d at 925;*Ryan v. Trans Union Corp.,* No. 99 C 216, 2000 WL 1100440, at \*1 (N.D.Ill. Aug.4, 2000). Bank One claims that plaintiffs "cannot and so do not allege that Bank One was notified of the dispute by a credit reporting agency."Def. Mem., p. 7. Plaintiffs, however, seek leave to amend the complaint to allege that (1) Clark Brown spoke with three major credit reporting agencies and informed them of the dispute; (2) the credit agencies then notified Bank One of the dispute; (3) Bank One failed to investigate the claim; and (4) Bank One is therefore liable under 15 U.S.C. § 1681s-2(b). Pl. Mem., p. 3. Plaintiffs apparently do not have any direct evidence regarding the second allegation but claim that "[i]t is clearly a reasonable inference" that Bank One was notified of the dispute by a credit reporting agency. Pl. Mem., p. 2.

The Court agrees that plaintiffs should be allowed to amend their complaint as stated above. Fed.R.Civ.P. 15(a) (motion to amend complaint should be freely granted "when justice so requires"); *Park v. City of Chicago,* 297 F.3d 606, 612 (7ᵗʰ Cir.2002). The parties have not yet taken-or even scheduled-any depositions or conducted any third-party discovery, so the amendment will not unduly prejudice Bank One or delay these proceedings. Pl. Mem., p. 4. *Compare Hindo v. University of Health Sciences/The Chicago Medical School,* 65 F.3d 608, 615 (7ᵗʰ Cir.1995) (district court properly denied leave to amend complaint one month before discovery ended absent some explanation for the delay). Nor is there any evidence of bad faith or dilatory motive on the part of plaintiffs, who only seek leave to amend due to Bank One's motion to dismiss. Indeed, Bank One does not argue against amendment in this case, other than generally to seek dismissal with prejudice. *See Bethany Pharmacal Co. v. QVC, Inc.,* 241 F.3d 854, 860-61 (7ᵗʰ Cir.2001) ("leave to amend a complaint should be freely granted when justice so requires" un less "there is undue delay, bad faith, dilatory motive, undue prejudice to the opposing party, or when the amendment would be futile").

The mere fact that plaintiffs currently lack actual proof that a consumer reporting agency notified Bank One of their credit dispute does not render their proposed amendment futile or inappropriate. For purposes of satisfying the liberal pleading requirements of Fed.R.Civ.P. 8, it is sufficient for plaintiffs to allege that on "information and belief" Bank One was notified of the credit dispute by one or more credit reporting agencies. *See Chisholm v. Foothill Capital Corp.,* 940 F.Supp. 1273, 1280 (N.D.Ill.1996) ("[a]llegations based on 'information and belief' are usually sufficient to meet Rule 8 pleading requirements"). Having said that, the Court notes that in order for plaintiffs to succeed on the merits of the case, they will need to establish more than just an "inference" that a consumer reporting agency notified Bank One of the dispute. *See, e.g., Wexler,* 2001 WL 428155, at \*3 (granting summary judgment to defendant bank where the plaintiff "informed [the bank] that he believed the credit information was incorrect, but there [were] no facts demonstrating a consumer reporting agency informed [the bank] of a dispute in the credit information").

**B. The Consumer Fraud Act**

**\*3** **[2]** In Count II of the complaint, plaintiffs allege that Bank One's wrongful furnishing of inaccurate information to credit reporting agencies constitutes a violation of the Illinois Consumer Fraud Act. Bank One argues that plaintiffs' Consumer Fraud Act claim is preempted by the FCRA, which provides for absolute immunity from state law claims "with respect to any matter regulated by section 1681s-2 ... relating to the responsibilities of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                              Page 4
Not Reported in F.Supp.2d, 2002 WL 31654950 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 31654950 (N.D.Ill.))**

persons who furnish information to consumer re-
porting agencies."15 U.S.C. § 1681t(b)(1)(F);
*Dornhecker,* 99 F.Supp.2d at 930. Plaintiffs "do not
dispute much of Defendant's argument regarding
FCRA preemption" but seek leave to amend the
complaint to plead that Bank One knowingly issued
a number of false loans in plaintiffs' names. Pl.
Mem., p. 4. Plaintiffs argue, without citation, that
"[t]he act of knowingly issuing false loans is not,
and cannot, be preempted by"§ 1681t. *Id.*

Section 1681s-2 of the FCRA regulates the
"[r]esponsibilities of persons who furnish informa-
tion to consumer reporting agencies."Thus, as
stated, Count II of plaintiffs' complaint is preemp-
ted by the FCRA. Cmplt. ¶¶ 19, 20 (alleging that
Bank One knowingly provided false information to
credit reporting agencies). However, plaintiffs' pro-
posed amendment to this claim would not be pree-
mpted by the statute. In *Dornhecker,* the court
found that the plaintiffs' claim for breach of duty
arising from defendant's opening of accounts based
on stolen information was not regulated by the
FCRA. 99 F.Supp.2d at 931. In this case, similarly,
Bank One's alleged misconduct in issuing false
loans in plaintiffs' names does not raise a challenge
to the information supplied to consumer reporting
agencies and, thus, is not regulated by the FCRA.
And because the Court has already determined that
amendment is appropriate, plaintiffs will be granted
leave to amend Count II of the complaint.
Fed.R.Civ.P. 15(a).

CONCLUSION

For the reasons stated above, plaintiffs' motion for
leave to amend the complaint (Docket Entry # 20-1)
is granted and Bank One's motion to dismiss
(Docket Entry # 16-1) is denied as moot. Plaintiffs
are ordered to file their second amended complaint
by December 6, 2002.

N.D.Ill.,2002.
Brown v. Bank One Corp.
Not Reported in F.Supp.2d, 2002 WL 31654950

(N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# SLIP SHEET

Westlaw.

251 Fed.Appx. 363                                                                                    Page 1
251 Fed.Appx. 363, 2007 WL 3037118 (C.A.7 (Ill.))
**(Cite as: 251 Fed.Appx. 363, 2007 WL 3037118 (C.A.7 (Ill.)))**

C
Nwoke v. Countrywide Home Loans, Inc.
C.A.7 (Ill.),2007.
This case was not selected for publication in the
Federal Reporter.Not for Publication in West's Fed-
eral Reporter See Fed. Rule of Appellate Procedure
32.1 generally governing citation of judicial de-
cisions issued on or after Jan. 1, 2007. See also
Seventh Circuit Rule 32.1. (Find CTA7 Rule 32.1)
United States Court of Appeals,Seventh Circuit.
Chinyere U. NWOKE, Plaintiff-Appellant,
v.
COUNTRYWIDE HOME LOANS, INC., Defend-
ant-Appellee.
No. 07-2233.

Submitted Oct. 17, 2007.[FN*]

FN* After an examination of the briefs and
the record, we have concluded that oral ar-
gument is unnecessary. Thus, the appeal is
submitted on the briefs and the record.
*See*Fed. R.App. P. 34(a)(2).
Decided Oct. 18, 2007.

**Background:** Borrower brought action alleging
that mortgage lender violated Fair Debt Collection
Practices Act (FDCPA) when it failed to credit her
account with full amount of mortgage payment. The
United States District Court for the Northern Dis-
trict of Illinois, Charles R. Norgle, Sr., J., entered
summary judgment in lender's favor, and borrower
appealed.

**Holdings:** The Court of Appeals held that:
(1) lender was not "debt collector," and
(2) Fair Credit Reporting Act (FCRA) preempted
borrower's state law negligence claim.

Affirmed.

West Headnotes

**[1] Antitrust and Trade Regulation 29T ☜212**

29T Antitrust and Trade Regulation
    29TIII Statutory Unfair Trade Practices and
Consumer Protection
        29TIII(C) Particular Subjects and Regula- tions
            29Tk210 Debt Collection
                29Tk212 k. Persons and Transactions
Covered. Most Cited Cases
Mortgage lender was not "debt collector" subject to
Fair Debt Collection Practices Act (FDCPA), even
though lender identified itself as "debt collector" in
collection letter it sent to borrower, where lender
was attempting to collect its own debt, not another
creditor's debt, using its own name. Fair Debt Col-
lection Practices Act, § 803(6), 15 U.S.C.A. §
1692a(6).

**[2] Credit Reporting Agencies 108A ☜3**

108A Credit Reporting Agencies
    108Ak3 k. Liability for False Information. Most
Cited Cases

**States 360 ☜18.19**

360 States
    360I Political Status and Relations
        360I(B) Federal Supremacy; Preemption
            360k18.19 k. Banking and Financial or
Credit Transactions. Most Cited Cases
Fair Credit Reporting Act (FCRA) preempted bor-
rower's state law negligence claim against mortgage
lender for providing inaccurate information to cred-
it reporting agencies. Fair Credit Reporting Act, §
610(e), 15 U.S.C.A. § 1681h(e).

**\*364** Appeal from the United States District Court
for the Northern District of Illinois, Eastern Divi-
sion. No. 06 C 30. Charles R. Norgle, Sr., Judge.
Chinyere U. Nwoke, Bolingbrook, IL, pro se.
Steven R. Smith, Bryan Cave, Chicago, IL, for De-
fendant-Appellee.

Before Hon. FRANK H. EASTERBROOK, Chief
Judge, Hon. DANIEL A. MANION, Circuit Judge

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

251 Fed.Appx. 363
251 Fed.Appx. 363, 2007 WL 3037118 (C.A.7 (Ill.))
(Cite as: 251 Fed.Appx. 363, 2007 WL 3037118 (C.A.7 (Ill.)))

and Hon. MICHAEL S. KANNE, Circuit Judge.

### ORDER

**\*\*1** Chinyere Nwoke sued Countrywide Home Loans, Inc., claiming that it was negligent and violated the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. § 1692e, when it failed to credit her account with the full amount of a mortgage payment. She contends that Countrywide's error caused credit-reporting agencies to lower her credit score, and that the resulting poor score led another lender to reject her mortgage application. She appeals from the district court's grant of summary judgment in favor of Countrywide. We af- firm.

Although, as the district court noted, Nwoke failed to comply with the court's local rule regarding the procedure for opposing a motion for summary judgment, N.D. Ill. R. 56.1(b)(3); *Cichon v. Exelon Generation Co.,* 401 F.3d 803, 809 (7th Cir.2005), the basic facts here are nevertheless undisputed. In July 2003 Nwoke refinanced her home mortgage with a loan from Countrywide. She has made all of her payments to Countrywide on time and has never been in default. Nwoke's problems with Countrywide began in December 2004 when she made two payments totaling $1,181.46, but Countrywide only credited $648.10 to her account. Nwoke did not learn of the error until October 2005, when Countrywide sent her a letter identifying itself as a "debt collector" and requesting payment of late fees. Nwoke called Countrywide to bring the mistake to its attention and later sent Countrywide copies of the cancelled checks. Recognizing its error, Countrywide told Nwoke to disregard the delinquency notices and sent her a check to reimburse late fees that had been charged to her account. Countrywide also submitted corrections to the credit-reporting agencies that it had earlier notified regarding Nwoke's mistaken delinquency; those agencies had already reflected the delinquency on Nwoke's credit report. By the middle of January 2006, Nwoke's credit reports had been corrected to reflect that she

had never been in default.

**[1]** After our de novo review, we agree with the district court that Countrywide is entitled to summary judgment. The FDCPA protects debtors from improper practices of "debt collectors"-third parties who attempt to recoup debts owed to **\*365** creditors. 15 U.S.C. § 1692a(6); *see Catencamp v. Cendant Timeshare Resort Group-Consumer Fin., Inc.,* 471 F.3d 780, 781 (7th Cir.2006). But a creditor who collects its own debt using its own name is not a "debt collector." 15 U.S.C. § 1 692a(4), (6); *see Nielsen v. Dickerson,* 307 F.3d 623, 634 (7th Cir.2002); *Aubert v. Am. Gen. Fin., Inc.,* 137 F.3d 976, 978 (7th Cir.1998). The undisputed facts establish that Countrywide extended a loan to Nwoke, and when Countrywide believed she was in default, it contacted her directly, using its own name, to collect the debt. Thus, Countrywide is Nwoke's creditor, not a debt collector subject to the FDCPA.

Nwoke argues that Countrywide's status as a "debt collector" is in dispute because Countrywide sent her a collection letter asserting that "Countrywide is a debt collector." But this statement has nothing to do with whether Countrywide is a "debt collector" for purposes of the FDCPA. To the contrary, the undisputed facts show that, although Countrywide sometimes operates as a debt collector, it was not a debt collector here-it attempted to collect its own debt, not another creditor's debt, using its own name. So Countrywide's statement in a single letter that it is a debt collector does not raise a genuine issue of material fact as to whether it is subject to the FDCPA for attempting to collect a debt it believed Nwoke owed.

**\*\*2** **[2]** To the extent that Nwoke argues Countrywide's negligence caused a drop in her credit score that prevented her from getting another mortgage, Countrywide is entitled to summary judgment on this claim as well. As the district court observed, the Fair Credit Reporting Act (FCRA) preempts state-law negligence claims for providing inaccurate information to credit-reporting agencies. *See* 15 U.S.C. § 1681h(e); *Young v. Equifax Credit Info.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

251 Fed.Appx. 363
251 Fed.Appx. 363, 2007 WL 3037118 (C.A.7 (Ill.))
**(Cite as: 251 Fed.Appx. 363, 2007 WL 3037118 (C.A.7 (Ill.)))**

Page 3

*Servs., Inc.,* 294 F.3d 631, 638 (5th Cir.2002); *Thornton v. Equifax, Inc.,* 619 F.2d 700, 703 (8th Cir.1980). And to succeed on an FCRA claim, a plaintiff must establish that the defendant acted maliciously or willfully intended to injure the plaintiff. *See* 15 U.S.C. § 1681h(e); *Cushman v. Trans Union Corp.,* 115 F.3d 220, 229 (3d Cir.1997); *Thornton,* 619 F.2d at 703. The facts established here show, at most, that Countrywide was careless when it told the credit-reporting agencies that Nwoke was in default, and Nwoke points to nothing in the record that shows Countrywide acted out of malice or with the intent to cause her harm. In fact, Countrywide promptly contacted the credit-reporting agencies as soon as it learned of its mistake.

AFFIRMED.

C.A.7 (Ill.),2007.
Nwoke v. Countrywide Home Loans, Inc.
251 Fed.Appx. 363, 2007 WL 3037118 (C.A.7 (Ill.))

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# SLIP SHEET

Westlaw.

--- N.E.2d ----
--- N.E.2d ----, 2008 WL 1790436 (Ill.App. 1 Dist.)
**(Cite as: --- N.E.2d ----, 2008 WL 1790436 (Ill.App. 1 Dist.))**

Page 1

**H**
Galvan v. Northwestern Memorial Hosp.
Ill.App. 1 Dist.,2008.
Only the Westlaw citation is currently available.
Appellate Court of Illinois,First District, First Division.
Antonio GALVAN, Individually and on Behalf of All Others Similarly Situated, Plaintiff-Appellant,
v.
NORTHWESTERN MEMORIAL HOSPITAL, Individually and on Behalf of All Others Similarly Situated, Defendant-Appellee.
Nos. 1-05-3620, 1-05-4083.

April 14, 2008.

**Background:** Patient brought class action against hospital and other similarly situated not-for-profit hospitals in the state, challenging, under the Consumer Fraud and Deceptive Business Practices Act, hospitals' practice of billing uninsured patients for gross hospital charges or list hospital charges that were higher than charges for services provided to insured patients, and asserting claim for unjust enrichment. The Circuit Court, Cook County, Thomas P. Quinn, J., 2005 WL 6013162, granted defendant hospital's motion with respect to pleadings, and dismissed the complaint with prejudice. Patient appealed.

**Holdings:** The Appellate Court, Garcia, J., held that:
(1) patient failed to state a claim under Consumer Fraud and Deceptive Business Practices Act for an unfair practice;
(2) patient failed to state a claim for consumer fraud under Consumer Fraud and Deceptive Business Practices Act; and
(3) hospital, by filing a lien under Health Care Services Lien Act, did not retain a benefit, as element of unjust enrichment.

Affirmed.

Robert E. Gordon, J., filed a specially concurring opinion.

**[1] Appeal and Error 30 ⟜762**

30 Appeal and Error
   30XII Briefs
      30k762 k. Reply Briefs. Most Cited Cases
Appellant, by raising for first time in his appellate reply brief an argument that trial court should have granted him leave to amend his complaint, waived appellate review of such issue, on appeal from trial court order granting motion with respect to pleadings and dismissing the complaint with prejudice. S.H.A. 735 ILCS 5/2-615; Sup.Ct.Rules, Rule 341(g).

**[2] Pretrial Procedure 307A ⟜622**

307A Pretrial Procedure
   307AIII Dismissal
      307AIII(B) Involuntary Dismissal
         307AIII(B)4 Pleading, Defects In, in General
            307Ak622 k. Insufficiency in General. Most Cited Cases
A motion to dismiss for failure to state a claim challenges the legal sufficiency of a complaint. S.H.A. 735 ILCS 5/2-615.

**[3] Pretrial Procedure 307A ⟜622**

307A Pretrial Procedure
   307AIII Dismissal
      307AIII(B) Involuntary Dismissal
         307AIII(B)4 Pleading, Defects In, in General
            307Ak622 k. Insufficiency in General. Most Cited Cases

**Pretrial Procedure 307A ⟜679**

307A Pretrial Procedure
   307AIII Dismissal

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- N.E.2d ----
--- N.E.2d ----, 2008 WL 1790436 (Ill.App. 1 Dist.)
**(Cite as: --- N.E.2d ----, 2008 WL 1790436 (Ill.App. 1 Dist.))**

307AIII(B) Involuntary Dismissal
307AIII(B)6 Proceedings and Effect
307Ak679 k. Construction of Plead-
ings. Most Cited Cases
In the context of a motion to dismiss for failure to
state a claim, the central inquiry is whether the al-
legations of the complaint, when considered in the
light most favorable to the plaintiff, are sufficient to
state a cause of action relief may be granted on.
S.H.A. 735 ILCS 5/2-615.

**[4] Pretrial Procedure 307A ☞624**

307A Pretrial Procedure
307AIII Dismissal
307AIII(B) Involuntary Dismissal
307AIII(B)4 Pleading, Defects In, in Gen-
eral
307Ak623 Clear and Certain Nature of
Insufficiency
307Ak624 k. Availability of Relief
Under Any State of Facts Provable. Most Cited Cases
A court should not dismiss a complaint on the
pleadings, pursuant to a motion to dismiss for fail-
ure to state a claim, unless it clearly appears that no
set of facts can be proved under the pleadings
which will entitle the plaintiff to recover. S.H.A.
735 ILCS 5/2-615.

**[5] Appeal and Error 30 ☞893(1)**

30 Appeal and Error
30XVI Review
30XVI(F) Trial De Novo
30k892 Trial De Novo
30k893 Cases Triable in Appellate Court
30k893(1) k. In General. Most
Cited Cases
Trial court's dismissal of a complaint, on a motion
with respect to pleadings, is reviewed de novo.
S.H.A. 735 ILCS 5/2-615.

**[6] Pleading 302 ☞48**

302 Pleading
302II Declaration, Complaint, Petition, or State-
ment
302k48 k. Statement of Cause of Action in
General. Most Cited Cases
In order to state a claim, a plaintiff must allege
facts sufficient to bring a claim within a legally
cognizable cause of action.

**[7] Pretrial Procedure 307A ☞622**

307A Pretrial Procedure
307AIII Dismissal
307AIII(B) Involuntary Dismissal
307AIII(B)4 Pleading, Defects In, in Gen-
eral
307Ak622 k. Insufficiency in General.
Most Cited Cases

**Pretrial Procedure 307A ☞679**

307A Pretrial Procedure
307AIII Dismissal
307AIII(B) Involuntary Dismissal
307AIII(B)6 Proceedings and Effect
307Ak679 k. Construction of Plead-
ings. Most Cited Cases
A court considering a motion to dismiss for failure
to state a claim will disregard the conclusions that
are pleaded and look only to well-pleaded facts to
determine whether they are sufficient to state a
cause of action against the defendant, and if the
facts are not sufficient, a court will grant a defend-
ant's motion to dismiss.

**[8] Antitrust and Trade Regulation 29T ☞134**

29T Antitrust and Trade Regulation
29TIII Statutory Unfair Trade Practices and
Consumer Protection
29TIII(A) In General
29Tk133 Nature and Elements
29Tk134 k. In General. Most Cited
Cases
Under the Consumer Fraud and Deceptive Business
Practices Act, a plaintiff must plead four elements:

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- N.E.2d ----
--- N.E.2d ----, 2008 WL 1790436 (Ill.App. 1 Dist.)                     Page 3
(Cite as: --- N.E.2d ----, 2008 WL 1790436 (Ill.App. 1 Dist.))

(1) an unfair or deceptive act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the unfair or deceptive practice; (3) the unfair or deceptive practice occurred in the course of conduct involving trade or commerce; and (4) the unfair or deceptive practice proximately caused plaintiff's injury. S.H.A. 815 ILCS 505/2.

**[9] Antitrust and Trade Regulation 29T** ⬅➔496

29T Antitrust and Trade Regulation
    29TV Price Regulation
        29TV(B) Enforcement and Remedies
            29Tk491 Actions
                29Tk496 k. Pleading. Most Cited Cases
Allegation by uninsured patient in class action, that hospital's practice of billing uninsured patients for gross hospital charges or list hospital charges that were higher than charges for services provided to insured patients created "a potential profit" of 50 percent for every uninsured patient, with no allegation that hospital actually profited from charging such higher rates, much less that it received an unconscionable profit, did not state a claim under the Consumer Fraud and Deceptive Business Practices Act for an unfair practice. S.H.A. 815 ILCS 505/2.

**[10] Antitrust and Trade Regulation 29T** ⬅➔135(1)

29T Antitrust and Trade Regulation
    29TIII Statutory Unfair Trade Practices and Consumer Protection
        29TIII(A) In General
            29Tk133 Nature and Elements
                29Tk135 Practices Prohibited or Required
                29Tk135(1) k. In General; Unfairness. Most Cited Cases
When measuring unfairness, for purposes of claim under Consumer Fraud and Deceptive Business Practices Act, courts consider three factors, all three of which do not need to be satisfied: (1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive, or un-

scrupulous; and (3) whether it causes substantial injury to consumers. S.H.A. 815 ILCS 505/2.

**[11] Antitrust and Trade Regulation 29T** ⬅➔ 460

29T Antitrust and Trade Regulation
    29TV Price Regulation
        29TV(A) In General
            29Tk460 k. Excessively High Prices; Maximum Prices. Most Cited Cases
Charging an unconscionably high price, by itself, is generally insufficient to establish a claim for unfairness, under the Consumer Fraud and Deceptive Business Practices Act; instead, defendant's conduct must also violate public policy, be so oppressive as to leave the consumer with little alternative except to submit to it, and injure the consumer. S.H.A. 815 ILCS 505/2.

**[12] Antitrust and Trade Regulation 29T** ⬅➔ 496

29T Antitrust and Trade Regulation
    29TV Price Regulation
        29TV(B) Enforcement and Remedies
            29Tk491 Actions
                29Tk496 k. Pleading. Most Cited Cases
Allegation by uninsured patient in class action, that hospital billed uninsured patients for gross hospital charges or list hospital charges, while insurers for insured patients were billed at lower rates pursuant to insurers' contracts with hospital, did not state a claim under the Consumer Fraud and Deceptive Business Practices Act for an unfair practice. S.H.A. 815 ILCS 505/2.

**[13] Antitrust and Trade Regulation 29T** ⬅➔ 162

29T Antitrust and Trade Regulation
    29TIII Statutory Unfair Trade Practices and Consumer Protection
        29TIII(B) Particular Practices
            29Tk162 k. Omissions and Other Failures

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

to Act in General; Disclosure. Most Cited Cases

An undisclosed fact is "material," for purposes of consumer fraud claim under Consumer Fraud and Deceptive Business Practices Act, where a buyer would have acted differently knowing the fact, or if the fact concerned the type of information upon which a buyer would be expected to rely in making a decision whether to purchase. S.H.A. 815 ILCS 505/2.

**[14] Antitrust and Trade Regulation 29T ⬅⮞ 162**

29T Antitrust and Trade Regulation
   29TIII Statutory Unfair Trade Practices and Consumer Protection
      29TIII(B) Particular Practices
         29Tk162 k. Omissions and Other Failures to Act in General; Disclosure. Most Cited Cases

Concealment is actionable as consumer fraud, under the Consumer Fraud and Deceptive Business Practices Act, only where it is employed as a device to mislead. S.H.A. 815 ILCS 505/2.

**[15] Fraud 184 ⬅⮞ 25**

184 Fraud
   184I Deception Constituting Fraud, and Liability Therefor
      184k25 k. Injury and Causation. Most Cited Cases

In a cause of action for fraudulent misrepresentation, a plaintiff must plead he was actually deceived by the misrepresentation, in order to establish proximate causation.

**[16] Antitrust and Trade Regulation 29T ⬅⮞ 162**

29T Antitrust and Trade Regulation
   29TIII Statutory Unfair Trade Practices and Consumer Protection
      29TIII(B) Particular Practices
         29Tk162 k. Omissions and Other Failures to Act in General; Disclosure. Most Cited Cases

In a case under the Consumer Fraud and Deceptive

Business Practices Act where the plaintiff alleges consumer fraud based on concealment of facts, the plaintiff need only allege, with respect to proximate cause, that he relied on the defendant's silence, and need not allege that he was actually deceived by a misrepresentation. S.H.A. 815 ILCS 505/2.

**[17] Antitrust and Trade Regulation 29T ⬅⮞ 496**

29T Antitrust and Trade Regulation
   29TV Price Regulation
      29TV(B) Enforcement and Remedies
         29Tk491 Actions
            29Tk496 k. Pleading. Most Cited Cases

Uninsured patient, in class action alleging that hospital concealed its practice of billing uninsured patients for gross hospital charges or list hospital charges that were higher than charges for services provided to insured patients, failed to allege that he suffered damages from the concealment and that any alleged damages were proximately caused by the concealment, as would be required to state a claim for consumer fraud under Consumer Fraud and Deceptive Business Practices Act; patient did not allege that he would have been charged a different rate had he been informed of existence of discounted rates for certain insured patients or that he would have sought care elsewhere if hospital had disclosed such information to him, that he ever paid anything for medical services he received or that hospital instituted any collection action other than asserting a lien on his settlement agreement with tortfeasor, or that, as a patient taken to hospital in emergency situation, he relied on hospital's rates and billing practice. S.H.A. 815 ILCS 505/2.

**[18] Implied a nd Co nstructive Contracts 2 05H ⬅⮞ 3**

205H Implied and Constructive Contracts
   205HI Nature and Grounds of Obligation
      205HI(A) In General
         205Hk2 Constructive or Quasi Contracts
            205Hk3 k. Unjust Enrichment. Most

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- N.E.2d ----
--- N.E.2d ----, 2008 WL 1790436 (Ill.App. 1 Dist.)
**(Cite as: --- N.E.2d ----, 2008 WL 1790436 (Ill.App. 1 Dist.))**

Page 5

Cited Cases
Hospital, by filing a lien under Health Care Services Lien Act, for medical care billed to uninsured patient based on gross hospital charges or list hospital charges that allegedly were higher than charges for services provided to insured patients, did not retain a benefit, as element of unjust enrichment; no trial court had adjudicated the rights of hospital and patient with respect to proceeds of patient's settlement with tortfeasor or enforced the lien. S.H.A. 770 ILCS 23/10(a), 23/30.

**[19] Implied a nd Co nstructive Contracts 2 05H ☞81**

205H Implied and Constructive Contracts
   205HII Actions
      205HII(B) Pleading
         205Hk81 k. Declaration, Complaint, or Petition. Most Cited Cases
To state a cause of action for unjust enrichment, a plaintiff must allege the defendant unjustly retained a benefit to the plaintiff's detriment, and the defendant's retention violated the fundamental principles of justice, equity, and good conscience.

**[20] Health 198H ☞960**

198H Health
   198HVII Compensation
      198Hk959 Liens
         198Hk960 k. In General. Most Cited Cases
Under the Health Care Services Lien Act, the lien is created only when the injured person has a sum paid or due him, and in the case of a compromise settlement, the lien attaches to any money or property which may be recovered. S.H.A. 770 ILCS 23/10(a).

Appeal from the Circuit Court of Cook County. No. 05 CH 1800, Thomas P. Quinn, Judge Presiding.
George F. Galland, Jr., Miner, Barnhill & Galland, P.C., David S. Rosenbloom, McDermott, Will & Emery, Chicago, IL, for Defendant-Appellee.
Marvin A. Miller, Dom J. Rizzi, Lori A. Fanning,

Miller, Faucher and Cafferty, LLP, Dominic Fichera, Fichera & Miller, Chicago, IL, for Plaintiff-Appellant.
Kathleen T. Pankau, Thaddeus J. Nodzenski, Illinois Hospital Association Naperville, IL, Amicus Curiae Brief of the Illinois Hospital Association.
Craig Becker, Service Employees International Union, Chicago, IL, Amicus Curiae Brief of the Service Employees International Union.
Justice GARCIA delivered the opinion of the court:
*1 The plaintiff, Antonio Galvan, brought a class action lawsuit against the defendant, Northwestern Memorial Hospital, and other similarly situated not-for-profit hospitals in Illinois to challenge their practices of charging uninsured patients more for services than they charged insured patients. Following a motion by the defendant, the trial court dismissed the plaintiff's complaint with prejudice pursuant to section 2-615 of the Code of Civil Procedure (Code) (735 ILCS 5/2-615 ( West 2004)). The plaintiff appeals, arguing he sufficiently pleaded a cause of action under the Illinois Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act) (815 ILCS 505/1 *et seq.* (West 2004)) and for unjust enrichment.

BACKGROUND

On August 27, 2003, the plaintiff was involved in an automobile accident and suffered serious injuries. He was taken to the emergency room at Northwestern where he underwent surgery. The plaintiff remained at Northwestern for 15 days. After he was released, Northwestern billed the plaintiff $87,033.99 for the health care services it provided. At the time of his hospitalization, the plaintiff was uninsured.

In an action to recover for his injuries, the plaintiff was awarded $240,000 in a settlement agreement with the tortfeasor. Northwestern asserted a lien on the proceeds of the settlement in the amount of $87,033.99.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 30 of 63

--- N.E.2d ----                                                                                    Page 6
--- N.E.2d ----, 2008 WL 1790436 (Ill.App. 1 Dist.)
**(Cite as: --- N.E.2d ----, 2008 WL 1790436 (Ill.App. 1 Dist.))**

On January 27, 2005, the plaintiff, individually and on behalf of "all uninsured persons who were treated at or were admitted to Northwestern Memorial Hospital and similar not-for-profit hospitals throughout the state of Illinois from 2001 to the present and who have been billed list or gross hospital charges by Northwestern Memorial Hospital and similar not-for-profit hospitals," filed a two-count complaint against Northwestern "and similarly situated not-for-profit hospitals operating in the state of Illinois that have charged or are charging their uninsured patients gross or list hospital charges."Count I alleged violations of the Consumer Fraud Act. Specifically, it alleged Northwestern's practice of billing uninsured patients gross or list hospital charges, which was more than 50% what it charged insured patients, was unfair and deceptive. In count II, the plaintiff alleged Northwestern was unjustly enriched by its imposition of the lien on the plaintiff's settlement.

The Illinois Hospital Association, in its amicus brief, explained the federal government mandates, through Medicare regulations, all hospitals maintain a charge master list, which outlines customary charges for each of a hospital's services and supplies. The plaintiff alleged when Northwestern billed him for his health care expenses, he was billed based on this list. He maintains this violated the Consumer Fraud Act because insured patients are generally charged significantly lower rates for the same services. The Hospital Association explained that, in general, insured patients are billed less than the price set in the charge master list because their insurance companies have contracted with the hospital.

*2 In May 2005, Northwestern moved to dismiss the plaintiff's complaint, arguing the plaintiff failed to state a claim upon which relief could be granted. On November 11, 2005, the trial court granted Northwestern's motion. The court held because the plaintiff was taken to Northwestern in an emergency, he could not allege any damages proximately caused by a deceptive act. Further, the

plaintiff could not allege unfairness because Northwestern's policy did not violate public policy, the plaintiff was free to challenge the amount he was charged, and the imposition of the lien was a benign act. The court also held the plaintiff failed to state a claim for unjust enrichment because he did not pay any money to Northwestern and thus could not allege Northwestern retained a benefit to his detriment.

The November 11, 2005, order contained the wrong case number. On December 12, 2005, the trial court granted the plaintiff's motion for the entry of an order bearing the correct case number. This appeal followed.

### AMICI BRIEFS

The Service Employees International Union (SEIU) was granted leave to file an amicus brief in support of the plaintiff. The Illinois Hospital Association submitted an amicus brief in support of Northwestern. These briefs outline hospital billing procedures and policies and the effect of these policies on workers. The amici briefs also disclose challenges to hospital billing practices raised in different lawsuits in Illinois and throughout the country.

### ANALYSIS

[1][2][3][4][5] The plaintiff argues the trial court erred when it granted Northwestern's section 2-615 motion to dismiss because he sufficiently stated a cause of action for violations of the Consumer Fraud Act and unjust enrichment. In the alternative, the plaintiff argues in his reply brief he should have been granted leave to amend his complaint.[FN1] A section 2-615 motion to dismiss challenges the legal sufficiency of a complaint. 735 ILCS 5/2-615 (West 2004); *First Midwest Bank, N.A. v. Stewart Title Guaranty Co.,* 218 Ill.2d 326, 334, 300 Ill.Dec. 69, 843 N.E.2d 327 (2006). In the context of a section 2-615 motion, "[t]he central inquiry is whether the allegations of the complaint, when considered in the light most favorable to the plaintiff,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- N.E.2d ----
--- N.E.2d ----, 2008 WL 1790436 (Ill.App. 1 Dist.)
(Cite as: --- N.E.2d ---, 2008 WL 1790436 (Ill.App. 1 Dist.))

Page 7

are sufficient to state a cause of action relief may be granted on."*Hill v. PS Illinois Trust,* 368 Ill.App.3d 310, 312, 305 Ill.Dec. 755, 856 N.E.2d 560 (2006). A court should not dismiss a complaint on the pleadings "unless it clearly appears that no set of facts can be proved under the pleadings which will entitle the plaintiff to recover."*Bryson v. News America Publications, Inc.,* 174 Ill.2d 77, 86-87, 220 Ill.Dec. 195, 672 N.E.2d 1207 (1996). We review the trial court's dismissal of a complaint *de novo. First Midwest Bank,* 218 Ill.2d at 334, 300 Ill.Dec. 69, 843 N.E.2d 327.

[6][7] In order to state a claim, a plaintiff must allege facts sufficient to bring a claim within a legally cognizable cause of action.*City of Chicago v. Beretta U.S.A. Corp.,* 213 Ill.2d 351, 368, 290 Ill.Dec. 525, 821 N.E.2d 1099 (2004). A court considering a motion to dismiss for failure to state a claim will "disregard the conclusions that are pleaded and look only to well-pleaded facts to determine whether they are sufficient to state a cause of action against the defendant."*Beretta,* 213 Ill.2d at 368, 290 Ill.Dec. 525, 821 N.E.2d 1099. If the facts are not sufficient, a court will grant a defendant's motion to dismiss. *Beretta,* 213 Ill.2d at 368, 290 Ill.Dec. 525, 821 N.E.2d 1099.

### A. Consumer Fraud Act

*3 [8] The plaintiff maintains he adequately pleaded Northwestern's practice of billing uninsured patients at its list or gross rate, which was more than 50% what it charged insured patients, was unfair and deceptive. "The Consumer Fraud Act is a regulatory and remedial statute intended to protect consumers, borrowers, and business persons against fraud, unfair methods of competition, and other unfair and deceptive business practices."*Robinson v. Toyota Motor Credit Corp.,* 201 Ill.2d 403, 416-17, 266 Ill.Dec. 879, 775 N.E.2d 951 (2002). The Consumer Fraud Act provides:

"Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, * * * in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby."815 ILCS 505/2 (West 2004).

Thus, under the Act, a plaintiff must plead three elements: (1) an unfair or deceptive act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the unfair or deceptive practice; and (3) the unfair or deceptive practice occurred in the course of conduct involving trade or commerce. *Robinson,* 201 Ill.2d at 417, 266 Ill.Dec. 879, 775 N.E.2d 951. In addition, "a valid claim must show that the consumer fraud proximately caused plaintiff's injury."*Connick v. Suzuki Motor Co.,* 174 Ill.2d 482, 501, 221 Ill.Dec. 389, 675 N.E.2d 584 (1996).

### 1. Unfairness

The plaintiff alleges Northwestern's practice of charging uninsured patients "artificially inflated" gross or list rates for services was unfair because if Northwestern collected the gross or list rates from uninsured patients, the hospital would receive an unconscionable 50% profit. The plaintiff also argued it was unfair that Northwestern gave patients with insurance significant discounts that uninsured patients did not get. Northwestern argues the plaintiff's unfairness claim fails for three reasons: (1) the plaintiff did not plead actual profits; (2) Northwestern's practice of charging uninsured patients higher prices, by itself, was insufficient to establish unfairness; and (3) Northwestern had legitimate reasons for charging uninsured patients more than it charges insured patients.

[9] To the extent the plaintiff's unfairness claim is

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- N.E.2d ----
--- N.E.2d ----, 2008 WL 1790436 (Ill.App. 1 Dist.)
(Cite as: --- N.E.2d ---, 2008 WL 1790436 (Ill.App. 1 Dist.))

Page 8

based on Northwestern making a substantial profit from uninsured patient care, the claim must fail because the plaintiff did not allege Northwestern actually profited from charging these rates, much less that it received an unconscionable profit. The plaintiff's complaint, instead, was couched in the language of potential profit:

"19. According to a report published by the Service Employees International Union ('SEIU'), Illinois hospitals routinely charge the uninsured list or gross charges for medical services that are up to double the actual cost of providing health care and Northwestern charges the uninsured over double the net price that an insured patient would be charged.

**\*4** 20. The uninsured have become a profit center for Northwestern. According to the SEIU Hospital Accountability Project, Northwestern *had a potential profit of 50% per uninsured discharge in 2001.*

\* \* \*

28. Northwestern and the Defendant Class through their deceptive and unjust assessment of the gross overcharges to the uninsured reaps thousands of dollars each year from the uninsured residing in Illinois, including Plaintiff and the putative plaintiff class, by willfully and surreptitiously assessing their grossly overstated list charges on the self-pay or uninsured patients."(Emphasis added.)

[10] The plaintiff also argued the practice of charging uninsured patients rates of more than 50% of that charged to insured patients was unfair under the Consumer Fraud Act. When measuring unfairness, courts consider three factors: "(1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers."*Robinson,* 201 Ill.2d at 417-18, 266 Ill.Dec. 879, 775 N.E.2d 951. All three criteria do

not need to be satisfied to support a finding of unfairness. " 'A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three.' "*Robinson,* 201 Ill.2d at 418, 266 Ill.Dec. 879, 775 N.E.2d 951, quoting *Cheshire Mortgage Services, Inc. v. Montes,* 223 Conn. 80, 106, 612 A.2d 1130, 1143-44 (1992).

[11] Charging an unconscionably high price, by itself, is generally insufficient to establish a claim for unfairness. Instead, the "defendant's conduct must [also] violate public policy, be so oppressive as to leave the consumer with little alternative except to submit to it, and injure the consumer."*Robinson,* 201 Ill.2d at 418, 266 Ill.Dec. 879, 775 N.E.2d 951.

In this case, the plaintiff argues Northwestern's practice violates public policy because by charging the uninsured gross or list rates, knowing most of these patients cannot pay that amount, hospitals can justify collecting higher rates from private insurers and the government, and hospitals can exaggerate the value of the charity care they provide. The SEIU maintains this practice violates public policy because Northwestern and other not-for-profit hospitals are exempt from taxation based on being institutions of public charity. As such, the hospitals have a legal duty to provide free and reduced-price care to those unable to pay. Charging uninsured patients more than other patients offends this policy.FN2

The plaintiff maintains this practice is oppressive because, as an emergency room patient, he had no choice but to accept the medical services provided to him at the inflated rates. He points out he was taken to Northwestern's emergency room following an automobile accident, he needed immediate medical attention, and he had no meaningful choice as to which hospital he was taken to. He argues he was harmed by Northwestern's collection efforts, which included a lien on one-third of his settlement funds.

**\*5** The plaintiff points to an order by Circuit Court Judge Stuart A. Nudelman, denying Our Lady of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- N.E.2d ----
--- N.E.2d ----, 2008 WL 1790436 (Ill.App. 1 Dist.)
**(Cite as: --- N.E.2d ----, 2008 WL 1790436 (Ill.App. 1 Dist.))**

Page 9

the Resurrection Medical Center's motion to dismiss a similar claim in *Servedio v. Our Lady of the Resurrection Medical Center,* No. 04L3381 (Cir. Ct. Cook Co., January 6, 2006). In that case, the plaintiffs sued Resurrection for violations of the Consumer Fraud Act, breach of contract, violations of the Illinois revenue code, and unconscionable conduct. The plaintiffs were all uninsured patients who presented at the emergency room at Resurrection. After services were rendered, none of the plaintiffs were able to pay their hospital bills. To collect for its services, Resurrection sued Servedio and sent collection notices to the other plaintiffs. The plaintiffs then sued Resurrection.

According to the trial court's order, the plaintiffs specifically alleged the rates Resurrection charged to insured patients were the *de facto* rates for services and uninsured patients were charged rates significantly higher than those *de facto* rates. In fact, the plaintiffs alleged they were charged double and triple the amounts charged to insured patients. The plaintiffs argued this practice was unfair under the Consumer Fraud Act because it violated Illinois' public policy that hospitals should provide health care to low income individuals, it was oppressive because the plaintiffs were in a position in which they had no reasonable alternative but to accept medical services and agree to pay, and it was injurious because if the plaintiffs and other low income uninsured patients were charged exorbitantly high fees for medical services, they would likely forgo medical attention when it was needed. Based on these allegations, the trial court found the plaintiffs sufficiently pleaded a cause of action under the Consumer Fraud Act. See also *Cristiani v. Advocate Health Systems Care Network, Inc.,* No. 03L14635 (Cir. Ct. Cook Co., January 27, 2006) (in a similar motion to dismiss, Circuit Court Judge Barbara J. Disko denied Advocate's motion to dismiss a claim under the Consumer Fraud Act, finding a 50% cost reduction for uninsured patients "could constitute a violation of the Consumer Fraud Act"); but compare with *Schmitt v . S t. E lizabeth's Hospital Sisters of the Third Order of St. Francis,*

No. 05L0186 (Cir. Ct. St. Clair Co., December 16, 2005) (similar complaint dismissed because "Plaintiff has failed to allege that he has paid any amount to St. Elizabeth's, or even offered to pay any amount, or that St. Elizabeth's has undertaken any collection activities against him, he has no actual damages, and thus cannot state a claim under the [Consumer Fraud Act]").

Northwestern maintains the only "clear-cut" circumstance in which a high price would violate the Consumer Fraud Act is where the seller violates public policy by giving little or no services for the price paid. Northwestern cites two cases as authority: *People ex rel. Hartigan v. Knecht Services, Inc.,* 216 Ill.App.3d 843, 854-56, 159 Ill.Dec. 318, 575 N.E.2d 1378 (1991) (explaining high prices alone are generally insufficient to establish unfairness under the Consumer Fraud Act, a party must also show the practice violates public policy, is immoral, unethical, or oppressive, and harms consumers); *People ex rel. Fahner v. Hedrich,* 108 Ill.App.3d 83, 90, 63 Ill.Dec. 782, 438 N.E.2d 924 (1982) (practice of charging a $1,500 sales commission when there was little or no service in connection with the sale was unfair under the Consumer Fraud Act because it violated public policy, the consumers were in a position in which they had no reasonable alternative but to pay, and consumers were injured where they were forced to pay a $1,500 fee for little or no services). In this case, because the plaintiff received numerous medical procedures and therapies during his 15-day stay at Northwestern, he could not allege unfairness based on high prices.

*6 Northwestern also argues it has a legitimate reason for charging uninsured patients more than it charges insured patients. Specifically, with insured patients, Northwestern knows it will be paid promptly for the services it provided; thus, it has assurance it will be paid. Further, by contracting with insurance companies for discounted rates, Northwestern can legitimately expect insured members to use its services. In support of this argument,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- N.E.2d ----
--- N.E.2d ----, 2008 WL 1790436 (Ill.App. 1 Dist.)
(Cite as: --- N.E.2d ----, 2008 WL 1790436 (Ill.App. 1 Dist.))

Page 10

Northwestern cites *Laughlin v. Evanston Hospital,* 133 Ill.2d 374, 140 Ill.Dec. 861, 550 N.E.2d 986 (1990), for the proposition that our supreme court has rejected the claim that volume discounts given by health care providers to other parties are unfair to those who do not receive such discounts.

In *Laughlin,* the plaintiffs were third-party payors who indemnified or insured patients for the cost of hospital services. Every plaintiff was charged the same amount for services provided by the defendant hospitals. However, one payor, Illinois Blue Cross Plan, had a contract with the hospitals whereby any amount that Blue Cross paid that exceeded 105% of a hospital's actual cost would be returned to Blue Cross at the end of the year. In 1982, that amount was $50 million. *Laughlin,* 133 Ill.2d at 376-77, 140 Ill.Dec. 861, 550 N.E.2d 986.

The plaintiffs sued these hospitals for violations of the Antitrust Act (740 ILCS 10/1 *et seq.* (West 2004)) and the Consumer Fraud Act. The hospitals moved to dismiss the complaint. The court dismissed the Antitrust Act count, holding: "Price discrimination of the character complained of by the plaintiffs, that is, discrimination which is not predatory, which is not the result of a concerted refusal to deal or a conspiracy and the basis of which is simply that the plaintiff did not obtain services at a lesser price bargained for by a competing buyer, is, in and of itself, not sufficient to state a cause of action under [the Antitrust Act]."*Laughlin,* 133 Ill.2d at 388, 140 Ill.Dec. 861, 550 N.E.2d 986.

Concerning the unfairness claim under the Consumer Fraud Act, the court held the reach of the Consumer Fraud Act is "limited to conduct that defrauds or deceives consumers or others."*Laughlin,* 133 Ill.2d at 390, 140 Ill.Dec. 861, 550 N.E.2d 986. Further, the court held, "To construe the Consumer Fraud Act to give a cause of action for discriminatory pricing that the legislature refused to give under the Antitrust Act would be incongruous."*Laughlin,* 133 Ill.2d at 391, 140 Ill.Dec. 861, 550 N.E.2d 986.

While the holding in *Laughlin* is informative, the plaintiff raises public policy arguments and allegations of oppressiveness that were not relevant in that case. Northwestern argues the public policy favoring charity care is not relevant in this case (nor was it raised by the plaintiff) because the plaintiff made no allegations he qualified for charity care. Further, Northwestern argues the plaintiff's oppressiveness argument is unpersuasive because the plaintiff did not and cannot allege he was required to pay anything as a condition of Northwestern treating him. Further, the lien imposed in the settlement agreement was not oppressive where Northwestern performed services and the plaintiff failed to pay for those services.

*7 The plaintiff's claim of unfairness is founded on the oppressiveness of the medical charges by Northwestern and his lack of meaningful choice "but to pay [Northwestern]'s exorbitant rates." The plaintiff cites *Central Standard Life Insurance Co. v. Davis,* 10 Ill.App.2d 245, 255, 134 N.E.2d 653 (1956) for the definition of oppressive as "unjustly severe" or "unreasonably burdensome." We are unpersuaded that either describes Northwestern's billing practices here.

[12] Underlying the plaintiff's claim that charging uninsured patients a higher price amounts to oppressive pricing is a suggestion that the insured and uninsured patients are similarly situated. They are not. The plaintiff ignores the obvious difference between an insured patient and one uninsured. An insured patient by definition has medical insurance either paid by him directly or by his employer as a benefit. In return for the insurance premiums, his insurance company contracts with a hospital for medical services at a reduced rate. The contract benefits the hospital because payment is guaranteed. There is no such guarantee from uninsured patients. The reality is an insured patient comes into the hospital with expenses already incurred for medical coverage. That his insurance company has been able to negotiate a reduced rate for medical services from the hospital is simply a product of doing business. There is no suggestion the billing contract ne-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- N.E.2d ----
--- N.E.2d ----, 2008 WL 1790436 (Ill.App. 1 Dist.)
**(Cite as: --- N.E.2d ----, 2008 WL 1790436 (Ill.App. 1 Dist.))**

Page 11

gotiated between Northwestern and a particular insurance company is negotiated at anything other than at arm's length. That an uninsured patient is charged a higher rate for medical services is the flip side of the revenue-stream coin. Those that have incurred the expense of medical insurance guaranteeing payment to a medical services provider receive reduced billing rates; those that have incurred no expense to guarantee payment to a medical services provider must bear the full cost for those services. While the plaintiff contends the rate he was charged was "exorbitant" a nd unrelated to the actual costs of the providing the medical services received, as a court of law we find no basis to address such arguments for "unfairness" as it would require we examine the billing practices in their entirety for both insured and uninsured patients, for each is a part of the revenue stream; we cannot ignore one and examine the other. As the amicus Illinois Hospital Association correctly contends, the contentions of the plaintiff should be directed to the deliberative process of the legislature.

We agree with the trial court; the plaintiff has failed to make out a case for unfairness in Northwestern's billing practices.

### 2. Deception

The plaintiff also argues his complaint adequately set out a deception claim under the Consumer Fraud Act because Northwestern concealed material facts from him and other uninsured patients. Specifically, the plaintiff argues Northwestern failed to disclose it charged uninsured patients at least double what it charged insured patients. The trial court held because of the emergency nature of the plaintiff's admission to Northwestern, he could not allege any damages proximately caused by the concealment or omission of any facts.

**\*8** As outlined above, to state a cause of action under the Act, a plaintiff must plead four elements: (1) a deceptive act or practice by the defendant; (2) an intent by the defendant that the plaintiff rely on

the practice; (3) the deceptive practice occurred in the course of conduct involving trade or commerce; and (4) the practice proximately caused the plaintiff's injury.*Robinson,* 201 Ill.2d at 417, 266 Ill.Dec. 879, 775 N.E.2d 951;*Connick,* 174 Ill.2d at 501, 221 Ill.Dec. 389, 675 N.E.2d 584.

[13][14] An omission or concealment of a material fact in the conduct of trade or commerce constitutes consumer fraud. 815 ILCS 505/2 (West 2004); *Connick,* 174 Ill.2d at 504, 221 Ill.Dec. 389, 675 N.E.2d 584. "A material fact exists where a buyer would have acted differently knowing the information, or if it concerned the type of information upon which a buyer would be expected to rely in making a decision whether to purchase."*Connick,* 174 Ill.2d at 505, 221 Ill.Dec. 389, 675 N.E.2d 584. Concealment is only actionable where it is employed as a device to mislead. *Pappas v. Pella Corp ..,* 363 Ill.App.3d 795, 799, 300 Ill.Dec. 552, 844 N.E.2d 995 (2006).

[15][16] In a cause of action for fraudulent misrepresentation, a plaintiff must plead he was actually deceived by the misrepresentation in order to establish proximate causation. *Pappas,* 363 Ill.App.3d at 804, 300 Ill.Dec. 552, 844 N.E.2d 995. In other words, under the Consumer Fraud Act, deceptive advertising could not be the proximate cause of the plaintiff's damages unless the plaintiff was deceived by the advertising. *Pappas,* 363 Ill.App.3d at 804, 300 Ill.Dec. 552, 844 N.E.2d 995. However, in a case where the plaintiff alleges consumer fraud based on concealment of facts, a plaintiff need only allege he relied on the defendant's concealment by silence."Requiring anything more would eviscerate the spirit and purpose of the Consumer Fraud Act."*Pappas,* 363 Ill.App.3d at 805, 300 Ill.Dec. 552, 844 N.E.2d 995. In *Pappas,* the plaintiff alleged the defendant, even though it was aware of a material defect in a product, never notified its customers that the product was defective. The court held the plaintiff, in effect, alleged he relied on the plaintiff's silence, which was sufficient to plead proximate cause. *Pappas,* 363 Ill.App.3d at 805,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- N.E.2d ----                                                    Page 12
--- N.E.2d ----, 2008 WL 1790436 (Ill.App. 1 Dist.)
**(Cite as: --- N.E.2d ----, 2008 WL 1790436 (Ill.App. 1 Dist.))**

300 Ill.Dec. 552, 844 N.E.2d 995.

In this case, the plaintiff pleaded:

"15. Northwestern and the Defendant Class do not disclose the disparate cost treatment to the uninsured in any of its promotional materials while touting its provision of services to charities and the poor.

\* \* \*

27. There is no meaningful disclosure of these discrepancies in charges to the uninsured. Northwestern and the Defendant Class are instead deceptively and unlawfully embedding these gross charges set forth in the billing statement sent to the uninsured in a manner that was deliberately calculated by Northwestern and the Defendant Class to conceal its gross overcharges from the uninsured.

28. Northwestern and the Defendant Class through their deceptive and unjust assessment of the gross overcharges to the uninsured reaps thousands of dollars each year from the uninsured residing in Illinois, including Plaintiff and the putative plaintiff class, by willfully and surreptitiously assessing their grossly overstated list charges on the self-pay or uninsured patients.

\* \* \*

**\*9** 35. The uninsured have little choice as to which hospital they enter, particularly in an emergency. They cannot 'shop around' for the best prices. In Cook County in 2001, the emergency room was the referral source for a higher proportion of self-pay patients (67%) than for patients with health insurance (45%). A higher proportion of self-pay patient admissions (69%) were deemed to be emergencies than were insured patient admissions (50%).*See* the Hospital Accountability Project of the Service Employees Union report entitled: *Why the Working Poor Pay*

*More: A Report on Discriminatory Pricing of Health Care.*

\* \* \*

62. Defendant's actions as alleged herein are unfair and deceptive, and constitute fraud, misrepresentation and the concealment, suppression and omission of material facts with the intent that Plaintiff and the Plaintiff Class would rely upon the fraudulent misrepresentation, concealment, suppression and omission of such material facts, all in violation of the Illinois Consumer Fraud Act.

63. By reason of the premises, and as a proximate cause thereof, Plaintiff and the Plaintiff Class have been injured and are thus entitled to damages from Northwestern, for its own fraudulent billing practices and for its conduct with respect to the uninsured, and all other relief prayed for in this Class Action Complaint."

[17] The plaintiff adequately pleaded that Northwestern concealed information about its rates and billing practice from him. However, he did not plead that he suffered any damages from the concealment, or that any alleged damages were proximately caused by the concealment. As Northwestern points out, the plaintiff never alleged he would have been charged a different rate had he been "informed of the existence of discounted rates for certain insured patients" o r he would have sought care elsewhere if Northwestern had disclosed this information to him. In fact, he pleaded the existence of the practice at Northwestern and other not-for-profit hospitals of charging uninsured patients more. Further, the plaintiff never paid anything for the medical services he received, nor did he plead Northwestern instituted any collection action other than asserting a lien on his settlement agreement. Finally, because the plaintiff was taken to Northwestern in an emergency situation so that care would have been provided before any discussions of rates or payments were had, the plaintiff makes

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- N.E.2d ----
--- N.E.2d ----, 2008 WL 1790436 (Ill.App. 1 Dist.)
(Cite as: --- N.E.2d ----, 2008 WL 1790436 (Ill.App. 1 Dist.))

no claim of reliance on Northwestern's rates and billing practice for the medical services he re- ceived.

The trial court properly dismissed count I of the plaintiff's complaint.

## II. Unjust Enrichment

[18] In count II of his complaint, the plaintiff al- leged Northwestern was unjustly enriched when it asserted a lien against the plaintiff's personal injury settlement. Although the trial court found the plaintiff suffered a detriment, it dismissed this count, holding the plaintiff never pleaded that Northwestern retained a benefit.

*10 [19] To state a cause of action for unjust en- richment, a plaintiff must allege the defendant un- justly retained a benefit to the plaintiff's detriment, and the defendant's retention violated the funda- mental principles of justice, equity, and good con- science. *HPI Health Care Services, Inc. v. Mt. Ver- non Hospital, Inc.,* 131 Ill.2d 145, 160, 137 Ill.Dec. 19, 545 N.E.2d 672 (1989).

The plaintiff argues Northwestern's lien on his set- tlement award was a property interest and, thus, Northwestern retained a benefit. Northwestern ar- gues the lien was unadjudicated and so long as it re- mains unadjudicated, it has retained no benefit.

Section 10 of the Health Care Services Lien Act (Lien Act) (770 ILCS 23/10(a) (West 2004)), provides:

"Every health care professional and health care provider that renders any service in the treatment, care, or maintenance of an injured person * * * shall have a lien upon all claims and causes of ac- tion of the injured person for the amount of the health care professional's or health care provider's reasonable charges * * *."

Once a health care provider asserts a lien, a trial court will adjudicate the rights of the interested parties and enforce the lien after petitioned by either the injured party or the health care provider. 770 ILCS 23/30 (West 2004).

[20] A lien is a "legal claim upon the property re- covered as security for payment of [a] debt."*In re Estate of Cooper,* 125 Ill.2d 363, 369, 126 Ill.Dec. 551, 532 N.E.2d 236 (1988). In other words, "when a hospital attaches a lien upon an accident victim's recovery, it fashions for itself a type of property in- terest in any assets constituting the recovery, be- cause a lien is a property interest."*Memedovic v. Chicago Transit Authority,* 214 Ill.App.3d 957, 959, 158 Ill.Dec. 613, 574 N.E.2d 726 (1991). A li- en can come into existence only when a recovery is made, because absent a provision to the contrary, a lien is created only when there is property to which it may attach. *Cooper,* 125 Ill.2d at 369, 126 Ill.Dec. 551, 532 N.E.2d 236. "Under the Hospital Lien Act, the lien is created only when the injured person has a 'sum paid or due' him. [Citation .] In the case of a compromise settlement, the lien at- taches to 'any money or property which may be re- covered.'[Citation.]"*Cooper,* 125 Ill.2d at 369, 126 Ill.Dec. 551, 532 N.E.2d 236.[FN3]*Cooper* and *Memedovic* establish a lien is a type of property in- terest, but until a trial court adjudicates the rights of the parties and enforces the lien, the health care provider, in this case Northwestern, has retained no benefit.

The trial court, therefore, properly dismissed Count II as well.

## CONCLUSION

For the reasons stated above, the decision of the cir- cuit court of Cook County is affirmed.

Affirmed.

WOLFSON, J., concurs.Justice ROBERT E. GOR- DON, specially concurring:
I agree with the majority that the trial court prop- erly dismissed plaintiff's complaint with prejudice pursuant to section 2-615 of the Code of Civil Pro-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- N.E.2d ----
--- N.E.2d ----, 2008 WL 1790436 (Ill.App. 1 Dist.)
**(Cite as: --- N.E.2d ----, 2008 WL 1790436 (Ill.App. 1 Dist.))**

cedure (CODE) 735 ILCS 5/2-615 (West 2004).

In order for a hospital to collect a bill for services rendered they must show that the bill is the fair, usual and customary charge for the services received at area hospitals at the time of the charge. *Victory Memorial Hospital v. Rice,* 143 Ill.App.3d 621, 97 Ill.Dec. 635, 493 N.E.2d 117 (1986).*In re the Estate of Ahbergo v. Hull, et al.,* 275 Ill.App.3d 439, 211 Ill.Dec. 905, 656 N.E.2d 97 (1995). Therefore, a trial court will adjudicate a hospital lien on the same basis. 770 ILCS 23/30 (West 2004). The amicus brief filed by the Service Employees International Union (SEIU) outlines hospital billing procedures and policies. The Illinois Hospital Association, in its amicus brief, explains how all hospitals maintain a master charge list outlining the customary charge for each hospital charge based on what other hospitals in the area are charging for each service they provide. Plaintiff admits he was billed for his health care expense based on this list. If a hospital individually enters in a contract with a health care insurance company to bill their insured at a reduced rate, there is nothing in the law that prohibits that conduct under the theory that it violates the Illinois Consumer Fraud and Deception Business Provision Act or under the theory for unjust enrichment as noted by the majority in their opinion.

> FN1. There is no need to address this contention, as issues not raised in the main brief are waived. See *Stephens v . Industrial Comm'n,* 284 Ill.App.3d 269, 276, 219 Ill.Dec. 596, 671 N.E.2d 763 (1996) (argument raised for the first time in the reply brief in violation of Rule 341(g) (155Ill.2dR.341(g)) need not be ad- dressed).

> FN2. The plaintiff did not raise the charity-care argument in his complaint or his brief. The plaintiff never alleged he was unable to pay for his services or he was entitled to charity care.

> FN3. The Hospital Lien Act was repealed and replaced with the Lien Act in 2003.

Ill.App. 1 Dist.,2008.
Galvan v. Northwestern Memorial Hosp.
--- N.E.2d ----, 2008 WL 1790436 (Ill.App. 1 Dist.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# SLIP SHEET

Westlaw.

Slip Copy                                                              Page 1
Slip Copy, 2008 WL 904902 (N.D.Ill.)
(Cite as: 2008 WL 904902 (N.D.Ill.))

Dry Enterprises, Inc. v. Sunjut AS
N.D.Ill.,2008.
Only the Westlaw citation is currently available.
      United States District Court,N.D. Illinois,Eastern
                          Division.
      DRY ENTERPRISES, INC., an Illinois corpora-
      tion; Sunpack Pacific, LLC, a Delaware limited li-
      ability company; Steven E. Dry, and individual; and
          Hakan Hazneci, an individual, Plaintiff,
                             v.
      SUNJUT AS, a Turkish corporation; Sun-Pack Cor-
      poration d/b/a Sunjut Corporation, an Illinois cor-
      poration; Metin Levi, an individual; Fidan Labbe,
      an individual; Yasemin Cinar, an individual; Karrie
      Patriquin, an individual; and Tuncer Ertoklar, an in-
                      dividual, Defendant.
                        No. 07 C 1657.

                       March 31, 2008.

Daniel Frank Lanciloti, Janet V. Siegel, Seyfarth
Shaw LLP, Chicago, IL, for Plaintiff.
William J. Holloway, Evan D. Brown, Kourtney A.
Mulcahy, Michael John Leech, Hinshaw & Cul-
bertson, LLP, Chicago, IL, for Defendant.

### MEMORANDUM OPINION AND ORDER

VIRGINIA M. KENDALL, District Judge.
*1 Plaintiffs Dry Enterprises, Inc. ("Dry Enter-
prises"), Sunpack Pacific, LLC ("Sunpack Pa-
cific"), Steven E. Dry ("Steven Dry") and Hakan
Hazneci ("Hazneci") (collectively "Dry") bring this
action against Defendants Sunjut A.S., Sun-Pack
Corporation ("Sun-Pack"), Metin Levi ("Levi"),
Fidan Labbe ("Labbe"), Yasemin Cinar ("Cinar"),
Karrie Patriquin ("Patriquin") and Tuncer Ertoklar
("Ertoklar") alleging violations of the Electronic
Communications Privacy Act, the Stored Communi-
cations Act, the Computer Fraud and Abuse Act,
breach of contract, tortious interference with pro-
spective economic advantage, tortious interference
with contract and defamation. Sunjut A. S., Sun-

Pack, Levi, Labbe, and Ertoklar move to dismiss
Plaintiff's defamation claim, and Cinar and Pat-
riquin move to dismiss Plaintiffs defamation, tor-
tious interference with contract, and tortious inter-
ference with prospective economic advantage claims.

### STATEMENT OF FACTS

At the motion to dismiss stage, all of the plaintiffs'
allegations are accepted as true. Pursuant to orally
agreed upon terms and conditions, Dry Enterprises
has, for the past several years, purchased flexible
intermediate bulk containers ("FIBCs") from Sunjut
U.S.A. and Sunjut A.S. (collectively "Sunjut").
Cmplt. at ¶ 3 9. FIBCs are a tylple of storage bag
used in international shipping that aids in pre-
serving the product during shipping. Dry Enter-
prises received orders from customers, purchased
the FIBCS from Sunjut U.S.A., and Sunjut A.S.
sent the FIBCs directly to Dry Enterprises' custom-
ers.Id. at ¶¶ 40-44.Sunjut U.S.A. then paid Dry its
margin on the sales each month. Id. at ¶ 45.By
2001, Dry became interested in purchasing FIBCs
manufactured in Asia at lower prices. Id. at ¶ 48.To
this end, once Steven Dry and Hazneci located a
suitable Chinese manufacturer, Sunjut became in-
terested in the opportunity. Id. at ¶¶ 51-52.In Au-
gust 2004, Dry, Hazneci, and Sunjut A.S. formed a
limited liability company known as Sunjut Pacific,
LLC, which on January 27, 2007 changed its name
to Sunpack Pacific, LLC ("Sunpack Pacific").Id . at
¶ 52.Sunpack Pacific was designed to purchase and
sell and distribute FIBCs manufactured in Asia to
customers all over the world. Id. at ¶ 54.

According to Sunpack Pacific's Operating Agree-
ment, Sunjut A.S. was required to contribute tech-
nology valued at $150,000, and Sunpack Pacific
paid Sunjut U.S.A. a commission on all bags de-
livered to the United States from manufacturers in
China. Id. at ¶¶ 56, 59.Both Dry Enterprises and
Sunjut U.S.A. became customers of Sunpack Pa-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

cific. *Id.* at ¶¶ 57-58.

After the formation of Sunpack Pacific, the parties' business relationship began to deteriorate. *Id.* at ¶ 63.On or about October 27, 2006, Steven Dry discovered that someone had altered his email settings such that all his emails were immediately forwarded to Levi, the managing director of Sunjut A.S. and president of Sunjut U.S.A. *Id.* at ¶ 64.Neither Levi nor anyone at Sunjut was authorized to access Steven Dry's email account, and Steven Dry believes that Levi, or someone else at his direction, altered the settings so that Levi could receive Steven Dry's proprietary information concerning the business of Dry Enterprises and Sunpack Pacific. *Id.* at ¶¶ 65-66.

*2 On January 18, 2007, Patriquin, Sunjut's customer service representative, informed Sunpack Pacific that from that point forward Sunjut would require Dry to attach its customers' original purchase orders when ordering FIBCs and releasing them from the warehouse and that Sunjut would no longer accept a purchase order that displayed the Sunpack name and logo. *Id.* at ¶ 68.In response, on January 19, 2007, Dry Enterprises informed Patriquin that it would purchase FIBCs directly and use its own warehouse and freight and thus would no longer need Sunjut's services to store or ship FIBCs or bill customers. *Id.* at ¶ 70.The same day, Levi confirmed the changes and stated that Sunjut would no longer bill Dry's customers on invoices displaying the Sunpack name and logo. *Id.* at ¶ 71.Although Sunjut U.S.A. had stated that the new terms would apply only to new orders, on March 16, 2007, it stated that it would not ship the outstanding orders as previously agreed. *Id.* at ¶ 72.

Sunjut A.S. then failed to provide Sunpack Pacific with the technology required by the Operating Agreement, and Sunjut U.S.A. failed to pay Sunpack Pacific for products purchased. *Id.* at ¶¶ 73-74.Sunjut A.S. also set up a joint venture and then another Chinese manufacturing plant, both of which competed with Sunpack Pacific. *Id.* at ¶¶ 75-77.

Levi also began defaming Sunpack Pacific, Steven Dry, Dry Enterprises, and Hazneci to customers and suppliers in order to harm their business reputations and divert their customers. *Id.* at ¶ 78.Specifically, Levi sent an email to two Chinese manufacturing partners of Sunpack Pacific stating in part that Dry and Hazneci were being fired by Sunjut for acting unethically. *Id.* at ¶¶ 79-80.Levi also noted that all business agreements would remain the same, but the contact person would change. *Id.* Dry asserts that these statements are false and that Levi and Sunjut knew the manufacturers had a business relationship with Sunpack Pacific, Dry, and Hazneci when they made the statements. *Id.* at ¶¶ 81-83.

Levi also sent a letter to SuperPacking, another supplier of Sunpack Pacific, falsely stating that Sunjut's lawyers were attempting to force Sunpack Pacific to stop using the Sunjut name, accusing Sunpack Pacific of stealing the name, and claiming that "their greed has blinded them." *Id.* at ¶¶ 84-85.Levi also encouraged Superpacking to refuse to support Sunpack Pacific regarding customers introduced under the Sunjut umbrella. *Id.* at ¶ 86.

Following these actions, Sunpack Pacific's lawyers sent a cease and desist letter to Levi and Sunjut. *Id.* at ¶ 88.On January 5, 2007, Sunpack Pacific adopted a resolution declaring failure of consideration by Sunjut A.S. and thus declaring that it was never a member of Sunpack Pacific. *Id.* at ¶ 89.Levi and Sunjut, however, continued to make defamatory statements about Sunpack Pacific and Dry to their manufacturers and customers in order to harm Dry and Sunpack Pacific and divert their customers. *Id.* at ¶¶ 91-97.Specifically, on February 21, 2007, Labbe sent a letter to a Dry Enterprises customer stating that "Steve has opened his own company in China, without permission has converted many bags from Sunjut to this company of his."*Id.* at ¶ 93.

*3 In addition, Patriquin, at Sunjut U.S.A.'s direction, sent an email to a Dry Enterprises customer "informing them that their shipment had arrived and that all invoices would be on Sunjut letterhead

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 904902 (N.D.Ill.)
(Cite as: 2008 WL 904902 (N.D.Ill.))

Page 3

from now on."*Id.* at ¶ 98.The customer responded that its contract was with Dry Enterprises and that it did not want to be pulled into the middle of a dispute. *Id.* Similarly, Ertoklar, a customer service representative contacted a Sunpack Pacific customer to state that it should send payments directly to Sunjut U.S.A.'s offices, and Cinar contacted Sunjut A.S.'s Europe branch offices and told them not to provide assistance to Dry Enterprises or Hazneci. *Id.* at ¶ 104-105.

### STANDARD OF REVIEW

When considering a motion to dismiss under Rule 12(b)(6), a court must accept as true all facts alleged in the complaint and construe all reasonable inferences in favor of the plaintiff. *See Murphy v. Walker,* 51 F.3d 714, 717 (7th Cir.1995). To state a claim upon which relief can be granted, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."Fed.R.Civ.P. 8(a)(2). A plaintiff need not allege all facts involved in the claim. *See Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc.,* 40 F.3d 247, 251 (7th Cir.1994). However, in order to survive a motion to dismiss for failure to state a claim, the claim must be supported by facts that, if taken as true, at least plausibly suggest that the plaintiff is entitled to relief. *See Bell Atlantic Corp. v. Twombly,* --- U.S. ----, ----, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007). Such a set of facts must "raise a reasonable expectation that discovery will reveal evidence" of illegality. *Id.* at 1965.

### DISCUSSION

#### General Allegations of Defamation

Dry makes several general allegations of defamation against all the Defendants. Specifically, Dry alleges:

"On numerous occasions, Levi made false and

defamatory statements to Sunpack Pacific's Chinese Suppliers, SunPack Pacific's customers, and to Dry Enterprises' customers in order to cause harm to the business and reputations of Sunpack Pacific, Dry Enterprises, Steven Dry, and Hazneci, and to divert the customers of Dry Enterprises and Sunpack Pacific to Sunjut A.S., Sunjut U.S.A. and Sunjut China."Cmplt. at ¶ 78.

"Sunjut A.S. and Levi continue to make false and defamatory statements to Sunpack Pacific's suppliers and customer ...."*Id.* at ¶ 91.

"Sunjut A.S., Sunjut U.S.A., Levi, and Labbe, both individually and as agents of their respective companies, and at Levi's direction, also made false and defamatory statements to Dry Enterprises' customers and Sunpack Pacific's customers in order to harm Dry Enterprises' and Sunpack Pacific's business relationships, to divert those customers from Sunpack Pacific and Dry Enterprises to Sunjut A. S., Sunjut U.S.A., and/or Sunjut China, and to cause harm to the character and reputation of Steven Dry and Hazneci."*Id.* at ¶ 92.

*4 "On information and belief, Sunjut A. S., Sunjut U.S.A., Levi, or other employees or agents acting at their direction have also made false and defamatory statements to these ten customers regarding Sunpack Pacific, Dry Enterprises, Steven Dry, or Hazneci."*Id.* at ¶ 102.

"Sunjut U.S.A., Sunjut A.S., Levi, Labbe, Patriquin, and Ertoklar continue to make these false and defamatory statements in an effort to cause harm to the business of Dry Enterprises and Sunpack Pacific, as well as cause harm to the character and reputation of Steven Dry and Hazneci, and to interfere Dry Enterprises and Sunpack Pacific's customers and suppliers and in order to divert that business to Sunjut A. S., Sunjut U.S.A., and/or Sunjut China [sic]."*Id.* at ¶ 107.

Claims of defamation are subject to specific pleading requirements. The Seventh Circuit has not

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

spoken as to the exact pleading standard for claims of defamation. Some courts have required Plaintiffs to specifically state the words alleged to be actionable to meet pleading standards. *See, e.g., Woodward v. Am. Family Mut. Ins. Co.,* 950 F.Supp. 1382, 1388 (N.D.Ill.1997); *Seaphus v. Lilly,* 691 F.Supp. 127, 134 (N.D.Ill.1988). However, the alleged defamatory statements need not be alleged verbatim. *See, e.g., Flentye v. Kathrein,* 485 F.Supp.2d 903, 919 (N.D.Ill.2007); *Chisolm v. Foothill Capital Corp.,* 940 F.Supp. 1273, 1284 (N.D.Ill.1996). The rationale behind this pleading requirement is that "general knowledge of the exact language used is necessary to form responsive pleadings."*Chisolm,* 940 F.Supp. at 1284*citing Vantassell-Matin v. Nelson,* 741 F.Supp. 698, 708 (N.D.Ill.1990). Thus, "an allegation is sufficiently specific if it allows the defendant to understand the nature of the claim and form a responsive pleading."*Wilton Partners III LLC v. Gallagher,* No. 03 C 1519, 2003 U.S. Dist. LEXIS 21899, at *16 (N.D.Ill.Dec. 2, 2003)*citing Soccorro v. IMI Data Search, Inc.,* No. 02 C 8120, 2003 U.S. Dist. LEXIS 7400, 2003 WL 1964269 (N.D.Ill. April 28, 2003).

Nonetheless, courts require some level of detail in defamation pleadings, and Dry's general allegations of defamation cannot survive a Motion to Dismiss. Notably, courts have dismissed claims of defamation when given much more detail than Dry provides in his general allegations. For example, in *Wilton Partners,* the plaintiffs alleged in their complaint that defendants "advised one or more of the above-referenced entities that Gallagher and FEPC were engaged in illegal or wrongful conduct; misappropriated or stole information belonging to Wilton; misrepresented themselves in proposals to one or more of the above-referenced entities or were otherwise lacking in business integrity."2003 U.S. Dist. LEXIS 21899 at *16-17, (N.D.Ill.Dec. 2, 2003). The court directed the plaintiff to amend the complaint and add more detail to the context and content of the statements, noting that "without greater detail regarding the alleged defamatory

statements, the court is unable to determine the precise context in which they were made and whether they are indeed capable of innocent construction."*Id.*

**\*5** Similarly, in *Cozzi v. Pepsi-Cola General Bottlers, Inc.,* the plaintiff alleged that defendant "black-balled" plaintiff to prospective employers and made accusations and caused the circulation of rumors among plaintiff's former colleagues, friends, and prospective employers that all of her assets were frozen, her assets at her home were seized, her motor vehicles were impounded, she was taken from her home in handcuffs, and she misappropriated money from her prior employer. No. 95 C 3648, 1997 U.S. Dist. LEXIS 7755, at *18, 1997 WL 308841 (N.D.Ill June 2, 1997). The plaintiff was ordered to supplement her allegations because she did not provide "the dates, the names of the speakers or recipients, nor the context in which any of the alleged defamatory statements were made."*Id.* at 18-19;*see also Wynne v. Stevenson,* No. 02 C 5263, 2002 WL 31804497, at * 2 (N.D.Ill.Dec.12, 2002) (allegations of "false and malicious statements" regarding Wynne's lack of "truthfulness and honesty" insufficient).

Dry's allegations amount to a statement that one member of a list of entities said something defamatory about a Plaintiff to another of a list of entities with no context or content. They are insufficiently pleaded and thus dismissed. As Dry does not argue that any specifically listed statements made by Cinar are defamatory, her Motion to Dismiss Count VII is granted.

### *Specific Defamatory Statements*

Dry also specifically describes several allegedly defamatory statements. Under Illinois law, a preliminary determination as to whether allegedly defamatory statements are actionable is a question of law to be decided by the Court.*Action Repair, Inc. v. Am. Broadcasting Co., Inc.,* 776 F.2d 143, 145 (7th Cir.1985). In order to state a claim for defamation

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                          Page 5
Slip Copy, 2008 WL 904902 (N.D.Ill.)
(Cite as: 2008 WL 904902 (N.D.Ill.))

under Illinois law, "a plaintiff must present facts showing that the defendant made a false statement about the plaintiff, the defendant made an unprivileged publication of that statement to a third party, and that this publication caused damages."*Solaia Tech., LLC v. Specialty Publ'g Co.,* 221 Ill.2d 558, 304 Ill.Dec. 369, 852 N.E.2d 825, 839 (Ill.2006)*citing Krasinski v. United Parcel Serv., Inc.,* 124 Ill.2d 483, 125 Ill.Dec. 310, 530 N.E.2d 468, 472 (1988). A defamatory statement is a statement that harms a person's reputation to the extent it lowers the person in the eyes of the community or deters the community from associating with her or him. *Solaia,* 304 Ill.Dec. 369, 852 N.E.2d at 839*citing Kolegas v. Heftel Broadcasting Corp.,* 154 Ill.2d 1, 180 Ill.Dec. 307, 607 N.E.2d 201, 206 (1992).

"Some statements are considered defamatory *per se* because they are so obviously and materially harmful to a plaintiff that his injury may be presumed."*Cody v. Harris,* 409 F.3d 853, 857 (7th Cir.2005)*citing Bryson v. New Am. Publ'ns, Inc.,* 174 Ill.2d 77, 220 Ill.Dec. 195, 672 N.E.2d 1207, 1214 (1996). There are five such categories of statements under Illinois law: "(1) those imputing the commission of a criminal offense; (2) those imputing infection with a loathsome communicable disease; (3) those imputing an inability to perform or want of integrity in the discharge of duties of office or employment; (4) those imputing a lack of ability, or that prejudice a party in his trade, profession, or business; and (5) those imputing adultery or fornication."*Cody,* 409 F.3d at 857 citing *Bryson v. New Am. Publ'ns, Inc.,* 174 Ill.2d 77, 220 Ill.Dec. 195, 672 N.E.2d 1207, 1214-15 (1996).

*6 Even if a statement falls into one of these categories, it is not actionable *per se* if it is reasonably susceptible to an innocent construction.*Knafel v. Chicago Sun-Times, Inc.,* 413 F.3d 637, 639-40 (7th Cir.2005)."A written or oral statement is to be considered in context, with the words and the implications therefrom given their natural and obvious meaning; if, as so construed, the statement may reasonably be innocently interpreted or reasonably

be interpreted as referring to someone other than the plaintiff it cannot be actionable."*Tuite v. Corbitt,* 2 24 Ill.2d 490, 310 Ill.Dec. 303, 866 N.E.2d 114, 123 (Ill.2006)*citing Chapski v. Copley Pres,* 92 Ill.2d 344, 65 Ill.Dec. 884, 442 N.E.2d 195, 199 (Ill.1982)."Whether a statement is reasonably susceptible to innocent interpretation is a question of law for the court to decide ."*Knafel,* 413 F.3d at 640.

**Defamatory Statements Attributed to Levi**

In their Motion to Dismiss, Defendants deal individually with various alleged defamatory statements attributable to Levi. In some cases, they parse out segments of an overall defamatory communication. "The legal effect of a statement should be considered in the context of the entire Memorandum, rather than independently."*Darovec Mktg. Group, Inc. v. Bio-Genics, Inc.,* 42 F.Supp.2d 810, 816-17 (N.D.Ill.1999) citing *Bryson v. New Am. Publ'ns, Inc.,* 174 Ill.2d 77, 220 Ill.Dec. 195, 672 N.E.2d 1207, 1216 (Ill.1996). Overall, the Parties address three separate "incidents" of defamation.

*November 1, 2006 Email from Levi to Sunpack Pacific's Manufacturing Partner in China*

Dry alleges that Levi sent an email to Changzhou Ssangleong, one of Sunpack Pacific's manufacturing partners in China on November 1, 2006. Cmplt. at ¶ 79. In the email, Levi discusses the decline of Sunjut's relationship with Dry and Hazneci. *Id.* In the following paragraphs, Dry specifically notes that two statements from that email are false and defamatory. *Id.* at ¶¶ 81-82.First, Dry notes that Sunpack Pacific is a separate company from Sunjut A. S., not a part of Sunjut as suggested by the email. Second, Dry states that Levi's statement that "Hakan and his partner been [sic] caught not acting in accordance with out [sic] partnership and our consepts [sic] of ethics. After numerous warnings and given opportunities to correct themselves, Sunjut is not successful to salvage this relationship,"

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 904902 (N.D.Ill.)
(Cite as: 2008 WL 904902 (N.D.Ill.))

Page 6

noting that it was Sunjut that repeatedly violated its duties pursuant to the agreement. Defendants argue in their Motion to Dismiss that neither of the noted statements are defamatory, arguing that the first statement does not harm the reputation of the Plaintiffs, and the second is an opinion.

The assertion that Sunjut Pacific is not a separate entity from Sunjut A.S. is subject to an innocent construction and thus not defamation *per se. See Tuite*, 310 Ill.Dec. 303, 866 N.E.2d at 123. Levi's statement that Dry and Hazneci were not acting "in accordance with our partnership and concepts of ethics," taken alone, is also not defamatory because it is an opinion. *See Flentye*, 485 F.Supp.2d at 920 (statement that plaintiff "lacks an ethical compass" is an opinion); *Gardner v. Senior Living Systems, Inc.*, 314 Ill.App.3d 114, 246 Ill.Dec. 822, 731 N.E.2d 350, 355 (Ill.App.2000) ( calling a plaintiff "unethical" is an opinion). However, "mixed expressions of fact and opinion may be actionable."*Flentye*, 485 F.Supp.2d at 920. *citing Bogosian v. Board of Educ. Of Cmty Unit Sch. Dist. 200*, 134 F.Supp.2d 952, 957 (N.D.Ill.2001).

*7 The fact that these two excerpts, standing alone, are not defamation *per se* is largely immaterial because the email in its entirety, and certainly some individual statements within the email, are defamation *per se.*The email states that Dry and Hazneci have violated the partnership agreement and that Sunjut is going to sue them. Cmplt. at ¶ 79. These statements impute that Dry exhibits a lack of ability in his profession. *Cody*, 409 F.3d at 857;*See also, Chisolm*, 940 F.Supp. at 1284-85 (accusation of "double dealing" concerned plaintiff's "professional competence and integrity"); *Quality Granite Const. Co., Inc. v. Hurst-Rosche Engineers, Inc.*, 261 Ill.App.3d 21, 198 Ill.Dec. 528, 632 N.E.2d 1139, 1143 (Ill.App.Ct.1994) ( letter alleging that Quality Granite defaulted on a contract "accused Quality of both an inability to perform and a lack of ability in its contractual undertaking). These allegations strike at the core of the business relationship, alleging that either Dry is incapable of performing

under the contract or that he has no integrity in that performance. As such, the statements are defamatory *per se* and Count VII is not dismissed.

***Letter from Levi to Superpacking***

Dry also alleges that Levi wrote a to Superpacking, a Chinese manufacturing partner of Sunpack Pacific, stating, "Today our lawyers are attaching [sic] SJP [Sunpack Pacific] to force them to stop using the name Sunjut. They are resisting this request. Although they do not act as a Sunjut group member, they want to continue using the name Sunjut without permission. This is called stealing. I will fight them in the hardest way. Their greed has blinded them. It is a shame but they are no longer my friends or collaborators. You need to know."Cmplt. at ¶ 84.

Levi's statement that "their greed has blinded them," is an opinion. *See, e.g., Solaia*, 304 Ill.Dec. 369, 852 N.E.2d at 841 (plaintiffs are a "deeply greedy people"). However, the statement as a whole is defamatory *per se* because it accuses Plaintiffs of a want of integrity in the discharge of their duties of office. *Cody*, 409 F.3d at 857;*See also Darovec*, 42 F.Supp.2d at 817;*Chisolm*, 940 F.Supp. At 1284-85; *Solaia*, 852, N.E.2d at 841-42. Specifically, Levi accuses Steven Dry of using a name he does not have permission to use such that Sunjut is taking legal action against them.

Levi also wrote in the letter that "[w]e will not and cannot forbid you to work with Hakan however you should not support them regarding customers that were introduced under the Sunjut umbrella."Cmplt. at ¶ 86. This statement adds to the defamatory character of the letter in that it makes clear that other statements are intended to deter Superpacking from associated with Hakan. *See, Muzikowski, ...* However, it does not constitute defamation in itself. Under Illinoi law, a defamatory statement must be about a plaintiff. *See, e.g., Solaia*, 304 Ill.Dec. 369, 852 N.E.2d at 839. Also, "the allegedly defamatory statement must contain an objectively verifiable

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 904902 (N.D.Ill.)
(Cite as: 2008 WL 904902 (N.D.Ill.))

Page 7

factual assertion."*Lifton v . Board o f Educ. of City of Chicago*, 416 F.3d 571, 579 (7th Cir.2005). This statement is neither about the Plaintiffs, nor does it assert any facts. Instead, it is a suggestion regarding Superpacking's future dealings with the Plaintiffs. Thus, it is not defamatory, much less defamatory *per se.*

### February 2007 Email from Levi to a Dry Enterprises Customer

**\*8** Lastly, in February of 2007, Levi sent an email to a Dry Enterprises customer stating, "for some time, Steve Dry, through Dry Enterprises, Inc., was a sales representative of Sunjut who assisted with Sunpack's U.S. sales. However, Steve Dry and Dry Enterprises are no longer sales representatives for Sunjut or Sunpack. Nevertheless, it has recently come to our attention that Mr. Steve Dry has begun to conduct business through his own venture, a Delaware company known as 'SunPack Pacific, LLC,' and is now apparently attempting to divert business from Sunjut/Sunpack to his company."Cmplt. at ¶ 95. This entire statement can be construed to state simply that Dry broke from Sunjut, started his own business, and is now competing in the industry. Thus, it is subject to an innocent construction and is not defamatory *per se. See, e.g., Tuite v. Corbitt*, 310 Ill.Dec. 303, 866 N.E.2d at 123.[FN1]

> FN1. P laintiffs may argue that some statements found not to be defamation *per se* are instead defamation *per quod.*Such an action is appropriate "where the defamatory character of the statement is not apparent on its face, and resort to extrinsic circumstances is necessary to demonstrate its injurious meaning."*Bryson*, 220 Ill.Dec. 195, 672 N.E.2d at 1221. In order to plead defamation *per quod*, a plaintiff must plead special damages, that is, actual damage resulting from the statement.*Id.* at 1222.Here, Plaintiffs state only that "plaintiffs have also suffered special dam-

ages in the form of financial loss resulting from the effect of Defendants' statements, relating to, among other things customers and goodwill. Cmplt. at ¶ 158. "When items of special damage are claimed, they shall be specifically stated."Fed.R.Civ.P. 9(g). Plaintiff does not adequately plead special damages. *See e.g., Brown & Williamson Tobacco Corp. v. Jacobson*, 713 F.2d 262, 270 (7th Cir.1983) (plaintiffs claim that they were "likely to suffer injury as a result of the natural tendency of the defendants' false and malicious statements to undermine Brown & Williamson's reputation for honesty and decrease its sales" insufficient); *Gros v. Midland Credit Mgmt.*, 525 F.Supp.2d 1019, 1027-28 (N.D.Ill.2007) (plaintiff's allegations that he suffered "out-of-pocket expenses, loss of time, aggravation, and inconvenience and emotional distress" as well as damages to credit insufficient); *Morton Grove Pharm., Inc. v. Nat'l Pediculosis Assn . , Inc.*, 494 F.Supp.2d 934, 941 (N.D.Ill.2007) (plaintiffs allegation that their sales decreased approximately 23% following defamation sufficient).

Still, although some of the individual statements addressed by Defendants, as discussed above, are not defamatory *per se*, some of the statements are defamatory *per se.*Thus, although Dry cannot rely on the statements held to be nondefamatory to support his claim, he has adequately alleged defamation, and Levi's Motion to Dismiss Count VII is denied.

### Defamatory Statement Attributed to Patriquin

Dry alleges that Patriquin "sent an email to one of Dry Enterprises' customers informing them that their shipment had arrived and that all invoices would be on Sunjut letterhead from now on" on March 1, 2007 and that this statement constituted defamation. Cmplt. ¶¶ 98-99. This statement is not

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

defamatory because it is not about or concerning a Plaintiff. *See, e.g., Solaia,* 304 Ill.Dec. 369, 852 N.E.2d at 839. Patriquin's Motion to Dismiss is therefore granted as to defamation.

**Defamatory Statement Attributed to Labbe**

Dry alleges that Labbe sent an email to a Dry Enterprises customer on February 21, 2007 stating that "Steve [Dry] has opened his own company in China, without permission has converted many bags from Sunjut to this company of his."Cmplt. at ¶ 93. This statement accuses Dry of stealing bags from Sunjut for use in his new company. Thus, it accuses Dry of "doing something bad in the course of carrying out his job" and is defamatory *per se,* and Labbe's Motion to Dismiss is denied.[FN2]*See Cody,* 409 F.3d at 857;*Republic Tobacco Co. v. North Atlantic Trading Co., Inc.,* 381 F.3d 717, 730 (7th Cir.2004)*citing Haynes v. Alfred A. Knopf, Inc.,* 8 F.3d 1222, 1226 (7th Cir.1993) ("Illinois Courts ... have been quick to find implication of criminal conduct or of employee or business misconduct in statements that might have seemed susceptible of an interpretation that would have taken them out of the *per se* categories").

> FN2. Dry includes a copy of the email containing these statements with their response. This Court does not consider anything outside of the Complaint in its decision.

**Defamatory Statement Attributed to Erktolar**

Dry alleges that "Erktolar, a customer service representative for Sunjut U.S.A. and at Sunjut U.S.A.'s direction, contacted a Sunpack Pacific customer to state that this customer should send payments for FIBCs directly to Sunjut U.S.A.'s offices." Cmplt. ¶ 103. As with Patriquin's statement, this is not a statement about a plaintiff and thus does not constitute defamation. *Solaia,* 304 Ill.Dec. 369, 852 N.E.2d at 839. Ertoklar's Motion to Dismiss Count VII is granted.

*Tortious Interference*

\*9 Cinar and Patriquin move to dismiss Plaintiffs allegations of tortious interference with contractual relations and tortious interference with prospective economic advantage. Under Illinois law, the elements of tortious interference with contractual relations are: (1) existence of a contract; (2) defendant's awareness of the contract; (3) intentional inducement of a contract breach; (4) actual breach of the contract; and (5) damages. *Cody,* 409 F.3d at 859*citing HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.,* 131 Ill.2d 145, 137 Ill.Dec. 19, 545 N.E.2d 672, 676 (Ill.1989). Similarly, the elements of tortious interference with prospective economic advantage are (1) a reasonable expectation of a future business relationship; (2) defendant's knowledge of that expectation; (3) defendant's purposeful interference by the defendant that prevents the legitimate expectation from becoming a valid business relationship; (4) and damages. *Cody,* 409 F.3d at 859*citing Fellhauer v. City of Geneva,* 142 Ill.2d 495, 154 Ill.Dec. 649, 568 N.E.2d 870, 878 (Ill.1991).

**Tortious Interference Allegations Against Cinar**

Plaintiffs allege that Cinar is liable for tortious interference because she "contacted Sunjut A.S.'s branch offices in Europe to tell them to no longer provide assistance to Dry Enterprises or Haznecki." Cmplt. ¶ 105. However, to state a cause of action for tortious interference under Illinois law, a plaintiff must allege "a business expectancy with a specific third party as well as action by the defendant directed towards that third party."*Ali,* 481 F.3d at 945-46*citing Assoc. Underwriters of Am. Agency, Inc. v. McCarthy,* 356 Ill.App.3d 1010, 292 Ill.Dec. 724, 826 N.E.2d 1160, 1169 (Ill.App.2005). Here, Cinar contacted branch offices of her employer, Sunjut. Because Cinar did not have contact with a third party, her Motion to Dismiss is granted as to tortious interference with contractual relations and tortious interference with prospective business relations.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 9
Slip Copy, 2008 WL 904902 (N.D.Ill.)
(Cite as: 2008 WL 904902 (N.D.Ill.))

**Tortious Interference Allegations Against Patriquin**

Dry alleges that Patriquin, "sent an email to one of Dry Enterprises' customers informing them that their shipment had arrived and that all invoices would be on Sunjut letterhead from now on. This prompted the customer to respond to Patriquin that its contract was with Dry Enterprises, and expresses frustration about being pulled into a dispute between Sunjut and Dry Enterprises, and that its was presumptuous to assume that the shipment belonged to the customer."Cmplt. ¶ 99. Patriquin took this action to harm Dry Enterprises and divert a customer to Sunjut. *Id.* a t ¶ 9 9, 292 Ill.Dec. 724, 826 N.E.2d 1160. Later, Dry alleges that as a result of such acts by Defendants, Dry lost some customers, and others ordered less FIBCs from Dry then they had in the past. *Id.* at 134, 292 Ill.Dec. 724, 826 N.E.2d 1160. Also, Dry asserts that some customers have terminated their contracts. *Id.* a t 143, 292 Ill.Dec. 724, 826 N.E.2d 1160. Plaintiffs have adequately alleged a claim against Patriquin. Patriquin's Motion to Dismiss is denied as to tortious interference with prospective economic advantage and tortious interference with contract.

**\*10** For the reasons stated above, the Motions to Dismiss Count VII are granted as to Ertoklar, Cinar, and Patriquin with leave to replead with specificity by April 14, 2008 and denied as to Sunjut A .S., Sun-Pack Corporation, Levi, and Labbe. Cinar's Motion to Dismiss Counts V and VII is granted with prejudice, and Patriquin's Motion to Dismiss Counts V and VII is denied.

So ordered.

N.D.Ill.,2008.
Dry Enterprises, Inc. v. Sunjut AS
Slip Copy, 2008 WL 904902 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# SLIP SHEET

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1104615 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2001 WL 1104615 (N.D.Ill.))

Page 1

▷
Chambers v. Habitat Co.
N.D.Ill.,2001.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.
Sandra Ann CHAMBERS, individually and on be-
half of all others similarly situated in the past,
present and future, Plaintiffs,
v.
THE HABITAT COMPANY, Long Grove House,
Daniel E. Levin, Sanford Kahn, Ltd., Alecia Smith,
and Lynn Mosely, Defendants.
No. 99-C-2095.

Sept. 18, 2001.

MEMORANDUM OPINION

GRADY, J.
*1 Before the court are the defendants' motions to
dismiss the plaintiff's second amended complaint,
and the plaintiff's "Motion to Strike Pleadings in
Defendant's Joint Motion to Dismiss."For the reas-
ons explained below, the defendants' motion is
granted, and the plaintiff's motion is denied.

BACKGROUND

The facts of this case were described in an earlier
opinion, and are as follows:

Plaintiff, Sandra Ann Chambers ("Chambers"), is a
resident of Illinois. Chambers rented an apartment
in Long Grove House, a public housing complex in
Chicago, Illinois, from its owner, Daniel Levin
("Levin"), and the Habitat Company ("Habitat"), a
rental management company. Alecia Smith
("Smith") serves as Habitat's property manager, and
Sanford Kahn, Ltd. ("Kahn") is Habitat's attorney.
Lynn Mosley ("Mosley") works for Habitat....

In 1995, Habitat initiated eviction proceedings

against Chambers in Illinois state court. On
November 15, 1996, the Circuit Court of Cook
County granted summary judgment for Habitat.
Chambers has exhausted her state appeals.... On
March 25, 1999, the Circuit Court of Cook County
entered an eviction order against Chambers allow-
ing Habitat to evict Chambers on April 9, 1999.
The state proceedings are complete.

On March 30, 1999, Chambers brought this suit,
styled as a class action, against Habitat, Long
Grove House, Levin, Kahn, Smith, and Mosley. She
moved for a temporary restraining order to halt the
eviction order issued by the Circuit Court of Cook
County. We denied that motion on April 8, 1999.
We subsequently dismissed her complaint and her
petition to proceed *in forma pauperis* on April 14,
1999. Chambers ... amended her complaint.... [S]he
no longer has any motions pending in the underly-
ing state action.

The amended complaint alleged violations of the
plaintiff's civil rights, breach of rental agreement,
violations of the Fair Debt Collection Practices Act
(FDCPA), fraud and false statements, defamation,
harassment, and malicious prosecution. On May 5,
1999, we dismissed Chambers' amended complaint
*sua sponte*, stating that we lacked jurisdiction to re-
view the state court judgment under the *Rooker-
Feldman* doctrine. Citing a case decided just two
months later, the Seventh Circuit held that *Rooker-
Feldman* did not bar all of the plaintiffs claims, va-
cated our opinion, and remanded the case. *Cham-
bers v. The Habitat Co.,* No. 99-2460, 2000 WL
748117 (7th Cir.2000) (citing *Long v. Shorebank
Development Corp.,* 182 F.3d 548 (7th Cir.1999)).

The plaintiff then filed a second amended com-
plaint ("complaint"), which dropped the claim for
breach of rental agreement but retained the other
claims mentioned above. The defendants have
moved again to dismiss the complaint. Among oth-
er arguments, they assert that the federal claims
should be dismissed because they are barred by the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                           Page 2
Not Reported in F.Supp.2d, 2001 WL 1104615 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2001 WL 1104615 (N.D.Ill.))**

*Rooker-Feldman* doctrine, collateral estoppel, and the statute of limitations. The defendants also argue that this court should dismiss the state law claims for failure to state a claim.

**\*2** Instead of filing a response to the defendants' motion, the plaintiff filed her own motion, styled as a "Motion to Strike Pleadings in Defendant's Joint Motion to Dismiss." The accompanying brief and the plaintiff's further "Surreply" argue the merits of the defendants' motion, and thus, we take them as a response and surreply to the defendants' motion.

## ANALYSIS

When analyzing a motion to dismiss we take as true the facts alleged in the complaint.

### I. *Section 1983 Claim for Violation of Due Process Rights*

The plaintiff argues that the defendants violated her rights to due process. She claims monetary damages for loss of personal property resulting from the eviction, emotional distress, loss of her rental subsidy, and the retroactive reimbursement of rental subsidy she lost, among other things.

To establish a § 1983 due process violation the plaintiff must show (1) that she was deprived of a constitutionally protected property interest, (2) state action, and (3) constitutionally inadequate process. *Barnes v. Ramos,* No. 94 C 7541, 1996 WL 599637, \*2 (N.D.Ill. Oct. 11, 1996), *aff'd,* 2001 WL 87470 (7th Cir. January 30, 2001). The defendants argue that the plaintiff fails to state a claim because all of the defendants are private entities, and thus not subject to liability under § 1983 [FN1]; the statute of limitations has run on her claims [FN2]; and that her claims are barred by the *Rooker-Feldman* doctrine or collateral estoppel.

> FN1. The plaintiff alleges that defendant Long Grove House is a public housing agency (PHA) that is privately owned. The

defendant argues that Long Grove House, as a privately owned entity, cannot be a PHA, and therefore, the plaintiff has failed to show "state action" supporting a § 1983 due process claim. However, federal regulations specifically contemplate that some PHA's are privately owned. *See* 24 C.F.R. § 880.201 ("Private-Owner/PHA Project. A project under this part which is owned by a private owner.") Therefore, the plaintiff has not pled herself out of court simply by alleging that the Long Grove House is privately owned. The question of Long Grove House's relationship to the United States Department of Housing and Urban Development (HUD) is one that may require discovery, and we decline to impose on the plaintiff a duty to plead the specifics of the relationship.

> FN2. The defendants argue that the statute of limitations has run on plaintiff's due process claims, all of which relate to the tenancy and eviction from the Long Grove House. The judgment was entered in November of 1996 and she filed suit here in March of 1999. The plaintiff points out, however, that the order to enforce the order of possession was not entered until March of 1999. It is unclear whether Chambers' injuries occurred (and her due process claims accrued) in November of 1996 when the order for possession was entered against her or in 1999 when the order was actually enforced. In *Long,* the Seventh Circuit stated in dicta that the plaintiff's injuries "were complete only when the Circuit Court entered the eviction order against her." 182 F.3d at 557. However, the Seventh Circuit has stated that procedural due process claims for deprivations of property rights do not accrue until the plaintiff is actually deprived of her property. *See Lawshe v. Simpson,* 16 F.3d 1475, 1480 (7th Cir.1994) (holding

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                          Page 3
Not Reported in F.Supp.2d, 2001 WL 1104615 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2001 WL 1104615 (N.D.Ill.))**

that a claim for deprivation of public employment without due process accrues on the date employment is actually terminated). Neither party has addressed this issue.

The *Rooker-Feldman* doctrine states that a federal court is precluded from exercising subject matter jurisdiction over claims that seek review of a state court judgment. *Maple Lanes, Inc. v. Messer,* 186 F.3d 823, 825 (7th Cir.1999), *cert. denied,*528 U .S. 1118 (2000). To assess the applicability of the *Rooker-Feldman* doctrine, "the fundamental and appropriate question to ask is whether the injury alleged resulted from the state court judgment itself or is distinct from the judgment."*Id .;Long,* 182 F.3d at 555. In *Long v. Shorebank Development Corp.,* the plaintiff alleged that defendants violated her rights to due process in eviction proceedings they instituted against her, and she sought money damages for injuries she suffered as a result of the eviction. In particular, she alleged that the defendants filed an action to collect a rental debt they knew did not exist, used fraud to keep her from going to court to contest the baseless eviction, and knowingly misrepresented to the court that she did not dispute the eviction. 182 F.3d at 551. Noting that the plaintiff, Long, would not have been deprived of her property if the eviction had not occurred, the Court stated that "it does not seem that Long's due process argument can be considered separate from the eviction order entered against her."*Id.* at 556.Indeed, "a litigant may not attempt to circumvent the effect of *Rooker-Feldman* and seek a reversal of a state court judgment simply by casting the complaint in the form of a civil rights action ."*Id.* at 557.However, the Court stated that Long's case was distinct from other cases where *Rooker-Feldman* was applied because she was precluded from raising in state court the claims that she was presenting in her federal suit. *Id.* at 557.Illinois law, the Court pointed out, prevents defendants from raising claims that are "not germane to the issue of possession," and counter-claims seeking money damages are not germane to posses-

sion. *Id.* at 559.

*3 The Seventh Circuit relied on *Long* to vacate our earlier order and held that the *Rooker-Feldman* doctrine does not bar Chambers' claims for money damages under § 1983 for the alleged violation of her due process rights. The Court went on to instruct us to determine whether Chambers' claims for

failure to comply with federal laws and regulations governing subsidized housing, and the alleged due process problems with adjudicating forcible entry and detainer claims via summary judgment ... raise issues that are sufficiently (not merely tangentially) related to issues of possession so as to be deemed "germane" under Illinois law to a forcible entry and detainer action.... If any of these claims raise issues that are germane to such actions, they most probably could have ben raised in the state court action and therefore would be "inextricably intertwined" with that judgment.

*Chambers,* 2000 WL 748117.

*A. Failure to comply with federal regulations*

Plaintiff claims the defendants failed to comply with circulars and/or handbooks issued by the United States Department of Housing and Urban Development ("HUD") governing the lease, eviction notices, and eviction procedures. The plaintiff claims the lease was illegal in that it failed to describe grievance procedures; the lease and eviction notice failed to inform her of the right to examine documents concerning her eviction and to inform her that she was entitled to due process; the eviction notice misstated the amount of rent owing; the eviction was without good cause; and she was denied due process because the use of summary judgment deprived her of an opportunity to examine witnesses at a hearing.

There are four categories of claims that are germane to the issue of possession. *See People ex. rel. Ill. Dept. of Transp. v. Walliser,* 629 N.E.2d 1189, 1194 (Ill.App.Ct.1994). These include:

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 4
Not Reported in F.Supp.2d, 2001 WL 1104615 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2001 WL 1104615 (N.D.Ill.))

(1) claims asserting a paramount right of possession; (2) claims denying the breach of the agreement vesting possession in the plaintiff; (3) claims challenging the validity or enforceability of the agreement on which the plaintiff bases the right to possession; or (4) claims questioning the plaintiff's motivation for bringing the action.

*Id.*

The plaintiff's claims that the defendants violated federal regulations are germane to the issue of possession. Noting that the Illinois statute allows defendants to "give in evidence any matter in defense of the [forcible entry and detainer] action," the Seventh Circuit observed that the statute "has been held to allow equitable defenses such as civil rights violations."*Johnson v. Illinois Dept. of Public Aid,* 467 F.2d 1269, 1273 (7th Cir.1972) (citing *Rosewood Corp. v. Fisher,* 46 Ill.2d 249 (1970), in which the defendant asserted due process and equal protection claims); *see also Marine Park Assoc. v. Johnson,* 274 N.E.2d 645, 648 (Ill.App.Ct.1971) (finding a civil rights claim based on racial discrimination germane to issue of possession). Further, noncompliance with HUD circulars applicable to federally-funded local housing authorities is a defense in Illinois eviction proceedings. *Johnson,* 467 F.2d at 1273 ( citing *Chicago Ho using A uth. v . Da ughrity,* 270 N.E.2d 613, 616 (Ill.App.Ct.1971); *see also Walliser,* 629 N.E.2d at 1196 (noting that federal regulations could constitute a defense to eviction, and would therefore be germane to the action, but concluding that the federal regulations at issue did not apply to the defendant). Because the plaintiff could have raised as a defense to the eviction the defendants' violations of HUD regulations and circulars regarding due process, we find these claims are barred by the *Rooker-Feldman* doctrine.[FN3]

FN3. Chambers argues that the Illinois Appellate Court considered irrelevant to the issue of possession the question of whether Habitat was a public housing authority. We disagree. In the course of addressing Chambers' argument that Habitat was re-

quired to re-evaluate her income before the Circuit Court ruled on Habitat's motion for use and occupancy, the appellate court stated that "there is no evidence on record that persuades this court that plaintiff's status as an agent of a Public Housing Authority, if true, is relevant to the issue of *use and occupancy." The Habitat Co. v. Chambers,* No. 1-97-2330 (Ill.App.Ct. Aug. 4, 1998) at 12. This statement reflects an insufficiency of evidence that specific rules apply to public housing authorities on the issue of use and occupancy, as opposed to possession. The two issues are distinct. For example, the order for use and occupancy was entered in January of 1996, and it required the plaintiff to pay $546.00 per month pending a jury trial on the issue of possession. The order of possession was entered in November of 1996.

B. *Summary Judgment Claims*

*4 The Seventh Circuit also instructed this court to determine whether *Rooker-Feldman* bars this court from considering Chambers' claim that the use of summary judgment motions unconstitutionally deprived her of the ability to present evidence and cross-examine witnesses. The Illinois Appellate Court specifically discussed her argument "that her eligibility to receive federally subsidized rent created a right that entitled her to an evidentiary hearing prior to the termination of her benefits," and that the use of summary judgment deprived her of this right. *The Habitat Co. v. Chambers,* No. 1-97-2330 (Ill.App.Ct. Aug. 4, 1998) ("order"), at 13. It concluded: "Illinois courts have consistently held that motions for summary judgment are proper in forcible entry and detainer proceedings."Order at 14.[FN4]

FN4. Although the defendants have not challenged this claim under Rule 12(b)(6), we think it is clear there can be no cause of action for utilization of summary judgment proceedings. Summary judgment does not

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 5
Not Reported in F.Supp.2d, 2001 WL 1104615 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2001 WL 1104615 (N.D.Ill.))

mean that the court will enter an order without examining evidence. As the Illinois appellate court noted, summary judgment is only appropriate "when the pleadings, depositions, and admissions on file, in addition to any affidavits presented, establish that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."Order at 6.

Therefore, not only could Chamber's have presented this argument in the state court, she in fact *did* present this argument in the state court. This issue has been fully litigated, and we may not disturb the state court ruling under the doctrine of collateral estoppel. *See American Nat'l Bank & Trust v. Regional Trans. Auth.,* 125 F.3d 420, 430 (7th Cir.1997) ("Under Illinois law 'collateral estoppel means that when an issue of ultimate fact has been previously determined by a valid and final judgment, that issue cannot be relitigated between the same parties.' ").

C. *Other Due Process Claims*

The Appellate Court of Illinois issued an order which discussed a number of the claims the plaintiff presents here. These include Chambers' claims that (1) she paid the rent she owed; (2) the defendants illegally evicted her pending a recertification of her rent based on a change in her income FN5; (3) the five-day notice she received incorrectly stated the amount of rent she owed; and (4) summary judgment motions are improper in forcible entry and detainer actions. Because these were all presented and litigated between the parties in state court, they are barred by collateral estoppel. *See American Nat'l Bank & Trust,* 125 F.3d at 430.

> FN5. The plaintiff claims that her income decreased in 1995, and as a beneficiary of a federally subsidized housing program, she was entitled to have her rent reduced to reflect her lower income. She claims that Smith failed to recertify her income and re-

calculate her rent and that the defendants illegally initiated eviction proceedings against her on the basis of rent she owed prior to recertification. The appellate court determined that the record showed, however, that Chambers failed to meet the conditions of recertification by failing to present documents verifying her income, and she was not entitled to have eviction proceedings delayed indefinitely. Order at 10.

Apart from the claims discussed, Chambers also argues that the eviction was illegal because the defendants violated the lease. The plaintiff states that according to her lease, tenants must receive more than five days notice that the tenancy will be terminated, and the landlord may evict only for good cause. The defendants, however, gave her only a five-day notice and they did not have good cause to evict her. These claims are clearly germane to the issue of possession, as they set forth a valid defense to eviction. *See*735 ILCS 5/9-106 ("The defendant may under a general denial of the allegations of the complaint offer in evidence any matter in defense of the action."). These claims are inextricably intertwined with the forcible entry and detainer action, and are therefore, barred by *Rooker-Feldman.*

D. *Due Process Claims for Money Damages*

The above sections discuss every claim Chambers raised in the "due process" section of her complaint. We have found, in sum, that each of these claims could have been raised as a defense or was in fact raised as a defense in the state court proceedings. As to the plaintiff's claims for money damages for these alleged due process violations, the Seventh Circuit has explicitly held that a litigant cannot avoid *Rooker-Feldman* simply by casting her complaint in the form of a federal civil rights violation and seeking money damages. *See Maple Lanes, Inc. v. Messer,* 186 F.2d at 825 (characterizing plaintiff's § 1983 claim seeking monetary damages for loss of property without due

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 55 of 63

Not Reported in F.Supp.2d                                                                                                      Page 6
Not Reported in F.Supp.2d, 2001 WL 1104615 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2001 WL 1104615 (N.D.Ill.))**

process as an attempt "to mount an end-run around the adverse outcome in state court").

**\*5** The language of the Court's order in this case, however, gives us pause. The Court stated that the *Rooker-Feldman* doctrine "does not bar Chambers' claims for money damages under ... § 1983 for the alleged violation of her due process rights."In an abundance of caution, we have reviewed the other sections of the complaint to determine whether plaintiff makes any further due process claims. In a section entitled "false statements," the plaintiff complains that defendants obtained judgment against her by making false representations to the court. The false statements identified by the plaintiff are (1) that one of Habitat's attorneys pled that Chambers' due process rights were not violated; (2) the defendants led the court to believe that Chambers was not entitled to the due process protections of federally-subsidized tenants; (3) defendant Mosley falsely told the court that the plaintiff had sent overdue rent in July 1995 to the wrong place. This resulted in the court allowing the defendant to return plaintiff's money and proceed with the eviction.[FN6]There are a number of problems with these claims. As to statement (1), this is a conclusion of law rather than a false statement of fact. *See United States v. Endo,* 635 F.2d 321, 323 (4th Cir.1980) (noting a distinction between denying specific acts and denying a legal conclusion). It is therefore not actionable. As to statement (2), the opinion of the appellate court clearly acknowledged Chambers' status as a subsidized housing tenant, and indeed, specifically discussed her due process right to an evidentiary hearing as a tenant receiving rent subsidies. Therefore, it is clear that the plaintiff presented evidence on her status as a subsidized housing tenant, and litigated her claims about the consequent due process protections she should have been afforded. This issue was litigated between the parties, and it is barred by collateral estoppel.

> FN6. The plaintiff also claims that defendant Smith misled the court into believing that the plaintiff owed more rent than she

did. The appellate court noted that even if Chambers owed less than Smith stated, the notice of termination was still valid because Chambers had not paid the full rent she owed. Order at 11. Chambers also claims that Smith misled the court when she failed to indicate that Chambers' arrearage was due to defendant Mosely's failure to recertify Chambers' income. The appellate court rejected the argument that Mosely failed to recertify Chamber's income. *See infra* note 5.

As to statement (3), according to the complaint, the testimony of defendant Mosley was taken during the first eviction proceeding, which the defendants dismissed voluntarily. It was in the second proceeding that the defendants obtained summary judgment. Therefore, this alleged misstatement could not have deprived Chambers of any property. *Frost v. Dorsch,* 92 C 4025, 1992 WL 390743 at \*1 (N.D.Ill.Dec. 18, 1992) (stating that a § 1983 claim must allege that defendants deprived the plaintiff of her rights under the Constitution). In addition, Chambers argued that she had a valid defense to the eviction on the basis of having made the July 1995 payment, a claim that the appellate court rejected after reviewing the record. Order at 7-8. Because this issue was fully litigated in state court between the same parties, we conclude that it is barred by collateral estoppel. *See American Nat'l Bank & Trust,* 125 F.3d at 430.

Count I is dismissed. Chambers' claims that the defendants violated her lease and federal regulations were defenses she could have raised in the forcible entry and detainer action, and therefore, are barred by *Rooker-Feldman.*Chambers' other due process claims, including the claims for money damages, were litigated in state court and are barred by collateral estoppel.

II. *Fair Debt Collection Practices Act*

**\*6** The plaintiff alleges that the defendants violated

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                      Page 7
Not Reported in F.Supp.2d, 2001 WL 1104615 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2001 WL 1104615 (N.D.Ill.))**

the FDCPA in a number of ways. For example, the defendants illegally assessed attorney fees, penalty fees, interest, costs, and attempted to garnish wages. The defendants argue that only Sandford Kahn, Ltd. is a "debt collector" within the meaning of the FDCPA, and the claim against Kahn, Ltd. must be dismissed because it is barred by the statute of limitations.

The FDCPA prohibits debt collectors from engaging in a range of activities. A debt collector is:

any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another....The term does not include –

(A) any officer or employee of a creditor while, in the name of the creditor, collecting debts for such creditor.

15 U.S.C.A. § 1692a(6). Here, the only defendant alleged to have collected the debt of another is Kahn, Ltd., which is the law firm that prosecuted the forcible entry and detainer action against the plaintiff. The other defendants are the plaintiff's creditors or employees of her creditors. Count II, therefore, can be asserted only against Kahn, Ltd.

As to Kahn Ltd., the defendants argue that claims for violations of the FDCPA must be brought within one year of the alleged violation. *See* 15 U.S.C. § 1692k(d). Because the complaint only refers to conduct occurring in 1996 and before, defendants contend that this claim is barred.

We have reviewed the complaint and attached documents, including the plaintiff's affidavit. The only allegations about collection activities after 1996 are that some or all of the defendants continued to assess illegal attorney fees, and other illegal charges. The plaintiff submits with her complaint exhibit O, which is a collection of invoices that include

charges for legal fees. The last invoice is from March of 1999. These invoices appear to come from the Habitat Company; there is no mention of Kahn, Ltd.

The plaintiff argues that Kahn, Ltd.'s continued involvement in the enforcement of the order of possession lasted at least until March of 1999. The second amended complaint includes no such allegation. While it alludes to wage garnishment, it does not state whether Kahn, Ltd. was involved or whether the plaintiff's wages were in fact garnished. The plaintiff attaches to her motion a document which was filed by Kahn, Ltd. in the state court action requesting an extension of the period for enforcement of the judgment. *See* Plaintiff's Motion, Ex. 3.

Although we give the plaintiff the benefit of imagination, *see Sanjuan v. American Bd. of Psychiatry & Neurology, Inc.,* 40 F.3d 247, 251 (7th Cir.1994), it is unclear how a request for an extension of time to enforce the judgment would violate the FDCPA. Perhaps the plaintiff means to assert that the actual enforcement of the judgment violated the FDCPA; however, the plaintiff provides no information about what Kahn, Ltd. did to enforce the judgment, much less how the enforcement actions were illeg- al.

\*7 Therefore, we dismiss Count II against all defendants both on the basis of limitations and for failure to state a claim.

### III. *Harassment*

In response to the defendant's argument that there is no Illinois cause of action for harassment, the plaintiff argues that her claim for harassment is actionable under § 1983 or the FDCPA. Neither her complaint nor her briefs identify a § 1983 claim that is different from those already discussed and dismissed. *See infra* I. The brief and the complaint focus on the allegedly illegal billing practices of the defendants under the FDCPA. Because we have

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                            Page 8
Not Reported in F.Supp.2d, 2001 WL 1104615 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2001 WL 1104615 (N.D.Ill.))**

dismissed the FDCPA claim, *see infra* II, we also dismiss Count III, Chambers' claim for harassment.

## IV. *Malicious Prosecution*

To state a claim for malicious prosecution under Illinois law, the plaintiff must allege that (1) she was subjected to judicial proceedings; (2) for which there was no probable cause; (3) the defendants instituted or continued the proceedings maliciously; (4) the proceedings were terminated in the plaintiff's favor; and (5) there was an injury. *Sneed v. Rybicki,* 146 F.3d 478, 480-81 (7th Cir.1998). Here, the plaintiff's claim fails because she does not allege that the eviction proceedings were terminated in her favor.

The plaintiff argues that there are two proceedings which terminated in her favor. One is a case to which she was not even a party; the other is a case which the defendants voluntarily dismissed. Because neither of these is an adjudication in favor of Chambers, we dismiss Count IV for failure to state a claim.

## V. *Fraud, Deceit, and False Statements*

To establish fraud under Illinois law, the plaintiff must show that (1) the defendant made a false statement, (2) of material fact, (3) which the defendant knew or believed to be false, (4) with the intent to induce the plaintiff to act; (5) the plaintiff justifiably relied on the statement, and (6) the plaintiff suffered damage from such reliance. *Houben v. Telular Corp.,* 231 F.3d 1066, 1074 (7th Cir.2000).Federal Rule of Civil Procedure 9(b) requires the plaintiff to plead fraud with particularity.

Although the plaintiff alleges several false statements of fact, there is no indication that she relied on any of those statements to her detriment. For example, she alleges that an attorney from Kahn, Ltd. represented that he would accept a payment she offered, but later sought and obtained judgment despite her payment; that Smith promised to recerti-

fy her rent retroactively, but continued with the eviction; that the lease contained a promise not to evict Chambers except for cause and she was evicted without cause; that sections of the lease and HUD handbook are fraudulent, deceptive, and misleading; and that Smith violated the lease in seeking Chambers' eviction.

Some of these may be false statements. However, it is not sufficient simply to show that false statements were made. The plaintiff must rely on those statements to her detriment. For example, in *Long v. Shorebank Development Corp.,* the defendants' misrepresentations caused the plaintiff to be lulled into inaction and to desist in defending the eviction. *See Long,* 182 F.3d at 552-53. Here, by contrast, the plaintiff vigorously contested the eviction. For example, she presented to the Illinois Appellate Court her defense that she had made payment and that it had been accepted. *See infra* I.4. She also presented her claim that Smith failed to recertify her rent to reflect a change in her income. *See infra* note 5.[FN7] Although she argues that she relied on the defendants' statements, it is simply not apparent from the complaint that she did so to her detriment.

> FN7. These claims, as mentioned earlier, would also be barred by collateral estop- pel.

\*8 Therefore, we dismiss this count for failure to state a claim.

## VI. *Defamation*

The defendants point out that the statute of limitations for defamation claims is one year, 735 ILCS 5/13-201, and argue that the plaintiff has failed to identify any defamatory statements made within the one year limitations period.

The plaintiff again refers to the five year statute of limitations found in 735 ILCS 5/13-205, but does not explain why this catch-all provision applies rather than the provision referring specifically to actions for defamation. We find that the more spe-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

cific provision and a one-year limitation period applies. *See Johnson Controls, Inc. v. Exide Corp.,*- F.Supp.2d-, 2001 WL 844867 at \*2 (N.D.Ill. July 25, 2001) (noting that the time accrues when the allegedly defamatory remark is published). The defamatory statement must have been made within one year of the filing of the lawsuit.

As to the defamatory statements, the plaintiff's affidavit states that defendants Smith and Mosley spread rumors about her "concerning this matter" and that her "credit report" has been damaged. The following elements are essential for a defamation claim under Illinois law: (1) a defamatory assertion of fact about the plaintiff; (2) publication; and (3) injury to the plaintiff's reputation. *Chisholm v. Foothill Capital Corp.,* 3 F.Supp.2d 925, 938 (N.D.Ill.1998). A plaintiff alleging defamation must recite the statement alleged to be defamatory. *Vantassell-Marin v. Nelson,* 741 F.Supp. 698, 707 (N.D.Ill.1990) ( noting that dismissal is appropriate in the absence of such recitation). The exact wording of the defamatory remark is not required when the substance of the remark is alleged and the defendants are able to respond.*Id.* (finding that the substance of the remarks was sufficiently alleged).

Here, the plaintiff fails to state the substance of the defamation either with regard to the rumors or the damage to her credit report. Falsity is a required element of the plaintiff's defamation claim, *Troman v. Wood,* 340 N.E.2d 292, 299 (Ill.1975), *Wynne v. Loyola Univ. of Chicago,* 741 N.E.2d 669, 675 (Ill.App.Ct.2000), and the defendants should not be required to respond to the complaint without a clear allegation as to the particulars of the defamatory statements.

Therefore, we dismiss Count VI for failure to state a claim.

VII. *Other claims*

The second amended complaint refers to claims under 42 U.S.C. § 1985 and § 1986. Although these

are not asserted as separate claims distinct from those already discussed, for the sake of completeness we will address the viability of the plaintiff's potential claims under these statutes.

In general, § 1985 prohibits conspiracies to interfere with civil rights, and § 1986 creates a cause of action against individuals who negligently fail to prevent violations of § 1985. A complaint alleging a violation of § 1985"must allege a conspiracy motivated by a racial or other class-based animus."*Kyle v. Morton High School,* 144 F.3d 448, 457 (7th Cir.1998)). A complaint fails to state a claim under § 1985 where it fails to allege "racially (or otherwise discriminatorily) motivated animus behind the defendants' actions."*Payton v. Rush-Presbyterian-St. Luke's Med. Ctr.,* 184 F.3d 623, 632 (7th Cir.1999). Here, the complaint is styled as a class-action, but to say that a group of individuals has been harmed is distinct from saying that the defendants' actions were motivated by animus against a particular class of individuals. The complaint does not allege any animus against a class on the basis of an invidious characteristic such as race or national origin. *See B erry v . I llinois Dep t. o f Human Services,* No. 00 C 5538, 2001 WL 111035 at \*12 (N.D.Ill. Feb. 2, 2001) (dismissing § 1985 claim where the plaintiff failed to allege discrimination on the basis of race, gender, or national origin). We therefore find that the plaintiff has failed to state a claim under § 1985.

**\*9** "There can be no cause of action under § 1986 absent a viable § 1985 claim."*Perkins v. Silverstein,* 939 F.2d 463, 472 (7th Cir.1991). We find that the plaintiff has failed to state a claim under § 1986, as well.

CONCLUSION

For the reasons stated above, we grant the defendants' motion to dismiss the plaintiff's second amended complaint. The plaintiff's motion to strike is denied as moot, inasmuch as we did not rely on the *Rooker-Feldman* doctrine to dismiss her due

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1104615 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2001 WL 1104615 (N.D.Ill.))

process claims for money damages. We grant the plaintiff's request for leave to file a third amended complaint, which she may do by October 20, 2001. This will be her final opportunity to amend her complaint. The defendant may have thirty days after service to plead to the third amended complaint.

N.D.Ill.,2001.
Chambers v. Habitat Co.
Not Reported in F.Supp.2d, 2001 WL 1104615 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# SLIP SHEET

Westlaw.

Not Reported in F.Supp.2d                                                                                     Page 1
Not Reported in F.Supp.2d, 2004 WL 783352 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 783352 (N.D.Ill.))**

**C**
Schaffner v. U.S. Bank N.A.
N.D.Ill.,2004.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern
Division.
Robert J. SCHAFFNER, Nancy A. Schaffner, and
Imaginative Graphics, Inc., Plaintiffs,
v.
U.S. BANK N.A., doing business as U.S. Bank
Home Mortgage, Defendant.
**No. 02 C 8062.**

Jan. 20, 2004.

Cathleen M. Combs, Daniel A. Edelman, James O.
Latturner, Kimberly A. Mines, Billy Thomas, John
D. Blythin, Edelman, Combs & Latturner, Chicago,
IL, for Plaintiffs.
Steven A. Levy, David Joel Chizewer, Goldberg,
Kohn, Bell, Black, Rosenbloom & Moritz, Ltd.,
Chicago, IL, for Defendant.

*MEMORANDUM OPINION*

GRADY, J.
**\*1** Before the court is defendant's motion to dismiss
the amended complaint pursuant to Federal Rule of
Civil Procedure 12(b)(6). For the following reas-
ons, the motion is granted.

*BACKGROUND*

The following facts, taken from plaintiffs' amended
complaint, are accepted as true for purposes of this
motion. Plaintiffs Robert J. Schaffner and Nancy A.
Schaffner own the corporate co-plaintiff Imaginat-
ive Graphics, Inc. ("Imaginative"). Plaintiffs ob-
tained a business loan from Amalgamated Bank of
Chicago ("Amalgamated Bank"), which is not a
party to this action. In the summer of 2001,
plaintiffs applied for additional financing from Am-
algamated Bank. The financing was delayed and ul-
timately denied, in part because of adverse credit

information reported by defendant U.S. Bank N.A.
("U.S. Bank") to one or more of the major credit
bureaus. Attached to the amended complaint as Ex-
hibit A is a document titled "Underwriting Find-
ings," which lists the adverse information as one of
the reasons for the denial of additional financing.

The adverse credit information related to a residen-
tial mortgage loan that the Schaffners had obtained
from U.S. Bank's predecessor. Payments were made
on time, and the loan was paid in full on April 16,
1999. U.S. Bank, however, reported that the
Schaffners had made late payments and that the
loan had been placed in collection or foreclosure.
U.S. Bank sent this misinformation to the major
credit bureaus electronically; the bureaus then sent
the misinformation to Amalgamated Bank.

On September 9, 2002, shortly after the Underwrit-
ing Findings were issued, U.S. Bank acknowledged
its error and sent the credit bureaus a "Universal
Data Form" requesting that the bureaus "[r]emove
all late payments and the 'collection' remarks" and
indicating that the residential mortgage loan had
been paid in full in April 1999. (Amended Com-
plaint, Ex. B, Universal Data Form.)

As a result of the denial of their application for ad-
ditional business financing, plaintiffs were unable
to pay Imaginative's bills during its slow season. In
addition, the Schaffners suffered distress and were
unable to pay their own salaries.

In November 2002, plaintiffs filed the instant action
against U.S. Bank. The complaint later was
amended to cure a defect in its jurisdictional allega-
tions. Count I of the amended complaint alleges
that U.S. Bank's publication of false credit informa-
tion defamed the Schaffners. Count II, which is as-
serted by all plaintiffs, is a tortious interference
with economic advantage claim.

Defendant now moves to dismiss the complaint.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                            Page 2
Not Reported in F.Supp.2d, 2004 WL 783352 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 783352 (N.D.Ill.))

### DISCUSSION

The purpose of a 12(b)(6) motion to dismiss is to test the sufficiency of the complaint, not to resolve the case on the merits. 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356, at 294 (2d ed.1990). Dismissal is appropriate only if " 'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." ' *Ledford v. Sullivan,* 105 F.3d 354, 356 (7th Cir.1997) (quoting *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)).

### A. *Count I-Defamation*

**\*2** One of U.S. Bank's arguments is that plaintiffs' defamation claim is preempted by § 1681h(e) of the Fair Credit Reporting Act ("FCRA"), which provides in relevant part:

Except as provided in sections 1681n and 1681o of this title, no consumer may bring any action or proceeding in the nature of defamation, invasion of privacy, or negligence with respect to the reporting of information against ... any person who furnishes information to a consumer reporting agency ... based on information disclosed by a user of a consumer report to or for a consumer against whom the user has taken adverse action, based in whole or in part on the report except as to false information furnished with malice or willful intent to injure such consumer.

15 U.S.C. § 1681h(e).

Plaintiffs contend that § 1681h(e)'s exception for claims involving "false information furnished with malice or willful intent to injure [the] consumer" applies here. According to plaintiffs, they have adequately alleged malice in the following paragraphs of the amended complaint:

13. U.S. Bank sent the major credit bureaus a Universal Data Form requesting that the credit bureaus "remove all late payments and the collection re-

marks."A copy is attached as *Exhibit B.* The report resulted from error by U.S. Bank's predecessor. *Exhibit C.*

14. U.S. Bank therefore knew that the statements [regarding late payments and collection or foreclosure] were false.

(Amended Complaint, ¶¶ 13-14.)

The problem with these paragraphs is that they merely allege that U.S. Bank knew that the information was false at some point in time after the information was provided. The amended complaint wholly fails to allege that defendant knew that the information was false *at the time it was furnished* and thus furnished the information with malice. We acknowledge that on a motion to dismiss, plaintiffs receive the benefit of imagination, so long as the hypotheses are consistent with the complaint. *SeeSanjuan v. American Bd. of Psychiatry & Neurology, Inc.,* 40 F.3d 247, 251 (7th Cir.1994). Nonetheless, we do not believe that hypothesizing that U.S. Bank knew the information was false at the time it furnished the information would be consistent with the complaint; this is precisely because of the artful way in which plaintiffs have attempted to avoid the requirement of pleading malice.[FN1]

> FN1. Plaintiff's overly general allegation that "U.S. Bank's actions were intentional or reckless, warranting substantial punitive damages" (Complaint, ¶ 17) is insufficient for the same reason.

Count I will be dismissed because it fails to allege that the credit information was furnished with malice and accordingly is preempted by the FCRA.

### B. *Count II-Tortious Interference With Prospective Economic Advantage*

To state a claim for tortious interference with prospective economic advantage, a plaintiff must allege "1) his reasonable expectation of entering into a valid business relationship; (2) the defendant's

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 783352 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 783352 (N.D.Ill.))**

Page 3

knowledge of the plaintiff's expectancy; (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship; and (4) damages to the plaintiff resulting from such interference."*Grund v. Donegan,* 298 Ill.App.3d 1034, 233 Ill.Dec. 56, 700 N.E.2d 157, 160 (Ill.App.Ct.1998).

**\*3** U.S. Bank argues that plaintiffs have failed to allege the first, second, and third elements of this tort. We agree. The amended complaint does not expressly allege that plaintiffs had a reasonable expectancy of receiving the additional financing, nor does it allege facts indicating that this was the case. The allegation that plaintiffs *applied* for financing is not sufficient to allege that they reasonably expected to receive the financing. *Cf.Anderson v. Vanden Dorpel,* 172 Ill.2d 399, 217 Ill.Dec. 720, 667 N.E.2d 1296, 1299-1300 (Ill.1996) (the hope of receiving a job offer is not a sufficient expectancy); *Buchanan v. Serbin Fashions, Inc.,* 698 F.Supp. 731, 734 (N.D.Ill.1988) (same). Moreover, plaintiffs do not allege that U.S. Bank knew of the Schaffners' application for additional financing or that U.S. Bank purposefully interfered with the financing.[FN2]Because Count II fails to allege three of the four elements of a tortious interference with prospective economic advantage claim, it will be dismissed.

> FN2. Plaintiffs' only argument as to the second element, knowledge, is that Exhibit A to the amended complaint, the Underwriting Findings, "shows that the investors to whom the credit application was submitted included U.S. Bank" and therefore U.S. Bank had specific knowledge that plaintiffs were applying for additional financing. (Plaintiffs' Response to Motion to Dismiss at 10.) We are not persuaded. Although the Underwriting Findings document lists U.S. Bank as an "investor," it is not clear from Exhibit A that the application was in fact submitted to U.S. Bank.

> The allegations of the amended complaint fail to allege knowledge as well.

We need not reach U.S. Bank's alternative arguments for dismissal.

### *CONCLUSION*

For the foregoing reasons, defendant's motion to dismiss the amended complaint is granted.

N.D.Ill.,2004.
Schaffner v. U.S. Bank N.A.
Not Reported in F.Supp.2d, 2004 WL 783352 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.